1AC5kreT                        trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TODD KREISLER,

4                 Plaintiff,

5           v.                              10 Civ. 7592 (RJS)

6   SECOND AVENUE DINER CORP. and
    J.J.N.K. CORP.,
7
                  Defendants.
8
    ------------------------------x
9
                                            October 12, 2011
10                                          9:10 a.m.
    Before:
11
                     HON. RICHARD J. SULLIVAN,
12
                                            District Judge
13
                          APPEARANCES
14
    LAW OFFICES OF ADAM SHORE
15       Attorneys  for Plaintiff
    BY:  ADAM T. SHORE
16
    PAUL STAMATELATOS
17       Attorney for Defendants

18

19

20

21

22

23

24

25

1AC5kreT                          trial

1          (Trial resumed)

2          THE COURT:  Let's get started, folks.  I think we said

3    9:00, right?  We lost some time yesterday so I wanted to make

4    up for it today by starting at 9:00.  So, Mr. Shore, you have

5    your next witness?

6          MR. SHORE:  Yes, your Honor.  My next witness is Leon

7    Geoxavier, plaintiff's expert, registered architect.

8          THE COURT:  Do we have anything we need to cover

9    before we move on with the next witness?

10          MR. STAMATELATOS:  No, your Honor.

11          THE COURT:  Mr. Shore, ready to go with the next

12    witness?

13          MR. SHORE:  Yes, your Honor.

14          THE COURT:  Okay.

15     LEON GEOXAVIER,

16        called as a witness by the Plaintiff,

17        having been duly sworn, testified as follows:

18          THE COURT:  State your name and spell your name for

19    the record.

20          THE WITNESS:  Leon Geoxavier.  G-E-O-X-A-V-I-E-R.

21          THE COURT:  Good morning.

22          THE WITNESS:  Good morning, sir.  Speak like that,

23    that should be fine.  Don't talk too fast.  The court reporter

24    is very good but there is a limit to what 10 fingers can do.

25          Mr. Shore, you may proceed.

1AC5kreT                      trial

1   DIRECT EXAMINATION

2   BY MR. SHORE:

3   Q.  Good morning, Mr. Geoxavier.  Are you a registered

4   architect?

5   A.  I am.

6   Q.  In what states are you a registered architect?

7   A.  I currently hold collective architecture licenses in the

8   States of New York and Pennsylvania.

9   Q.  Do you have any experience in dealing with making places

10  public accommodation accessible to people with mobility

11  impairments?

12  A.  I do.

13  Q.  When did you first gain experience in doing that?

14  A.  I began working in a New York State firm following college

15  graduation in 2003.  Since that time I have had several clients

16  where we have analyzed, designed, and overseen installation of

17  various accommodations.

18  Q.  Are you familiar with the facts of this case?

19  A.  Yes, sir.

20  Q.  Did you prepare an affidavit regarding your inspection of

21  the facility inspection of the Second Avenue Diner Corp. doing

22  business as Plaza Diner Corp. at 1066 Second Avenue on June

23  15th, 2011?

24  A.  I did.

25          MR. SHORE:  I will mark the affidavit into evidence.

1AC5KRET                    Geoxavier - direct

1          THE COURT:  Any objection.  This is the report or the

2    affidavit?

3              MR. STAMATELATOS:  No, your Honor.

4              MR. SHORE:  The affidavit and report.

5          THE COURT:  Which is Plaintiff's Exhibit?  Does it

6    have a number?

7              MR. SHORE:  Yes, it does, your Honor.  Plaintiff's

8    Exhibit 13.

9          THE COURT:  13.  Okay.  And no objection you said,

10   right, Mr. Stamatelatos?

11             MR. STAMATELATOS:  That's correct, your Honor.

12         THE COURT:  Plaintiff's Exhibit 13 is received.

13         (Plaintiff's Exhibit 13 received in evidence)

14   BY MR. SHORE:

15   Q.  Mr. Geoxavier, is this the affidavit that you prepared?

16   A.  It is, sir.

17         THE COURT:  I don't know what you have in front of you

18   but what is my Plaintiff's Exhibit 13 is a letter to you,

19   Mr. Shore.  Is that what you're referring to or something else?

20             MR. SHORE:  There is a letter, I believe, after the

21   letter.  There is an additional affidavit and it states

22   affidavit of the initial letter and then the letter was turned

23   into an affidavit, it states affidavit of Leon Geoxavier R.A.

24   At the top it says 1066 Second Avenue a/k/a Plaza Diner.

25         THE COURT:  And it says page?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1AC5KRET                        Geoxavier - direct

```
 1              MR. SHORE:  1 of 4.

 2              THE COURT:  This is part of Exhibit B to Plaintiff's

 3    Exhibit 13?

 4              MR. SHORE:  Yes.

 5              THE COURT:  So the only thing you're introducing is

 6    the affidavit, is that what you are saying?

 7              MR. SHORE:  Yes, your Honor.

 8              THE COURT:  All right.

 9    BY MR. SHORE:

10    Q.  Did you notice any violations of the ADAG or the Americans

11    with Disabilities Guidelines when you did your inspection of

12    Second Avenue Diner Corp./Plaza Diner?

13    A.  In reviewing the site I did have several concerns about

14    compliance that I documented.  It's in the affidavit.  I can

15    read them, but.

16    Q.  We'll start with the entrance.  What did you note about the

17    entrance when you inspected 1066 Second Avenue, the Plaza

18    Diner?

19    A.  When I examined the site I noted that there was a step from

20    the public sidewalk into a vestibule and then from that

21    vestibule one could enter into the interior space.  There are

22    two doors that need to be traversed to get from the public

23    sidewalk into the interior, and the codes that we reference

24    outline the requirements of a space one has to have to make

25    that entry and I do not believe that current condition
```

1AC5KRET                    Geoxavier - direct

1   complies.

2   Q.  Which condition are you specifying?  Are you talking about

3   the step?

4   A.  The step and the clear space and the doors, basically.

5   Q.  With regard -- let's address each one of those issues

6   separately.

7            With the step, why is the step in violation?  For

8   example, are spaces of public accommodation required to have a

9   permanent ramp in accordance with the ADAG unless a portable

10  ramp isn't achievable?  Is that your familiarity?

11  A.  My understanding of the code is that accommodations have to

12  be provided where one can traverse from the public thoroughfare

13  into the space without barriers, so to speak.

14  Q.  Do you a think permanent ramp can be installed at the Plaza

15  Diner?

16  A.  Yes.  I believe it is feasible.

17  Q.  Are there numerous different ways in which a ramp can be --

18  a permanent ramp can be installed or is there only one way?

19  A.  No, there is several ways in order to construct a ramp.  It

20  could be a ramp solely on the interior of the space.

21  Q.  When you say ramp you're talking about a permanent ramp?

22  A.  Correct.

23  Q.  We will get into portable ramps after.  So, the first

24  permanent ramp you mentioned was a ramp into the interior, an

25  inwards ramp?

1AC5KRET                    Geoxavier – direct

1    A.  Correct.  One could construct a ramp from the grade level

2    at the public sidewalk to the finished floor level on the

3    interior where the wrap is on the interior of the space.  One

4    could construct it on the outside of the space going from

5    sidewalk grade up to finished level and then finished level

6    inside.

7           So, there are a number of ways that one can design a

8    ramp to get from grade to finished floor.  It is not a

9    significant or impossible distance.

10          THE COURT:  Well, how long would a ramp have to be?

11   It can't be too steep, right?

12          THE WITNESS:  There are requirements into how steep a

13   ramp can be -- well, there are two things I want to say about

14   that, one is it depends on the configuration of the ramp and

15   then so if you are able to achieve the distance for the height

16   that you're going, you may be fine.  If, for some reason, you

17   can't accommodate that distance and need to compress the ramp

18   to make it slightly steeper than what the letter of the code

19   allows, there are waivers and variances for that condition.

20          THE COURT:  Well, did you measure how much space there

21   was in the interior from the first door to the second door?

22          THE WITNESS:  Well, the first door and the second door

23   are perpendicular at 90 degrees, from my recollection.  There

24   is perhaps a couple of inches of space in that vestibule but it

25   is not a significant distance.

1    THE COURT:  Well, did you measure it is my question.

2    THE WITNESS:  I did not measure it, sir.

3    THE COURT:  No.  Why not?  Isn't that a relevant issue

4    as to whether it is feasible to build a ramp in a fairly

5    confined space to figure out what the grade would be?

6    THE WITNESS:  I'm not sure I understand your question.

7    In terms of did I measure the height of the step or

8    the distance between the doors?

9    THE COURT:  The distance.  The length that a ramp

10   would be if it were to be an interior one.  You say one way to

11   do this would be an interior ramp was you enter at street

12   level, you knock down the step and then you have a ramp going

13   from street level to the finished floor that's about eight

14   inches high, is that correct?  Or did you not measure that?

15   THE WITNESS:  Well, I believe I measured it.  I don't

16   remember what the actual measurement was.  But I will say for

17   that space --

18   BY MR. SHORE:

19   Q.  Can you give an approximation of how many inches the step

20   is?

21   A.  Approximately seven to seven and a half inches there, what

22   I remember.  I would have to verify my notes.

23   Q.  Did the step vary in height?

24   A.  Yes, because the adjacent sidewalk was not completely

25   level.

1      But I will say to answer your question, sir, that the

2  space of the diner, there is enough space in that facility to

3  accommodate a ramp.  It may not be the best design or what

4  makes the most sense, logistically.  There are a lot of design

5  options.  If, for some reason, you don't want a ramp on the

6  inside because it takes too much space, you can put it on the

7  outside.

8      THE COURT:  What if you don't want people to slip and

9  fall?  You don't want it too steep because people may slip and

10  fall, right?  If it is a very confined space and very steep

11  ramp then that may not be feasible, perhaps.

12      Do you have an opinion as to whether or not that might

13  be a concern?

14      THE WITNESS:  If I'm interpreting your question

15  correctly, if you're asking if one could build a ramp within

16  the existing vestibule, I don't think that's feasible because

17  it is a small space and it would be a little too steep.

18  However, within the space in general one could construct an

19  interior ramp.

20      Does that make sense?

21      THE COURT:  I think so.

22      THE WITNESS:  I'm trying to interpret your question

23  correctly.

24      THE COURT:  In your view you would have to reconfigure

25  the vestibule.

1    THE WITNESS:  Correct.  You may also need to

2    reconfigure the interior space slightly if you want to

3    construct a ramp on the inside, on the interior.

4    THE COURT:  Did you consider different options to do

5    that?

6    THE WITNESS:  Admittedly, I didn't go through the

7    exercise of preparing different design options because I

8    believe that's somewhat outside my role.  I do believe a number

9    of design options are feasible.  Ultimately, the architect that

10   would oversee the installation would coordinate the design with

11   the tenant and owner.

12   THE COURT:  What did you think your role was?

13   THE WITNESS:  To assess the feasibility -- well, to

14   assess the conditions and the feasibility of modifications.  I

15   believe modifications are feasible but I didn't draw them out

16   and design them because that's something for the architect on

17   behalf of the owner and tenant to do.

18   THE COURT:  But, in terms of feasibility, what are the

19   factors that inform your decision as to whether something is

20   feasible?

21   THE WITNESS:  Approximate spatial configuration; is

22   the spacing large enough and could accommodate the

23   installation.

24   THE COURT:  Cost?

25   THE WITNESS:  Admittedly --

1AC5KRET                              Geoxavier - direct

1             MR. SHORE:  Well --

2             THE COURT:  I'm asking the questions.

3             Did you consider cost as part of the analysis as to

4      whether it would be feasible?

5             THE WITNESS:  Relative cost I would say.  I did not

6      prepare a formal cost estimate and, generally, in terms of

7      feasibility we look at, or at least I look at the physical

8      configuration.  I don't think the project would be a million

9      dollars, so to speak.  I do think it is within the realm of

10     possibilities financially, if that makes sense.

11     BY MR. SHORE:

12     Q.  When you are talking about cost estimates you are talking

13     about cost estimates regarding the inwards ramp?

14     A.  Well, correct, but --

15     Q.  With regards to -- please just answer my question.

16             With regards to a ramp on the exterior of the facility

17     along Second Avenue are you aware, is the Plaza Diner on the

18     corner of 56th and Second Avenue?

19     A.  Yes, I do.

20     Q.  Can a ramp be installed on Second Avenue?

21     A.  Yes, sir.

22     Q.  And approximately how many inches along Second Avenue would

23     that ramp have to be?

24     A.  I don't know about inches.  I don't have a calculator in

25     front of me but it would be approximately 10 feet, maybe.

1AC5KRET                          Geoxavier - direct

1    Q.  Is the slopage of a ramp generally 1 to 12?  Is that what

2    is required by code?

3    A.  Yes, sir.

4    Q.  Can it also be as low as 1 to 8 or 1 to 10 if the

5    facility --

6           MR. STAMATELATOS:  I object, your Honor.  Mr. Shore is

7    not an expert.  If he wants to ask the expert a particular

8    question about what slopage is, I have no problem with that,

9    but I don't want him to lead the expert as to what the code is.

10          THE COURT:  I think the objection is leading and I

11   will sustain the objection.

12   BY MR. SHORE:

13   Q.  So, what is your knowledge of what the slopage of a ramp

14   has to be?

15   A.  My understanding is that the general guideline is that the

16   slope should be 1 to 12.  However, as I stated earlier there

17   are conditions and options for whether the slope can be

18   steeper.

19   Q.  In your opinion, can a permanent ramp be installed on

20   Second Avenue -- a permanent be ramp be installed on Second

21   Avenue outside the diner?

22   A.  Yes, sir.

23   Q.  Have you seen similar ramps at other places of public

24   accommodation throughout the City?

25   A.  Yes.

1    Q.   And those ramps, do they have handrails?

2    A.   Yes.

3    Q.   Do you think a handrail would be required in the

4    installation of a permanent ramp if one were to be installed in

5    this case?

6    A.   I would recommend it.  I don't know if the code or the City

7    or governing agents would mandate it.  And if for some reason

8    it was deemed not advantageous, one could apply for a waiver

9    not to have a handrail but, in general, I would recommend it.

10          THE COURT:  Where would the exterior ramp go?  Have

11   you thought about that?

12          THE WITNESS:  Yes.  One could create a level landing

13   outside the current vestibule and run a ramp towards the north

14   along the west facing elevation of the building until it

15   terminated with grade level.

16          THE COURT:  To the north?

17   BY MR. SHORE:

18   Q.   Mr. Geoxavier, if you can refresh your recollection in

19   reading the expert report you prepared and I would also like to

20   offer into evidence the defendant's expert report and as well

21   as the pictures.  I think the pictures have already --

22   Plaintiff's Exhibit 15 have already been offered.

23          THE COURT:  Plaintiff's Exhibit 15 is already in.

24          MR. SHORE:  I would like to offer these into evidence.

25          THE COURT:  15 is in evidence so what are you --

```
 1              MR. SHORE:  Plaintiff's Exhibit 14, defendant's
 2   expert.
 3              THE COURT:  Any objection?
 4              MR. STAMATELATOS:  No, your Honor.
 5              THE COURT:  Plaintiff's Exhibit 14 received.
 6              (Plaintiff's Exhibit 14 received in evidence)
 7   BY MR. SHORE:
 8   Q.  If I can present it to the witness so he can review both
 9   reports?
10              Mr. Geoxavier, if you can review your expert report
11   first and then review the defendant's expert report?  You
12   reviewed both already, is that correct?  Well, you drafted one,
13   obviously, and defendant's expert report, have you read that
14   previously?
15   A.  I believe so, yes.
16   Q.  Have you read the report?
17   A.  Yes, sir.
18   Q.  In your expert report it says to address the status a small
19   ramp can be constructed from the sidewalk level up to the
20   vestibule level?
21   A.  Correct.
22   Q.  Is that your opinion today as well?
23   A.  Yes, sir.
24   Q.  It also says the ramp should be constructed to meet all
25   applicable accessibility requirements which include proper
```

1AC5KRET                    Geoxavier – direct

```
 1   landings, a sloped ramp surface, railings, etc., and signage,
 2   correct?  Is that your opinion today?
 3   A.  Yes, sir.
 4             THE COURT:  But, again, you have no cost analysis in
 5   your report, do you?
 6             MR. SHORE:  What would the --
 7             THE COURT:  No, no, no.  I get to ask questions.
 8             You didn't cost this out in any way, did you?
 9             THE WITNESS:  I didn't provide a formal written cost
10   estimate, no.
11             THE COURT:  Did you provide an informal one?
12             THE WITNESS:  I believe in discussions I asked --
13             THE COURT:  In your affidavit there is no mention of
14   cost, right?
15             THE WITNESS:  Correct.  I don't believe I indicated
16   that there was -- I don't think provided a formal cost
17   estimate, no.
18             THE COURT:  Did you not think that was a relevant
19   consideration?
20             THE WITNESS:  My understanding of what I was asked to
21   analyze was current conditions and feasibility and --
22             THE COURT:  But isn't cost a part of feasibility or is
23   it not, in your view?
24             If this is a business that makes $50,000 a year and it
25   would cost a million dollars to do this, just as an example,
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1     that doesn't affect the feasibility, in your mind?

2              THE WITNESS:  Can you -- I'm sorry.  Can you say that

3     again?

4              THE COURT:  I'm saying if the cost was a million

5     dollars and the income generated by the establishment was

6     $50,000 a year, would that impact your assessment of

7     feasibility?  Are you talking simply about design feasibility?

8              THE WITNESS:  Forgive me, sir, but from an

9     architectural engineering standpoint, no, not necessarily.

10    But, I do understand your question.  And if I thought that what

11    I was recommending was so beyond reasonable in terms of

12    feasibility I would indicate that.

13             For instance, if I recommended that the entire street

14    of Second Avenue be moved 12 feet to the right, that obviously

15    would be a physical impossibility and a financial impossibility

16    and I would probably indicate that but I probably wouldn't

17    recommend that at all.  So, I was asked to provide --

18             THE COURT:  But all you have said, in fairness, is to

19    address the step a small ramp can be constructed from the

20    sidewalk level up to the vestibule level.

21             THE WITNESS:  Correct.

22             THE COURT:  The ramp should be constructed to meet all

23    applicable accessibility requirements which would include

24    proper landing, a sloped ramp surface, railings, and signage.

25             THE WITNESS:  Correct.

1AC5KRET                        Geoxavier - direct

```
 1          THE COURT:  That's the extent of your opinion with
 2   respect to the feasibility of building a ramp, right?  Is there
 3   more to this that I have missed?
 4          MR. SHORE:  Your Honor, there is a point -- did you
 5   provide an informal cost estimate to me prior to today about
 6   what the installation of a ramp is on Second Avenue, what the
 7   cost would be?
 8   A.  I believe I indicated that in similar projects the cost
 9   ranged from between $3,000 to $10,000.
10   Q.  Is that in your opinion what a permanent ramp would cost on
11   the Second Avenue side?
12   A.  For this particular project, yes.
13          THE COURT:  Have you provided reports like this in
14   other cases?
15          THE WITNESS:  Yes, sir.
16          THE COURT:  Do you typically include a cost assessment
17   or not?
18          THE WITNESS:  Not initially unless requested to, no.
19   BY MR. SHORE:
20   Q.  Were you requested to provide a cost estimate in this case?
21   A.  I don't believe so.  Or I don't recall.
22   Q.  Do you remember receiving an e-mail from me requesting cost
23   estimates in the report?
24   A.  Apparently, I don't.  I don't recall.
25   Q.  But your opinion today is as previously expressed to me,
```

1   that the cost estimates of installing a permanent ramp is

2   anywhere from $3,000 to $10,000 on Second Avenue?

3   A.  Yes.  I believe so, yes.

4   Q.  Can a permanent ramp be installed on 56th Street between

5   First and Second Avenue closer, obviously, to Second Avenue

6   leading into the restaurant?

7   A.  Potentially, yes.

8   Q.  How would that be done?

9   A.  One could reconfigure the entrance such that there was a

10  landing and then a ramp that extended towards the east.

11              THE COURT:  Is any of this in the report?

12              THE WITNESS:  I don't -- no.

13              THE COURT:  East, west, north, south?

14              The only thing in the report is that a small ramp can

15  be constructed?

16              THE WITNESS:  Correct, sir.

17              THE COURT:  Okay.

18  BY MR. SHORE:

19  Q.  Are you familiar with portable ramps?

20  A.  Yes, sir.

21  Q.  Do portable ramps -- what is your knowledge regarding

22  portable ramps?

23              MR. STAMATELATOS:  I object, your Honor.  There is no

24  mention of any portable ramps in the expert's report so I --

25              MR. SHORE:  Just because it is not in an expert report

1    doesn't mean the expert can't testify as to it.

2            THE COURT:  Well, I mean --

3            MR. SHORE:  Certainly the defendants have provided

4    pictures of a portable ramp.

5            THE COURT:  Are you an expert in portable ramps?  Do

6    you know anything about portable ramps?

7            THE WITNESS:  I do.  In working with buildings and

8    facility managers occasionally portable ramps are procured and

9    used in various situation.

10           THE COURT:  I will allow the question.  Go ahead.

11   BY MR. SHORE:

12   Q.  Do portable ramps -- do you know if the ADAG states that

13   portable ramps should take into consideration non-slip surfaces

14   as well as handrails on the portable ramp?

15   A.  There are --

16           THE COURT:  Now you're asking him about his knowledge

17   of regulations, not about his area of expertise.  I thought you

18   were going to ask him something about -- the regulations are

19   what they are.  Is there any reason why I need this witness to

20   tell me what the regulations are?

21           MR. SHORE:  If the Court is going to take judicial

22   notice of the ADAG standards, possibly not.  I think the ADAG

23   standards state that with regards to portable ramps they should

24   only be used when permanent ramps are not readily achievable

25   and when portable ramps are used --

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AC5KRET                          Geoxavier - direct

```
 1              THE COURT:  I don't need this witness to tell me legal
 2     standards or regulations so let's ask him things about the
 3     subject he is expert in.
 4     BY MR. SHORE:
 5     Q.  What about the restroom; did you, in paragraph 3 of your
 6     affidavit, you talk about the restrooms?  Were the restrooms
 7     compliant?
 8     A.  No.  No, sir.
 9     Q.  Do you recall what the restrooms looked like?
10     A.  I do.
11     Q.  If you want to refresh your recollection there are pictures
12     of the restrooms at the table that were marked into evidence.
13     A.  I believe this photo reflects what I saw when I visited the
14     site.
15     Q.  Do you remember if there was a men's and women's restroom?
16     A.  I believe there was.
17     Q.  Did you go into both the men's and women's restroom?
18     A.  No, sir, just the men's.
19     Q.  Why did you only go into the men's restroom?
20     A.  I believe the women's room was out at the time of my visit
21     and I also didn't think it was necessary.
22     Q.  Why didn't it -- were you aware that the plaintiff in this
23     case was a male when you did your expert inspection?
24              MR. STAMATELATOS:  Object, your Honor.  Leading the
25     witness.
```

 1                MR. SHORE:  I'm asking him a question, not leading the

 2     witness.

 3                THE COURT:  I will allow that.

 4                You knew that Mr. Kreisler was male?

 5                THE WITNESS:  I admittedly did not know who the

 6     individual was until after the visit.

 7                THE COURT:  All right, but your report says the

 8     existing restroom facilities do not comply with ADA codes.

 9                THE WITNESS:  Correct, sir.

10                THE COURT:  You only inspected one of the restrooms?

11                THE WITNESS:  Correct.

12                THE COURT:  And then in terms of the way in which the

13     facilities do not comply with ADA codes you say Code issues

14     concerning the restroom include the fact that an existing sink,

15     toilet and washroom accessories do not meet the code

16     requirements for those items?

17                THE WITNESS:  Correct, sir.

18                THE COURT:  So they don't comply with the ADA codes

19     and the issues include the fact that they don't comply with the

20     codes.  I mean, could you be more specific?

21                THE WITNESS:  The codes indicate that there are

22     required clear floor areas in front of fixtures which in this

23     case I do not believe exist.  The code requires that certain

24     accessories be provided which also do not exist.

25                THE COURT:  Well, what was -- how much space was your

1AC5KRET                          Geoxavier - direct

1    understanding as to what is required by the code?

2              THE WITNESS:  I usually consult a code book when doing

3    a formal design so I don't want to misspeak.

4              THE COURT:  This is your report.  You've said that the

5    restroom didn't comply with codes.

6              THE WITNESS:  Correct, sir.

7              THE COURT:  In what way does it not comply with code?

8              THE WITNESS:  The floor area inside of the sink is

9    required to be certain dimensions that I could see did not --

10             THE COURT:  What dimensions are required?

11             THE WITNESS:  I believe the clear floor space in front

12   of a sink is approximately two foot by three foot square but,

13   again, I would like to reference a code book to verify that

14   answer.

15             THE COURT:  What you did observe?

16             THE WITNESS:  It has less than a clear floor area.

17             THE COURT:  How much did it have?

18             THE WITNESS:  The center of the faucet of the sink is

19   less than 18 inches from the adjacent wall which I believe is

20   too small of a space.

21             THE COURT:  Less than 18 inches?

22             THE WITNESS:  As an example.

23             THE COURT:  18 inches is not in the report, right?

24             THE DEFENDANT:  Correct, sir.

25             THE COURT:  Did you measure it?

1AC5KRET                          Geoxavier - direct

1           THE WITNESS:  I did not measure it, no.

2           THE COURT:  So, how do you know it is less than 18?

3           THE WITNESS:  Visually I could perceive that the

4      distance was less than what would be required.  In the photo it

5      is also adjacent, a four by four tile.

6           THE COURT:  What photo are you referring to?

7           THE WITNESS:  I'm looking at apparently the second

8      page of Plaintiff's Exhibit 15.

9           THE COURT:  15-2?  They should have numbers on the

10     page, the second page --

11          THE WITNESS:  It looks like this.  We are looking at

12     the same photo.

13          THE COURT:  15-2.

14          THE WITNESS:  For example, grabs bars are required on

15     the rear of a toilet and on the sides of a toilet, just

16     generally one side is acceptable although many facilities have

17     a pull down bar that functions for both sides.  But, again, one

18     side is allowable.

19          MR. SHORE:  When you say one side what do you --

20          THE WITNESS:  Forgive me.

21          If you are looking at the toilet in the photo there is

22     a bar at the right but no bar at the rear and a bar is required

23     at the rear.  So, that's noncompliance if you were to have that

24     accessory.  You are required to have a mirror at a minimum and

25     maximum height, I didn't see that.  You are required to have

1AC5KRET                    Geoxavier – direct

1    some kind of guard or insulation or protection for the pipes

2    beneath the sink so that if someone is in a wheelchair let's

3    say they don't burn themselves or hit themselves on a pipe; I

4    didn't see that.

5            So, there are a number of individual items that don't

6    comply with code.  I could generally see that the facility did

7    not comply with code.  I admittedly did not prepare an

8    exhaustive inventory referencing all the applicable codes for

9    this particular situation.

10   BY MR. SHORE:

11   Q.  If someone is claiming to be exempt from making their

12   facility accessible to people with disabilities due to a lack

13   of financial resources, are they required to make a request

14   from the Mayor's Office of Disability?

15   A.  Yes, sir.

16           THE COURT:  Does this go to his expertise as an

17   architect?

18           MR. SHORE:  I think it does.  Yes, your Honor.

19           THE COURT:  It sounds again like a legal or regulatory

20   issue.

21           MR. SHORE:  I think it would be helpful to the case if

22   he could answer the question.  And I don't think -- it is

23   regulatory issue and it is mentioned in his report, the Mayor's

24   Office for --

25           MR. STAMATELATOS:  It is not in his report, your

1    Honor.  He mentions these approvals have to be given from the

2    Mayor's office for certain changes to facility.  I will object

3    to him answering any question relating to the Mayor's office.

4              THE COURT:  The report says all recommendations in

5    this report are subject to review and approval by the DOB --

6    Department of Buildings -- is that correct, MOPD, Mayor's

7    Office for People with Disabilities and all other governmental

8    agencies having jurisdiction.  So, that's in the report.

9              What was your question, Mr. Shore?

10   BY MR. SHORE:

11   Q.  If someone is claiming they don't have -- a place of public

12   accommodations is claiming they don't have the money or the

13   financial resources to make the facility accommodation

14   accessible to people with mobility impairments or people with

15   other disabilities, are they required to request an exemption

16   from the MOPD -- Mayor's office of People with Disabilities?

17   A.  In my experience, yes.

18             I have worked with clients where the full compliance

19   may not be feasible because of either physical conditions, the

20   existing conditions of the building, the store conditions or

21   financial difficulty and the process, to my knowledge, is that

22   after getting approval from the Department of Buildings or

23   review from the Department of Buildings I should say, one could

24   request a waiver from certain code requirements from the

25   Mayor's Office of People with Disabilities.

1    Q.  Did you review the defendant's expert report that is marked

2    into evidence at the table in front of you?

3    A.  Yes, sir.

4    Q.  Does the Department of Transportation offer building

5    permits?  Or does the Department of Buildings offer building

6    permits?

7    A.  My understanding is the Department of Buildings is the

8    primary regulatory agency for building permits.  However, if

9    the --

10   Q.  If you can just answer the question?

11   A.  Sorry, sir.

12           THE COURT:  I think he was answering the question.

13           Go ahead, continue.  What were you going to say?

14           THE WITNESS:  In certain scenarios, depending on the

15   location of the project relative to the sidewalk or the street,

16   approval and review from the Department of Transportation may

17   be required in certain scenarios.

18   BY MR. SHORE:

19   Q.  To your knowledge, does there have to be -- withdraw the

20   question.

21           To your knowledge is there any reason why a permanent

22   ramp cannot be built on Second Avenue in front of the Second

23   Avenue Diner on 56th Street?

24   A.  No, sir.

25   Q.  Is there anything in the defendant's expert report

1AC5KRET                     Geoxavier – direct

1    regarding street vendors or telephone booths or the sidewalk is

2    too narrow?  Do you find that to be true or untrue in your

3    opinion, that the sidewalk is too narrow and street vendors and

4    the telephone booth prevent installation of a permanent ramp?

5    What is your opinion on that?

6    A.   I guess I would disagree with some of the assertions made

7    in the report and I would recommend that we seek the official

8    word of the Department of Transportation or buildings if that

9    is what is being disputed.  I would contest some of the

10   findings, though.

11   Q.   What is the process for obtaining a permit in New York

12   City?  What is your understanding of obtaining a permit for a

13   ramp in New York City?

14   A.   Once design drawings are prepared they are submitted to the

15   Department of Buildings.  From there the Department of

16   Buildings will indicate whether additional approvals are

17   required from agencies like the Department of Transportation or

18   the MTA or the Landmarks Preservation Commission.  So, you will

19   be referred to get approval them.  Once you have approval from

20   them you can go back to Department of Buildings and follow

21   through with the permitting process and then a work permit is

22   issued, the work is performed, and the work is signed off.

23        Generally, that's how it works.  There is a lot of

24   details I'm skimming over.

25   Q.   To your knowledge is there any hold on applying for a

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AC5KRET                         Geoxavier – direct

1    permit from the Department of Buildings for a permanent ramp at

2    the facility in question here?

3    A.  No, sir.

4              THE COURT:  Did you inquire?  What is the basis for

5    that opinion?

6              THE WITNESS:  I was working on a project on Second

7    Avenue north of 96th Street where the subway project is going

8    on and there were concerns about whether there were any project

9    freezes in the Second Avenue zone and my understanding is that

10   the MTA requires approval or review of certain projects in that

11   zone but there is no impediment to receiving approvals.

12             There are similar situations at times with the

13   Department of Transportation.  The Department of Transportation

14   puts temporary review freezes on projects, for instance if you

15   are working in a very crowded area, embargoes, but again, those

16   are temporary and depending on the project it can be approved

17   regardless depending on the specific situation, if that makes

18   sense.

19             THE COURT:  Okay.

20   BY MR. SHORE:

21   Q.  It does.

22             Are there any violations of the Americans with

23   Disabilities Act, the New York City Human Rights Law or the New

24   York State Human Rights law that you observed at the Plaza

25   Diner when you conducted your inspection?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    A.  Any potential concerns or violations that I had I indicated

2    in my report.  I admittedly didn't do an exhaustive analysis of

3    the site to see if there were any other.  There may be.

4    Q.  Did you probe into any of the walls?

5    A.  I did not perform any investigative probes.

6    Q.  Is probing into the walls of, say, the restroom sometimes

7    conducted?

8            MR. STAMATELATOS:  I object, your Honor.  I don't know

9    what is the relevance of this line of questioning.

10           THE COURT:  I'm not sure I understand the question or

11   the answer.  Let's rephrase the question.

12   BY MR. SHORE:

13   Q.  With regard to the restrooms, did you notice they're

14   directly adjacent to each other?

15   A.  I did, sir.

16   Q.  Is there any reason the bathrooms can't be combined into a

17   unisex restroom?

18   A.  No, sir.

19   Q.  Is there any reason why one of the bathrooms can't be

20   expanded to make it fully accessible in accordance with the ADA

21   guidelines?

22   A.  No, sir.

23           THE COURT:  But did you do any kind of cost analysis

24   for the restrooms?

25           THE WITNESS:  I did not prepare a written cost

1AC5KRET                          Geoxavier – direct

1    analysis, no.

2              THE COURT:  Well, did you do any cost analysis whether

3    you prepared a written one or not; did you do one?

4              THE WITNESS:  I can do a mental one right now.

5              THE COURT:  Have you prior to today done one?

6              THE WITNESS:  No, sir.

7              THE COURT:  All right.

8    BY MR. SHORE:

9    Q.  The last question for you is in the event, say there was a

10   hold on, for example, on obtaining a permit from the Department

11   of Buildings or DOT, after the hold could the diner then apply

12   for a permit to obtain a permanent ramp?

13   A.  I guess going back to a question prior, I don't believe

14   there is a hold right now but in theory if there were a

15   temporary embargo for whatever reason, I imagine after it is

16   lifted one can proceed with permitting.  It seems like a

17   hypothetical question.

18   Q.  Is there any limit on how many times someone can apply for

19   a building permit?

20   A.  Not to my knowledge.

21   Q.  So, if someone is denied a building permit they can reapply

22   for another building permit?

23   A.  If someone is denied a building permit --

24   Q.  For one reason?

25   A.  -- for a reason you can reapply.  Yes, you can.

1   Q.  If a facility didn't have the financial resources to make

2   it fully accessible at certain times, does that mean that place

3   cannot be made accessible?

4              MR. STAMATELATOS:  I object, your Honor.  Calls for

5   speculation.

6              THE COURT:  Sustained as to form.

7              MR. SHORE:  Counsel, let me finish my question.

8              THE COURT:  Sustained as to form, clearly, and I think

9   it is compound as well.  Start over.

10  BY MR. SHORE:

11  Q.  Are there certain steps that the Plaza Diner can take to

12  make it more accessible that can be done with that much

13  difficulty, cost or expense?

14             THE COURT:  What is the "it"?  The restroom

15  specifically or other things?

16  BY MR. SHORE:

17  Q.  Let's talk about the entrance first or, yes, the restroom

18  or the entrance.  Both of them.

19  A.  Yes.

20  Q.  What can be done without much difficulty or expense?

21  A.  I think one of the things I indicated in my report was that

22  I had concerns about signage.  Signage is easily or relatively

23  easier to install compared to a more intensive installation.

24             THE COURT:  Signage that would say what?

25             THE WITNESS:  Signage indicating the entrance that

1AC5KRET                          Geoxavier - direct

1   complies with the ADA codes for letter sizing and tactibility,

2   any special call for service or assistance.  The code is pretty

3   expansive and there are a number of little things that you can

4   do compared to big ones which seems like the question.

5           THE COURT:  Well, I'm just trying to understand, is it

6   signs in lieu of a ramp or as part of a ramp?

7           THE WITNESS:  As part of the overarching accessibility

8   package it can be broken down into parts.

9           THE COURT:  So the sign should say what?

10          THE WITNESS:  I would like to reference the code to

11  provide you with a -- I can't provide a diagram right now.

12          MR. SHORE:  I have the ADAG standards with me.

13          THE COURT:  He is your expert.

14  BY MR. SHORE:

15  Q.  What are your requirements for the site and on the exterior

16  building when there is a portable ramp?  Are there certain

17  requirements for having signage when you have a portable ramp

18  or buzzer?

19  A.  There are.  It can't -- I admittedly don't quote the code

20  letter for letter every day.  We keep reference books in online

21  systems so that we have it accessible to us without memorizing

22  especially because there are updates periodically.

23          My understanding, you are required to have a certain

24  size and shape and it has to have lettering of certain size and

25  shape; there has to be contrast between lettering and

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1  background and there has to be either tactibility in the

2  letters or a supplemental braille system so I don't want to

3  give the Court an incorrect answer by saying it has to be

4  dogmatically XYZ.  Generally, the architect for the building or

5  this project would do a design and then be able to say this is

6  what you need if you understand what I'm saying.

7  BY MR. SHORE:

8  Q.  Does signage have to be permanently affixed to the outside

9  of a facility?

10  A.  Yes.

11  Q.  What about the restrooms?  In the case of a restroom, even

12  if it is not fully compliant with the ADA guidelines should

13  there still be a sign addressing people with mobility

14  disabilities as to which restroom is accessible?  Should there

15  be signage on the outside of a door?

16  A.  There should be signage for the restroom.  I don't believe

17  the restrooms are currently accessible so maybe they shouldn't

18  say accessible but they should indicate the bathrooms and be of

19  a certain size and shape.  With regards to the restrooms there

20  are a gamut of concerns, some are more easily addressable than

21  others.  Accessories can be installed relatively simpler

22  compared to maybe creating sufficient floor space, if that

23  makes sense.

24          THE COURT:  What sign would be necessary for the

25  restrooms?

1       THE WITNESS:  Generally you would need a sign that's

2  perhaps 4 by 6 that is white lettering on a dark background or

3  white lettering on dark background that is tactile, that is

4  graphic, and that has if not tactibility some kind of

5  braille -- supplemental braille system.  Again, I don't want to

6  mislead the Court by giving an overly dogmatic description of

7  what is needed because that's the responsibility of the owner

8  and tenants architect to perform.

9  BY MR. SHORE:

10  Q.  Have you heard of international accessibility?

11  A.  That is one of the graphic symbols that's referenced.

12  Q.  What does the international symbol of accessibility have on

13  it?

14  A.  It has a circle and a line and have then a half circle

15  indicating a wheelchair.

16  Q.  Do you think that would be appropriate in this case to

17  provide the international symbol of accessibility on the

18  outside or inside of the facility?

19  A.  If nothing is changed on the sign it would be somewhat

20  misleading because it is not actually accessible.

21  Q.  Defendants have testified that people in wheelchairs have

22  been in the women's restroom before.  There is pictures of the

23  women's restroom in the photographs attached to the exhibit.

24       MR. STAMATELATOS:  Object, your Honor.  He has not

25  been in the women's restroom, he cannot form an opinion.

1AC5KRET                          Geoxavier - direct

1        THE COURT:  I haven't heard the question yet.

2   Continue.

3   BY MR. SHORE:

4   Q.  Based on the women's restroom -- I believe there is one at

5   the end that contains a picture, a color photograph that

6   contains a picture of the women's bathroom with the rear and

7   side grab bar.  If you can start with picture 15-B?

8        THE COURT:  Wait.  Wait.  15?

9        MR. SHORE:  15-2.

10       THE COURT:  I thought this was the men's bathroom.

11       MR. SHORE:  This is the men's bathroom.

12       THE COURT:  I thought you were asking questions about

13  the women's bathroom.

14  BY MR. SHORE:

15  Q.  Let's ask questions about the men's bathroom quickly.

16  Should there be a rear grab bar?

17  A.  Yes.

18  Q.  Can the defendant's garbage can be located somewhere else?

19  A.  Yes.

20  Q.  Can insulation be provided under the sink to prevent burns

21  and prevent -- and to allow adequate clearance for people in

22  wheelchairs to put their legs underneath the sink?

23  A.  Yes.

24  Q.  And to prevent them from bumping their knee as well?

25  A.  Yes.

1    Q.   Does the soap dispenser appear too high?

2    A.   It does.

3              THE COURT:   Appears too high?  How high should it be

4    and how high is it?

5              THE WITNESS:   The standards, I believe, reference a

6    minimum height of approximately 42 to 48 inches depending on

7    circumstances.  This appears well above that height.

8              THE COURT:   Maximum height or minimum height?

9              THE WITNESS:   Minimum height.  Excuse me, maximum

10   height.  There is a range, minimum and maximum range and it

11   appears based on this in the --

12             THE COURT:   Based on how this picture appears?

13             THE WITNESS:   Based on the picture and my visual

14   recollection.

15             THE COURT:   But you didn't measure it?

16             THE WITNESS:   No, sir.

17             MR. STAMATELATOS:   I would just like to point out

18   something at this moment, your Honor.  Mr. Shore has not laid a

19   foundation as to when these pictures were taken so I would like

20   him to limit his examination of the witness as to what is

21   indicated on the pictures only not as to the time that these

22   pictures were taken.

23             MR. SHORE:   Your Honor, these exhibits are previously

24   marked into -- stipulated and marked into evidence.

25             THE COURT:   They're in evidence.  I don't think --

1AC5KRET                         Geoxavier - direct

1    what has not been established, I don't think, is when they were

2    taken.  Do you think that's in the record?

3             MR. SHORE:  I would have to call defense counsel and

4    ask him since he is the one that provided them.

5             MR. STAMATELATOS:  Mr. Shore introduced the pictures,

6    your Honor.

7             MR. SHORE:  Defense counsel provided the pictures to

8    me, your Honor.

9             THE COURT:  All I am asking is what is in the record.

10   Again, I'm the finder of fact so if the record hasn't been made

11   then it is not going to do anybody much good.  I don't think

12   the record is clear as to when the photos were taken.

13   BY MR. SHORE:

14   Q.  I direct your attention to Exhibit 15-14; is that sign

15   handicap accessible.  Is that an accessible signage?

16   A.  It doesn't appear to meet the criteria.

17            THE COURT:  I didn't hear what you said.  It

18   definitely?

19            THE WITNESS:  It doesn't appear to meet the criteria

20   I'm familiar with, that I recall from the code.

21            MR. SHORE:  I would like the Court to take -- the

22   expert has mentioned the Code.  I would like the Court to take

23   judicial notice of the ADAG standards which require appropriate

24   signage for both the entrance --

25            THE COURT:  Let's deal with the witness.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    MR. SHORE:  Okay.

2    BY MR. SHORE:

3    Q.  Do you see the sign of the women's restroom?

4              THE COURT:  What exhibit.

5              MR. SHORE:  15-23.

6    A.  Yes, sir.

7    Q.  Does the women's sign appear accessible?

8    A.  It does not.

9    Q.  Does it appear compliant with the ADAG standards in 28

10   C.F.R. part 36?

11   A.  I don't believe it meets those criteria.

12   Q.  Again, 15-25, again the picture of the women's restroom,

13   does that appear accessible to you?

14   A.  No, sir.

15   Q.  Do you think it would be humiliating to the plaintiff to

16   have to go into a bathroom that has a women's sign on it?

17             MR. STAMATELATOS:  I object, your Honor.

18             THE COURT:  Sustained.

19             Are you an expert in psychology or humiliation or do

20   you have a sense of these things based on your training as an

21   architect?

22             THE WITNESS:  Forgive me, sir, my --

23             THE COURT:  You don't.  Sustained.

24             Come on, Mr. Shore.  He's an expert.  Let's have him

25   testify about things he can testify about.

1AC5KRET                          Geoxavier - direct

1   BY MR. SHORE:

2   Q.   Is there anything else you think the Plaza Diner can do to

3   make it more accessible to comply with the ADAG standards that

4   hasn't been discussed yet today, this morning, or that is not

5   in your expert affidavit?

6   A.   I don't believe so.   Again, my analysis was not exhaustive

7   so there may be further violations that need to be addressed.

8                MR. SHORE:   No further questions.

9                THE COURT:   Okay.   Mr. Stamatelatos, do you want to do

10   cross-examination?

11                MR. STAMATELATOS:   Sure, your Honor.

12                MR. SHORE:   Your Honor, may I ask one more question?

13                THE COURT:   Yes.

14   BY MR. SHORE:

15   Q.   Defendant's expert report states that the liquor license

16   prevent the facility from having a unisex restroom.   Are you

17   are aware of any such law that prevents a facility in New York

18   from having a unisex bathroom?

19   A.   I have read and I am familiar with I believe the local law

20   that you're referencing and to my understanding there is no

21   mandate that says one can't have a unisex restroom.   There are

22   a number of -- I believe in the particular code that you are

23   mentioning there are a lot of sections of the code that

24   indicate that there are waivers possible depending on

25   situations so it is not overly dogmatic.   I haven't seen

1AC5KRET                          Geoxavier – direct

1   anything that is overly dogmatic to say a unisex restroom would

2   not be allowed.

3            MR. SHORE:  Could the Court take judicial notice of

4   local law of the City of New York year 2005, no. 57?

5            No further questions.

6            THE COURT:  Okay.  All right Mr. Stamatelatos.

7   CROSS EXAMINATION

8   BY MR. STAMATELATOS:

9   Q.  Good morning, Mr. Geoxavier.

10  A.  Good morning, sir.

11  Q.  Isn't it true that only visited the Plaza Diner, 1066

12  Second Avenue on June 15, 2011?

13  A.  Correct, sir.

14  Q.  Did you review any materials prior to your testimony today

15  since your inspection on June 15, 2011?

16  A.  Any materials?  I believe I reviewed the affidavit that I

17  had prepared and I believe I reviewed the report that was

18  Exhibit 14, I believe.  It was just that I just had --

19            THE COURT:  The photos you mean.

20            THE WITNESS:  No, the other report.

21            THE COURT:  The other expert report.

22  BY MR. STAMATELATOS:

23  Q.  The report of Peter Georgopoulos?

24  A.  I believe so.

25  Q.  Any other documents or reports that you might have reviewed

1AC5kreT                         Geoxavier - cross

```
 1  prior to your testimony today?

 2  A.  No, sir.

 3  Q.  Isn't it true that you did not take any measurements of

 4  anything at the Plaza Diner on June 15, 2011?

 5  A.  I did take measurements with a tape measure.  I didn't take

 6  exhaustive measurements or record them.

 7          THE COURT:  What did you measure?  Do you recall?

 8          THE WITNESS:  I believe I measured the entrance step

 9  and a few dimensions.  Again, I don't recall the actual

10  measurements or their locations.

11          THE COURT:  Did you take notes?  When you were doing

12  the measurements did you write them down?

13          THE WITNESS:  No.

14  BY MR. STAMATELATOS:

15  Q.  So, basically what you are testifying to today is just

16  basically a recollection from approximately four months ago,

17  correct?

18          MR. SHORE:  Objection.

19          THE COURT:  That's a fair question.

20  A.  My visual recollection, yes, and the report that I wrote

21  after the visit.

22  Q.  Outside of what is on your report the rest is from your

23  recollection four months ago, correct?

24          MR. SHORE:  Objection.  Asked and answered.

25  A.  Correct.
```

1    THE COURT:  Overruled.

2  A.  Correct.

3  BY MR. STAMATELATOS:

4  Q.  So, what you are testifying to then, a lot of the things

5  that you testified to might be incorrect.  Is this a proper

6  assumption I can make?

7    THE COURT:  I didn't hear the question.  Say it again.

8  Q.  Some things you are testifying to today which are not in

9  your report might be incorrect?

10    MR. SHORE:  Objection, your Honor.  Vague and

11  ambiguous question.  He is not even referencing what

12  specific --

13    THE COURT:  I will allow the question.  I don't know

14  what it is worth.  If you can answer it you can answer it.

15    MR. SHORE:  If he can repeat the question?  I didn't

16  understand it.

17    THE WITNESS:  You said might, right?  Some things

18  might be incorrect?

19  BY MR. STAMATELATOS:

20  Q.  That are not in your report because you are only testifying

21  from recollection of something you saw four months ago.

22    MR. SHORE:  Your Honor, objection.  He didn't testify

23  that he's testifying based just on his recollection, he is

24  testifying of the inspection, he is testifying on his

25  recollection of the inspection as well as his review of the

1AC5kreT                          Geoxavier - cross

1    expert reports in this case.

2              THE COURT:  Mr. Stamatelatos, maybe you should break

3    this down.

4              MR. STAMATELATOS:  I will move on.  That's fine.

5              THE COURT:  The point is specific measurements are not

6    in the report so with respect to measurements do you recall any

7    of the measurements you made?

8              THE WITNESS:  Again, I don't want to misquote and say

9    a particular inch but I took measurements to gauge overall

10   feasibility and gain overall understanding of the site.

11             THE COURT:  Your recollection of the measurements is

12   based purely on memory an not on any notes, right?

13             THE WITNESS:  Generally, yes.

14   BY MR. STAMATELATOS:

15   Q.  So you say that -- firstly, let's start with a permanent

16   ramp.  A permanent ramp can be built on the Second Avenue side

17   of the diner, is that your testimony?

18   A.  Correct.

19   Q.  You say the cost would be approximately $5,000 to $10,000,

20   correct?

21             THE COURT:  He said from 3.

22   Q.  I apologize.  $3,000 to $10,000.

23   A.  Yes.

24   Q.  Can you tell me what would the width of that ramp,

25   according to all codes applicable with New York City Department

1AC5kreT                          Geoxavier - cross

1   of Building, New York City Department of Transportation, any

2   other governmental agency, be?  What is the width of that ramp

3   from the wall of the exterior of the diner extending out to the

4   side wall including hand railings, how wide would it have to

5   be?

6   A.  I don't think I can give you a precise measurement because

7   that would depend on the design that the architect would

8   develop with the building owner and tenant and it would depend

9   on the location of the property line relative to the facade

10  based on land survey which I don't a copy of.

11  Q.  So you have never seen a survey of the property at 1066

12  Second Avenue, is that correct?

13  A.  A land survey?

14  Q.  Yes.

15  A.  No.

16  Q.  Because usually one would need a land survey if you are

17  going to construct a permanent ramp on the exterior of a

18  building or interior of a building correct?  You would have to

19  establish the property line?

20  A.  If you are going to submit -- if I was doing the design

21  drawings, yes, I would need that.

22  Q.  Even if you are not doing design drawings would you not

23  need a survey of the boundaries of the property on which the

24  Second Avenue Diner is located?

25  A.  In order to determine general feasibility, no, I don't.  In

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AC5kreT                          Geoxavier - cross

1  order to prepare design drawings and give you an exact inch

2  dimension, I would.

3  Q.  Did you measure the width of the sidewalk which is located

4  in front of the Plaza Diner?

5  A.  No.

6  Q.  Does the width of a sidewalk in front of a facility play

7  any part in whether a permanent ramp can be installed at a

8  particular location?

9  A.  It depends on the scenario and the location.

10  Q.  So, do you agree with me that from location to location it

11  might be on the north side of a block, the same block or the

12  south side of a block?  Maybe the City might allow a permanent

13  ramp on the north side of the facility on a block but would

14  disallow it on the south side of the same block, another

15  facility?

16          MR. SHORE:  Objection, your Honor.  Numerous compound

17  questions.

18          THE COURT:  Break that up.

19  Q.  Let's take, for example, the Plaza Diner.  It is located

20  between what streets on Second Avenue?

21  A.  1066 block?

22  Q.  Yes.

23  A.  I would have to look at a map to confirm, but 50s?  56?

24  Q.  Let's say that ramp on a corner in the 50s and look at a

25  location in the Second Avenue line in the 90s.  Let's assume

1AC5kreT                          Geoxavier - cross

1    that the City allows a ramp on the Second Avenue line in the

2    90s.  Can we assume from that that the City would allow a ramp

3    where the Plaza Diner is located?

4            MR. SHORE:  Objection, your Honor.  Questions outside

5    scope of direct.

6            THE COURT:  Overruled.  He testified about his

7    experience on Second Avenue in the 90s.

8    BY MR. STAMATELATOS:

9    Q.  In the 90s.

10   A.  Is it possible that the city may not?

11   Q.  May not allow a permanent ramp in front of the Plaza Diner?

12   A.  I'm not aware of any particular regulation that does not.

13   Q.  So, is it your testimony then that whenever somebody

14   applies for a permanent ramp in front of a public facility the

15   City will approve it no matter what?

16   A.  The City allows you to apply for that permit and if there

17   are circumstances for which they would not allow it, then they

18   would not allow it but they would give you a reason and a

19   waiver for it.  I'm unaware if at this particular location any

20   of those conditions exist.

21   Q.  So, would the City allow it?  How do you know the City

22   would allow it at this particular location?

23   A.  I don't see any reason why they wouldn't, frankly.

24   Q.  Did you do any research with any governmental agency to

25   ascertain whether a permanent sidewalk --

1         THE COURT:  Permanent ramp.

2    Q.  -- or permanent ramp can be installed on the sidewalk on

3    Second Avenue in front of the Plaza Diner?

4    A.  Sorry.  I'm not sure I understand your question correctly.

5    Q.  Did you contact any governmental agency to ascertain

6    whether a permanent ramp can be installed in front of the Plaza

7    Diner on Second Avenue?

8    A.  No.

9    Q.  Do you know how long the ramp would be if it had to be

10   installed in front of the Plaza Diner on Second Avenue, a

11   permanent ramp?  How long?  What would the length have to be?

12   A.  I believe the length could go the full distance of the

13   facade.

14   Q.  And how much, approximately, would that be?

15   A.  I'm not sure I can give you an exact measurement.

16   Somewhere between six and 12 feet perhaps.  Maybe even longer.

17   Q.  Now, let's assume that the permanent ramp is approved by

18   the City and can be installed at the Plaza Diner.  Once you

19   construct the ramp you have to construct the landing as well,

20   is that correct?

21   A.  Correct.

22   Q.  And what would the width and length of that landing have to

23   be to comply with all governmental agency codes including to be

24   ADA compliant?

25   A.  I believe approximately five feet square but, again, it

1  depends on the direction of travel and the direction of the

2  configuration of the entrance.  It would be an issue really for

3  the designing architect, for the owner, and tenant to

4  determine.

5  Q.  Where would this landing have to be constructed?

6  A.  There are several options in terms of where this landing

7  could logistically sit.  It would be at the end of the ramp and

8  entrance but it depends on the configuration of the entrance

9  and ramp by the design architect.

10  Q.  Would this landing have to be constructed on the sidewalk

11  or would it have to be constructed in the diner itself?

12  A.  It could be a combination of both, either -- or, again, a

13  combination where the landing bridges the distance between the

14  two.

15  Q.  But you did not research that aspect to testify in this

16  particular case or compile your report, correct?

17          MR. SHORE:  Objection, your Honor.

18          THE COURT:  Sustained.  No, overruled.  I will allow

19  this.

20          THE WITNESS:  Did I prepare or outline drawings?

21  BY MR. STAMATELATOS:

22  Q.  You --

23          THE COURT:  Wait.  Stop.  Rephrase the question.

24  Q.  You did not research where this landing would have to be

25  located to make it compliant with any governmental agency, is

1AC5kreT                         Geoxavier – cross

1    that correct?

2    A.   In terms of determining feasibility?

3    Q.   Yes.

4    A.   I believe that the landing can be installed.  In terms of

5    the location or design or configuration of it I did not prepare

6    design drawings outlining where that would exist.

7    Q.   You know that there is a vestibule at the entrance of the

8    Plaza Diner, correct?

9    A.   Yes.  Correct.

10   Q.   Once you enter the Plaza Diner what would be on your left?

11   Do you recall?

12   A.   Once I entered the outer door or the inner door?

13   Q.   The inner door.  Once you are inside the diner itself, you

14   pass the vestibule, what would be on your left?

15   A.   Facing which direction?

16   Q.   Facing Second Avenue.

17   A.   Facing Second Avenue?

18   Q.   Yes.

19   A.   On my left would be the door I just walked through.

20            THE COURT:  Wait.  Let's start over.

21            Is there a photo you want to show him?

22            MR. STAMATELATOS:  No.

23            THE COURT:  15-1?

24            MR. STAMATELATOS:  No.  I'm not going to show him any

25   photos, your Honor.

1   Q.  So, let's say you proceed past the door and once you enter,

2   is there anything on the left?

3   A.  Facing?

4          MR. STAMATELATOS:  Second Avenue.

5          THE COURT:  Facing Second Avenue means you are in the

6   vestibule looking towards the street.

7          MR. STAMATELATOS:  That's right.

8          THE COURT:  You are talking about being in the

9   vestibule looking towards the restaurant.

10          MR. STAMATELATOS:  He is inside the restaurant, your

11   Honor.

12          MR. SHORE:  Your Honor, I believe it depends on which

13   direction he is facing.  Is he facing the street or facing the

14   restrooms?

15          MR. STAMATELATOS:  Facing south.

16          THE COURT:  South I would be facing the door I just

17   walked through.

18   BY MR. STAMATELATOS:

19   Q.  You have passed through the vestibule and passed through

20   the door?

21   A.  Right.

22   Q.  You entered the Plaza Diner?

23   A.  Right.

24   Q.  What would be on your left?

25          MR. SHORE:  Your Honor, objection.

1AC5kreT                        Geoxavier - cross

1          THE WITNESS:  If I'm facing south what would be -- am

2     I allowed to answer?

3          THE COURT:  Yes.

4          THE DEFENDANT:  If I am facing south?

5     Q.  Yes.

6     A.  What would be on my left would be the restaurant.  If I'm

7     facing north what would be on my left is Second Avenue.  And --

8     Q.  Is there any seating areas when you entered the restaurant?

9     Are there any seating areas, if you can recall?

10    A.  I believe there are seating areas in the restaurant.

11    Q.  Do you remember the seating configuration in the

12    restaurant?

13    A.  Specifically in terms of its layout?

14    Q.  Yes.

15    A.  No.  I know generally there were booths and fixed seats in

16    various locations but I couldn't quote exactly where they are.

17    Q.  So, let's assume you build a ramp; the landing, would you

18    have to change the interior doors that lead into the diner?

19    A.  Potentially.  Again, it depends on the design of the ramp.

20    Q.  Now, let's assume Mr. Kreisler wants to enter the Plaza

21    Diner.  If the ramp and the landing is there can he enter the

22    designer without changing anything else?

23    A.  I'm sorry.  Say that again.

24    Q.  Assuming we build a ramp and the landing and Mr. Kreisler

25    wants to enter the Plaza Diner, is he able to, yes or no?

1AC5kreT                         Geoxavier – cross

1    A.  It depends on the configuration design of the ramp.

2    Q.  We build the ramp according to whatever configuration you

3    want and the landing, can he then enter the diner?

4            MR. SHORE:  Objection.  Asked and answered.

5    A.  Yes.

6            THE COURT:  He didn't answer.

7    A.  Yes.  I mean, if you design a ramp up to the space can you

8    then enter the space?

9    Q.  Yes.

10   A.  Yes.

11   Q.  With the existing doors as they are because we are only

12   installing the permanent ramp and the landing.  Can he still

13   enter the Plaza Diner?

14   A.  Forgive me, sir.  The ramp and landing can be configured a

15   number of different ways.  Ultimately, the design architect

16   would work with the tenant and owner on how the ramp would be

17   configured and the relationship of the entry doors to that

18   ramp.  There may be modifications required, there may not.  It

19   is a pretty infinite hypothetical.

20   Q.  So, am I correct then in saying that even if the Plaza

21   Diner installs a permanent ramp with a landing it is not a

22   hundred percent sure that Mr. Kreisler can still enter the

23   Plaza Diner?  Am I correct in assuming that?

24   A.  It seems that you are asking me a hypothetical.

25   Q.  Yes, I'm asking a hypothetical because there is --

1    THE COURT:  Hypotheticals are part of expert testimony

2    all the time.

3    A.  I'm just confirming.  In theory one could design a code

4    compliant ramp that leads into a non-code compliant space.

5    Q.  Listen to my question.  You are missing the point.  There

6    is a permanent ramp, right, the ramp itself and then there is a

7    landing, right, so you have seen the Plaza Diner?

8    A.  Yes, sir.

9    Q.  Because you have made an expert report?

10   A.  Yes, sir.

11   Q.  So, let's assume the Plaza Diner constructs only a

12   sidewalk, permanent ramp and a landing.  Can Mr. Kreisler still

13   enter the Plaza Diner without making any other changes other

14   than installing the ramp and the landing?

15   A.  Potentially.

16   Q.  He can.  Okay.  So then the door is fine for Mr. Kreisler

17   to enter the Plaza Diner there, correct?

18   A.  Well, forgive me.  Mr. Kreisler?  I have only met

19   Mr. Kreisler relatively recently so I don't -- and I'm not an

20   expert in terms of his personal abilities to traverse anywhere,

21   truthfully.  In terms of code compliance, one could create a

22   code compliant ramp and then have a non-code compliant interior

23   which I think is what you're asking me.

24   Q.  I'm not asking.  I'm just asking you if one constructs the

25   ramp.

1AC5kreT                          Geoxavier - cross

```
 1   A.  I can't speak to his ability to travel anywhere.

 2              THE COURT:  Let him finish what he was going to ask.

 3              THE WITNESS:  Sorry.

 4              THE COURT:  Go ahead.  What were you going to ask?

 5   BY MR. STAMATELATOS:

 6   Q.  I'm just asking you if the Plaza Diner installs the

 7   permanent ramp and the landing can Mr. Kreisler then enter the

 8   Plaza Diner?

 9   A.  He's not sure about Mr. Kreisler.

10              THE COURT:  He's not sure about Mr. Kreisler.

11              THE WITNESS:  I'm not sure about Mr. Kreisler --

12   BY MR. STAMATELATOS:

13   Q.  Is Mr. Kreisler then --

14              THE COURT:  Let's leave Mr. Kreisler out of this.

15              If A person in a wheelchair, based on your

16   understanding of code requirements, enter the diner or would

17   there need to be changes to the doors?

18              THE WITNESS:  In theory one could enter the space.

19   There still may need to be modifications to the doors in order

20   to achieve code compliance.

21              THE COURT:  Didn't you suggest that the vestibule

22   needed to be changed?

23              THE WITNESS:  In terms of adhering to code it does.

24   BY MR. STAMATELATOS:

25   Q.  What change would have to be made to the vestibule to make
```

1AC5kreT                        Geoxavier - cross

1    it fully ADA compliant?

2    A.  I admittedly did not do an item by item exhaustive code

3    analysis to indicate which items were not code compliant and

4    any new design would have to be coordinated with a new

5    architect.

6    Q.  And you cannot testify today as to what the size of the

7    vestibule would have to be to make it compliant with four

8    codes, is that correct?

9    A.  It is in the code already.

10   Q.  I'm asking today you cannot testify today.

11           MR. SHORE:  Objection, your Honor.  Can he repeat

12   the --

13           THE COURT:  Objection to him repeating the question?

14           MR. SHORE:  His last question was --

15           MR. STAMATELATOS:  I will rephrase it.

16           MR. SHORE:  Thank you.

17           THE COURT:  I didn't understand the objection.

18   Rephrase it.

19   BY MR. STAMATELATOS:

20   Q.  Today, you cannot tell us what the measurement of the

21   vestibule has to be to make it compliant with the ADA or New

22   York City Department of Buildings, is that correct?

23   A.  I can't quote it to you right now, no.

24   Q.  Do you know whether adjacent to the vestibule there is any

25   seating capacity in the Plaza Diner directly adjacent to the

1    vestibule?

2    A.  Adjacent to the vestibule is there seating?

3    Q.  Yes.

4    A.  I believe there was, yes.

5    Q.  And can you say whether if the vestibule has to be made

6    code compliant the diner would have to remove some of the

7    seating which is adjacent to the vestibule?

8    A.  The design of a new vestibule and the configuration of

9    seating would be something that the design architect would

10   coordinate with the owner and tenant.

11   Q.  So, you cannot say whether the diner would lose any seating

12   if the vestibule is made ADA compliant, am I correct?

13   A.  I'm sorry.  Can you repeat the question again?

14   Q.  Today as you are sitting here, right now, you cannot tell

15   this Court that if the vestibule is made code compliant which

16   you say it is not code compliant, if it is made code compliant

17   you cannot say whether the Plaza Diner will lose any seating

18   capacity.  We are only talking about the about vestibule which

19   is --

20   A.  Depending on the configuration of the code compliant

21   vestibule in lieu of its current vestibule the interior could

22   gain, lose, or reconfigure its existing seating depending on

23   how the design architect worked that out with the owner and

24   tenant.

25   Q.  Let's move on from the vestibule.

1AC5kreT                    Geoxavier - cross

1          THE COURT:  Have you costed that out?  Do you have an

2    estimate of what it would cost to make the vestibule code

3    compliant?

4          THE WITNESS:  There are a number of options in terms

5    of making it code compliant and working with the configuration.

6    There are a lot of different options so I don't, again, I

7    didn't do a written cost analysis for --

8          THE COURT:  You don't have any cost analysis for a

9    vestibule.

10          THE WITNESS:  I have worked on similar projects where

11    we have reconfigured the interior vestibule like this and it

12    could range between $5,000 and $10,000.

13    BY MR. STAMATELATOS:

14    Q.  You say $5,000 and $10,000 for the vestibule, does that

15    include new doors and new vestibule, new flooring?

16    A.  Again, there are a number of options in terms of

17    redesigning the vestibule.  You could work with the terms that

18    you have and reconfigure them.  You can get new materials, you

19    can upgrade materials.  So, cost estimates are a little tricky

20    in that way.

21    Q.  They're tricky, they can go from $5,000 to 50,000 to

22    $100,000 for a vestibule in Manhattan, correct?

23    A.  You can spend an infinite amount of money on anything.

24          THE COURT:  I'm looking at the vestibule in 15-1, if

25    you can go to that exhibit if you have it.  Let's give it to

1AC5kreT                         Geoxavier – cross

1    the witness.

2              MR. SHORE:  15-1, your Honor.

3              THE COURT:  15-1, one is interior and one is exterior.

4    I think that's the only shot.  Exterior but it is a partial

5    shot of the vestibule, right?

6              THE WITNESS:  Yes.

7              THE COURT:  To make the vestibule code compliant you

8    would have to knock down a wall, is that correct?

9              THE WITNESS:  Right now the outer door and the

10   interior door are at the 90 degree angle.  One could

11   reconfigure them so that they are in succession and with the

12   appropriate distance and have proper clear space on the side

13   reusing existing materials and reconfiguring the seating around

14   it.  Again, there are a lot of different options that one

15   establishes doing design.

16   BY MR. STAMATELATOS:

17   Q.  We will get to the seating situation in a few minutes.

18   Let's assume the ramp is built, the landing is built, the

19   vestibule is changed, one needs to go to the bathroom at the

20   Plaza Diner.  Is the aisle leading from the vestibule to the

21   bathrooms code compliant?

22             MR. SHORE:  Objection, your Honor.  Beyond the scope

23   of direct.

24             MR. STAMATELATOS:  Actually, it is in his report, your

25   Honor.

1            THE COURT:  I think it is in the report, isn't it.

2            MR. STAMATELATOS:  Yes, your Honor.

3            THE WITNESS:  Sorry, the existing vestibule, photo of

4     the existing bathroom?

5     BY MR. STAMATELATOS:

6     Q.  Let's say we have made the vestibule code compliant, now

7     there is a diner or person in the diner, he wants to go from

8     the vestibule to the bathroom.  Do you recall that in the diner

9     there is an aisle between the two booths?

10    A.  I do believe there is an aisle in between the booths

11    referenced in photo 15-1.

12    Q.  Do you recall whether the width of that aisle is code

13    compliant?

14    A.  I do not.

15    Q.  Because your report says that it is not compliant.  So,

16    assuming your report is correct because you made this report,

17    correct?

18    A.  Correct.

19    Q.  To make the aisle compliant with the code what would one

20    have to do?  Do you want to look at your report; do you have it

21    in front of you?

22    A.  I do not.  That would be helpful.

23            I think I indicate in my report modifications can be

24    made to the layout of the existing --

25    Q.  Look at paragraph 4 on page 3.  It says seating tables?

1AC5kreT                    Geoxavier - cross

1    A.  Correct.

2    Q.  The existing fixed seating and tables do not allow the

3    required clear floor space and accessible route through the

4    space?

5    A.  Correct.

6    Q.  Does that mean that the aisle is not compliant with the ADA

7    Code?

8    A.  Correct.

9    Q.  So, now to make it compliant what does the width have to be

10   of the aisle, if you know?  If you don't know you can say you

11   don't know.

12   A.  I don't know the exact numerical measurement.

13            THE COURT:  How do you know it is not compliant?

14            THE WITNESS:  I could tell it was too narrow but

15   depending on the overall configuration of the space, the code

16   dictates the width that it should be in inches.  I don't want

17   to misquote the wrong inches dimension but to me it appeared

18   too small on site currently.

19   BY MR. STAMATELATOS:

20   Q.  Let's say somebody is traversing the aisle going to the

21   bathroom; do you agree with me that on your right there are

22   booths and on your left there would be booths?

23   A.  In the existing configuration that appears to be the case.

24   Q.  On your right as you go to the bathroom there are

25   four-seater booths, do you understand what I'm talking about?

1AC5kreT                    Geoxavier - cross

1    It is a booth which can seat four people, correct?

2    A.  In its current configuration.

3    Q.  Did you measure the width of the seat of that four-seater

4    booth, the width of the seat?  Did you measure that?

5    A.  No, sir.

6    Q.  From your recollection do you recall whether it is wide, is

7    it narrow?

8    A.  The width?

9    Q.  Yeah, the width of the seat.

10   A.  I think I indicated I didn't take an actual measurement.

11   Q.  And if you walk in on your left there are the single-seat

12   booths that can seat two people, is that correct?

13   A.  I believe that is what is shown in the photo.

14   Q.  If you can recollect.  If you don't remember you can say I

15   don't remember.

16   A.  My recollection is that this photo appears to be the

17   site -- the conditions on the site that I was in and if that is

18   the current existing layout that appears correct.

19   Q.  Did you look at the width of the seats in the single-seater

20   booths?

21   A.  No, sir.

22   Q.  Let's say one goes through the aisle to the bathrooms; you

23   only went in the mens bathroom, correct?

24   A.  I'm sorry, I thought you were telling me.

25   Q.  You only went into the mens bathroom when you inspected

1    premises on June 15th, correct?

2    A.   Correct.

3    Q.   Now, you testified prior that one can incorporate grab

4    bars, you can put the soap dispenser higher, you can move the

5    garbage receptacle, correct?

6    A.   Correct.

7    Q.   Is that necessary if it is not handicap accessible, sir?

8    A.   In general, making spaces more accessible and adhering to

9    codes as best as possible is the goal.

10   Q.   But if a handicapped person or wheelchair cannot enter that

11   bathroom, does it make sense to do all of that?

12   A.   Yes.

13   Q.   To make it accessible for handicap people?

14   A.   If I may elaborate a little?

15   Q.   Sure.

16   A.   The codes that are put in place are to provide access

17   universally to as many people as possible.  That is not

18   necessarily overly prescriptive to a specific situation.  For

19   example, we have codes that say we have to make things tactile

20   or in braille for the visually impaired in the same code that

21   we have to have fire alarms with strobes for people who are

22   hearing impaired.  Not all disabilities are the same.  These

23   codes are universally prepared so that we provide as much

24   access for as many people.

25   Q.   So you have seen Mr. Kreisler, you have seen the size of

1AC5kreT                        Geoxavier – cross

1    his wheelchair.  Can Mr. Kreisler get into the mens bathroom?

2    A.  I don't know.

3    Q.  Why do you say you do not know?

4    A.  I only met Mr. Kreisler recently and I don't know the

5    dimensions of his wheelchair.

6    Q.  So, as you are sitting here today you cannot say that that

7    bathroom is not code compliant then, correct?

8    A.  No.  The code is pretty prescriptive about what is required

9    and the current conditions do not meet the code.

10          THE COURT:  But based on your sort of eyeballing it,

11   right?  You didn't do any measurements as to what the clear

12   space is in the restroom that you visited.

13          THE WITNESS:  Correct.  I didn't write down my

14   numeric -- any numerical measurement but in my professional

15   opinion as an architect and general depth perception, it does

16   not appear to comply with codes.

17   BY MR. STAMATELATOS:

18   Q.  And you cannot say today whether Mr. Kreisler can enter

19   that bathroom in his wheelchair or not, correct?

20   A.  Again, I don't know the dimensions of his wheelchair.

21   Q.  You testified earlier, too, that the Plaza Diner says we

22   need two bathrooms so we can keep our beer and liquor license.

23   That is not totally false, correct?

24   A.  I'm not sure I understand the question.

25          THE COURT:  Yes.  Sustained.  Rephrase.

1AC5kreT                          Geoxavier – cross

1   Q.  You testified previously that there is a local rule that if

2   one has a liquor license two bathrooms are necessary and you

3   said one can get away with it.  Do you recall that?

4   A.  I would ask to read back what I said, but I believe I

5   indicated that I had reviewed the law, there are a lot of

6   requirements for restrooms and there are a lot of options for

7   waivers depending on the specific conditions.

8   Q.  But one cannot assume that a waiver will be granted if one

9   is going to knock down the two bathrooms at the Plaza Diner and

10  construct one unisex bathroom, correct?

11  A.  I'm sorry.  Can you say that again?

12  Q.  Let's assume the two bathrooms at the Plaza Diner are

13  demolished and one unisex bathroom is constructed.  Do you

14  understand that scenario?

15  A.  Yes.

16  Q.  Does that guarantee the Plaza Diner that they will still be

17  able to maintain their wine and beer license at the diner?

18  A.  In order to accomplish -- you started your question with

19  assuming you knocked down the bathrooms and create one

20  bathroom.

21  Q.  Yes.

22  A.  That would have to be a -- that would be designed and

23  submitted to the governmental agencies for review and approval.

24  As part of that review process the architect that was

25  overseeing the design would verify any of those requirements in

1AC5kreT                          Geoxavier - cross

```
 1  that local law and if there were any discrepancies apply for a
 2  waiver.  If a waiver was not granted for any reason, which I do
 3  not see any reason why it wouldn't, per se, then it would be
 4  constructed.
 5  Q.  But there is a possibility that they would not get a waiver
 6  to only have one unisex bathroom, correct?
 7  A.  That possibility exists.
 8  Q.  And you did not do any research relating to the one
 9  bathroom waiver policy at the Plaza Diner, correct?
10  A.  At the Plaza Diner specifically, no.
11  Q.  Now, let's assume that two bathrooms are required at the
12  Plaza Diner so that they can conduct their business and
13  maintain their wine and beer license.  Would the existing
14  bathrooms --
15          MR. SHORE:  Objection.  Calls for conclusion of law.
16          THE COURT:  I haven't heard the question yet.  State
17  the question and we will see where we are at.
18  BY MR. STAMATELATOS:
19  Q.  Assuming the Plaza Diner wants to make two bathrooms ADA
20  compliant so it can keep its wine and beer license; would the
21  existing two bathrooms have to be enlarged, firstly?
22  A.  Most likely, yes.
23  Q.  And by enlarging those two bathrooms, do you see the Plaza
24  Diner losing any seating capacity?
25  A.  Depending on the configuration of these new bathrooms if it
```

1   were required and the configuration of other spaces by the

2   design architect the Plaza Diner could lose, gain or just

3   reconfigure their existing seating.

4   Q.  In your professional opinion what would they do?  Would

5   they lose, gain, or stay the same?

6   A.  There are a lot of options available.  I haven't prepared

7   design drawings or explored every potential scenario or option

8   available.

9   Q.  But isn't that the reason why you have not been able to do

10  that, because you didn't go prepared to the Plaza Diner?  You

11  did not really inspect the interior of the Plaza Diner?

12          MR. SHORE:  Objection.

13          THE COURT:  Compound question.  Ask one question.

14  BY MR. STAMATELATOS:

15  Q.  You did not do a proper inspection at the Plaza Diner on

16  June 15, 2011; is that not correct?

17  A.  In order to assess feasibility, I believe I did.  In order

18  to prepare appropriate design drawings for all possible

19  scenarios?  No.

20  Q.  Are you familiar that there is a counter at the Plaza

21  Diner?

22  A.  Yes.

23  Q.  Do you know how many stools for people that are able to sit

24  at the stools of the counter?

25  A.  I don't recall the capacity, no.

1  Q.  Do you recall whether the counter has stools along side the

2  front and the side?

3  A.  I don't recall.

4  Q.  Do you recall the height of that counter at the Plaza

5  Diner?

6  A.  Numerically in inches, I do not.  I would like to consult

7  my report.

8  Q.  Sure.

9  A.  I'm sorry.  Your question again?

10           THE COURT:  Do you recall the height of the counter.

11           THE WITNESS:  No, sir.

12  BY MR. STAMATELATOS:

13  Q.  Do you know whether that counter is a transaction counter?

14  A.  I indicated that it was a transaction counter merely as a

15  nomenclature.  It appeared to be a counter serving several

16  purposes.

17  Q.  Purposes meaning?

18  A.  There appears to be served food on top of the counter,

19  there appear to be transactions and other activities.  I'm not

20  sure what goes on on the counter all day.

21  Q.  So you don't know what type of counter it is, is that

22  correct?

23  A.  Again, for nomenclature purposes I called it a transaction

24  counter.

25  Q.  Now, regarding, we can go back to the restrooms?  You said

1  that you could move the sink and the lavatory.  Where would you

2  move it to in the mens bathroom to make it more compliant and

3  accessible?  Where would you move it to?

4  A.  Again, the design options are numerous for making the

5  restrooms code compliant.  That would have to be coordinated

6  with the design architect, owner, and tenant.  There are a

7  number of modifications you can do to the wall and to the

8  spatial configuration of those bathrooms to achieve code

9  compliance.

10 Q.  So you would have to move the walls –– so you cannot

11 basically move the sink and the lavatory in the existing

12 bathroom to make it more accessible, is that correct?

13         MR. SHORE:  Objection, your Honor.  Compound question

14 again.

15         THE COURT:  The second question.  Do you understand

16 the second question?

17 A.  Can you repeat the second question?

18 Q.  Without moving the walls as the mens bathroom currently

19 exists, is it true that even if you move the lavatory and the

20 sink inside that restroom you cannot make it more accessible to

21 handicap people?

22         MR. SHORE:  If you understand the question.

23 A.  If I understand the question correctly, without relocating

24 the walls there are modifications you can make to make the

25 restroom more accessible.  To make the restrooms fully

1  accessible relocations and modifications to the walls may be

2  required.

3  Q.  Because your report says, if you look at paragraph 3 on

4  page 3, the second paragraph:  Modifications can be performed

5  to make the restroom more accessible and closer to barrier free

6  including relocation, replacement of the existing sink and

7  toilet, to provide code compliant fixtures with required clear

8  floor space.  You don't mention moving any walls.

9  A.  Correct.

10  Q.  So, am I correct in saying that wherever you move the sink

11  and the lavatory in that mens bathroom it is not going to make

12  it any more accessible than it presently is, correct?

13  A.  No.  I think that's incorrect.

14  Q.  So, you are telling me --

15         THE COURT:  Let him finish, let him finish.

16         THE WITNESS:  As I indicated, there are modifications

17  that you can do today to make spaces more accessible.

18         THE COURT:  Can I ask a question?

19         THE WITNESS:  Sorry?

20         THE COURT:  So, making the mens restroom that you

21  inspected fully code compliant, could you do that without

22  enlarging the restroom?

23         THE WITNESS:  Potentially.

24         THE COURT:  Potentially.  How?

25         THE WITNESS:  Again, using design drawings would you

1  have to map out the clear floor space required and indicate

2  which fixtures you are going to use and how they were going to

3  be aligned properly.

4          THE COURT:  But do you know what the clear floor space

5  is that is required?

6          THE WITNESS:  Well, it is written in the code.  I

7  don't know --

8          THE COURT:  And, do you know what the floor space

9  available in the restroom, as it is currently configured, is?

10          THE WITNESS:  I don't know the exact square inches or

11  square footage, no.

12  BY MR. STAMATELATOS:

13  Q.  So, you cannot tell us today how you would reconfigure that

14  bathroom to make it compliant, is that correct?

15  A.  I haven't done design drawings to indicate the options

16  possible, no.

17  Q.  And you could not tell what the cost would be to make the

18  mens bathroom code compliant, correct?

19  A.  Depending on the level of code compliance sought and the

20  options pursued it would depend.

21  Q.  But you cannot give us a figure because you do not know how

22  you have to configure them, correct?

23          MR. SHORE:  Objection, your Honor.  Repetitive.  Asked

24  and answered.

25          THE COURT:  But that's overruled.  That is what this

1     case is about, right?

2              MR. SHORE:  I didn't understand the Count Three.

3              THE COURT:  The question is -- I won't restate the

4     question but you didn't do cost analysis, right, to determine

5     how much it would cost to make the restrooms code compliant.

6     You didn't do that?

7              THE WITNESS:  A written analysis, no.

8              THE COURT:  Any other analysis, written or unwritten?

9              THE WITNESS:  Well, forgive me, if I can speak a

10    little generally, with your permission?

11             THE COURT:  Just answer my question.

12             THE WITNESS:  Fair enough.

13             THE COURT:  Have you done any cost analysis as to what

14    the range would be to make these restrooms code compliant?  Yes

15    or no?

16             THE WITNESS:  Yes.

17             THE COURT:  Yes, you have.

18             THE WITNESS:  Mentally, yes.

19             THE COURT:  When did you do that?

20             THE WITNESS:  In just asking me today I can --

21             THE COURT:  Prior to today had you done any assessment

22    of the cost?

23             THE WITNESS:  I think anecdotally when it was asked of

24    me I was able to provide that information.

25             THE COURT:  My question is a simple one.  Did you do a

1AC5kreT                        Geoxavier – cross

1    cost analysis prior to today of what it would take to make

2    restrooms code compliant?  Yes or no.

3           THE WITNESS:  No, sir.

4    BY MR. STAMATELATOS:

5    Q.  Can you testify today whether the Plaza Diner would lose

6    any seating capacity if it had to make the counter code

7    compliant, if the counter was not code compliant?

8    A.  Depending on the design, the Plaza Diner could gain, lose

9    or reconfigure seating in order to achieve a code-compliant

10   transaction counter.

11          THE COURT:  Have you done any assessment as to how

12   they could -- how they might actually gain seating by enlarging

13   the restrooms?

14          THE WITNESS:  Have I done those design drawings?

15          THE COURT:  Yes.

16          THE WITNESS:  In order for them to gain seating?  No.

17          THE COURT:  What is your basis for saying they could

18   gain seating?  Because theoretically it is possible as one of

19   three outcomes; gain, lose, maintain?  Or because you have

20   looked at the space and have done an assessment as to whether

21   or not you might actually gain seating after enlarging the

22   restroom?

23          THE WITNESS:  Forgive me, sir.  You are asking my

24   opinion?

25          THE COURT:  But your opinion has to be based on

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    something, right, Mr. Geoxavier?

2            THE WITNESS:  Correct.

3            THE COURT:  You can't be sort of hurling it out there.

4    So, what is your basis for the opinion that the seating could

5    be increased after you have increased the size of the

6    restrooms?

7            THE WITNESS:  General assessment of the spatial

8    configuration of the entire space and their current

9    configuration and potential design options for the future.

10           THE COURT:  You are saying if they did an entire

11   reconfiguration of all their seating and the restroom perhaps

12   you could take out the counter and add tables and maybe you

13   would have more seats?

14           THE WITNESS:  Theoretically, if the entire space was

15   gutted, let's say, and the restrooms, kitchen, service spaces

16   all fixed seating and the entry were completely reconfigured,

17   it is possible at the end of the day you would have an outcome

18   with fully accessible entrance, fully accessible room,

19   appropriate transaction counter, and perhaps even more seating.

20           THE COURT:  Have you done any assessment as to what

21   that would cost?

22           THE WITNESS:  No, sir.

23           THE COURT:  Do you think it would be $3,000 to

24   $10,000?

25           THE WITNESS:  No, sir.

1AC5kreT                         Geoxavier - cross

1          THE COURT:  Do you think the restaurant would have to

2   be closed down for a significant period of time when you made

3   those renovations?

4          THE WITNESS:  Most likely.

5          THE COURT:  Most likely?  You think it can be done

6   without?

7          THE WITNESS:  You are asking me the scenario if they

8   gain seating then?

9          THE COURT:  You are the one that has posited that as a

10  possibility so I'm asking your basis for saying why you think

11  it would gain seating.  And you are suggesting that they could

12  gain seating if they basically gut renovated the entire

13  facility?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Next.

16  BY MR. STAMATELATOS:

17  Q.  Are you aware that between the counter stools and the

18  booths there is a wall which separates the counter seating area

19  and the booth area?  Are you familiar with that?

20  A.  I believe there is a rail indicated in one of the photos,

21  15-1.

22  Q.  Do you know what the distance is between the booths and the

23  stools at the counter?

24  A.  I do not.

25         THE COURT:  Can I interrupt for just a second?

1AC5kreT                          Geoxavier - cross

1      We have a number of people who are here for the

2  sentencing we have at 11:00 which is fine.  You are welcome to

3  stay.  I have a bench trial going in a civil matter that we are

4  going to go pretty close to 11:00.

5           Sorry about that.

6  BY MR. STAMATELATOS:

7  Q.  You have reviewed the expert report of Peter Georgopoulos,

8  correct?

9  A.  Correct.

10  Q.  Is there anything in that report that you disagree with

11  today?

12  A.  Yes.

13  Q.  If you can tell me which items you disagree with?

14  A.  May I have a copy?

15           MR. SHORE:  You have a copy.

16           THE COURT:  I have 14.

17           THE WITNESS:  Forgive me.  Do you want me to go

18  through the whole report and tell you if there are any items

19  that I disagree with?

20  BY MR. STAMATELATOS:

21  Q.  Yes.

22           Your attorney mentioned before there were some -- the

23  liquor license issue.  Let me know if there is anything else.

24  It is two and a half pages, take a quick look.

25  A.  At the top of the second page Mr. Georgopoulos indicates

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AC5kreT                          Geoxavier – cross

1    that the Department of Transportation official said no permits

2    are being given in that area for permanent structures.

3    Q.  And --

4              THE COURT:  Let him finish.

5    A.  I disagree.  I have not seen any statement from the

6    Department of Transportation and am unaware of any rules that

7    indicate that permanent structures are not permitted in that

8    area.

9              He indicates Second Avenue sidewalk in that area is

10   narrow.  I guess that's a relative determination.  I think it

11   is actually rather adequately sized considering there are much

12   smaller, narrower sidewalks in other parts the city.

13             He indicates telephone booths and permitted street

14   vendors are in front of the entrance.  That's a statement.

15   Q.  Before you move on with that, did you see those telephones

16   booths he is referring to?

17   A.  I don't recall the telephone booths in front of the

18   entrance.

19             Again, it is just a statement of fact.  I would

20   presume that Mr. Georgopoulos is stating that these telephone

21   booths and permitted street vendors are perhaps obstructions to

22   a potential ramp.  If that's the conclusion being drawn I would

23   disagree with that, telephone booths are relocatable as are

24   street vendors.

25             Making a permanent structure will impede the flow of

1AC5kreT                        Geoxavier - cross

1    pedestrian traffic and could conflict with access issues of

2    other persons with disabilities including the blind and those

3    requiring walking canes.  I guess I would generally disagree

4    with that statement.  There are plenty of instances where there

5    are ramps that have -- that are appropriately designed, that

6    don't provide an obstruction to other disabled people.  A

7    permanent ramp at the corner of the building will not be

8    permitted.  Again, I guess I generally disagree with that.  I

9    think ultimately we would have to see what the government

10   agencies with jurisdiction would say.  I don't foresee --

11   Q.  But you don't know because --

12              THE COURT:  Wait.

13              THE WITNESS:  You have --

14              THE COURT:  Stop.  Stop.  Okay?  She can only write

15   down when one person is speaking.  You have to let him finish.

16   You can't interrupt, okay?

17              THE WITNESS:  My opinion is that a ramp at the corner

18   of the building could be installed and would be permitted.  I

19   have seen nothing, to my knowledge, that would indicate that it

20   would not.

21              Do you want me to go through the report?

22   BY MR. STAMATELATOS:

23   Q.  If there is anything else that you disagree with, mention

24   it, otherwise if there is nothing else.  That's fine with me.

25   A.  Again, on the same page Mr. Georgopoulos indicates the

1    subject premises must contain two bathrooms according to Local

2    Law 58.  I guess I would be concerned as to the interpretation

3    of that local law.  The two of us may actually disagree on that

4    so I would like to know which portion of the reference standard

5    he is considering is applicable in this scenario.  We may

6    disagree on that.

7              He indicates to modify the bathrooms as proposed by

8    the plaintiffs would not be readily achievable given

9    conflicting New York City building code requirements requiring

10   a restroom for each gender.  Again, I think we may disagree on

11   that.

12             He indicates the cost of altering the bathrooms would

13   exceed $13,000.  Without an actual design or a proposed design

14   I think it's premature to give an actual dollar figure.  I

15   mean, we can talk about a range or certain options but we may

16   ultimately disagree on the cost of these modifications.

17             THE COURT:  Okay.  Next question.

18   Q.  If we can just go back to the permanent ramp because I

19   didn't ask you, we were discussing about a permanent ramp being

20   constructed on Second Avenue.  You also mentioned that a

21   permanent ramp could be constructed on 56th Street adjacent to

22   the diner, correct?

23   A.  Potentially, yes.

24   Q.  Would that entail the similar layout and construction as a

25   permanent ramp on Second Avenue?

1AC5kreT                          Geoxavier - cross

1    A.  It could be similar.  There are a number of design options.

2    Q.  No.  What I mean is would it be maybe a small ramp or would

3    it be basically the same ramp that would have to be constructed

4    if it was constructed on Second Avenue?

5    A.  Again, if there is additional space available on 56th

6    Street the design could change.

7    Q.  Did you look at the width of the sidewalk on 56th Street?

8    A.  I did not measure the sidewalk on 56th Street, no.

9    Q.  Did you do any research whether The city or the Department

10   of Transportation would allow a permanent ramp on 56th Street?

11   A.  Specifically, no.

12           MR. STAMATELATOS:  If I can have one moment, your

13   Honor?

14           THE COURT:  Okay.

15           MR. STAMATELATOS:  I have no further questions.

16           THE COURT:  Let's take a break here.  Do you want to

17   do some redirect I assume, Mr. Shore?  I shouldn't assume,

18   perhaps, but do you want to?

19           MR. SHORE:  I have a few questions I'm considering.

20   Would you like me to do them now?

21           THE COURT:  Well, I was going to take a break now and

22   prepare for the sentencing that I have scheduled for 11:00.  If

23   you have one or two then I think maybe I would let you do this

24   now because it is more efficient to finish with the witness

25   rather than have him wait around.  But if it is more than one

1    or two, then I think that might be tricky.

2              MR. SHORE:  It would just be one or two.

3              THE COURT:  Okay.

4    REDIRECT EXAMINATION

5    BY MR. SHORE:

6    Q.  You stated that a permanent ramp could be installed on

7    Second Avenue to provide access to the plaintiff in front of

8    the Plaza Diner located at 56th and Second Avenue diner, is

9    that correct?

10   A.  Yes, sir.

11   Q.  What is the proximate cost estimate of that?

12   A.  For a scenario that I'm envisioning I believe I said

13   between 3,000 and 10 though thousand before.

14             MR. SHORE:  Yes, you did.

15             THE COURT:  That's just for the ramp?

16             THE WITNESS:  Correct.

17             THE COURT:  Doesn't involve the reconfiguration of the

18   restroom?

19             THE WITNESS:  Correct.

20             THE COURT:  All right.

21   BY MR. SHORE:

22   Q.  The last question is, if the restaurant isn't fully

23   accessible, are there other things that the restaurant can do

24   to make it more accessible even if, for example, even if the

25   vestibule isn't fully compliant?

1AC5kreT                        Geoxavier - redirect

```
 1            MR. STAMATELATOS:  I object, your Honor.  That was
 2   previously asked in Mr. Shore's direct.
 3            THE COURT:  I will allow it.  Overruled.
 4   BY MR. SHORE:
 5   Q.  If a permanent ramp was installed and the vestibule is not
 6   completely compliant and the plaintiff would be able to make it
 7   through the vestibule, would that be allowable under applicable
 8   law?
 9            THE COURT:  Are you an expert in the applicable law as
10   to what would be allowable short of full compliance?  Is that
11   an area of expertise for you?
12            THE WITNESS:  In a way, yes, in that I have worked
13   with existing -- worked with clients who are existing buildings
14   where they are making some modifications towards accessibility
15   but they're not making the entire facility fully code
16   compliant.  And there are laws that indicate that you are only
17   forced to do so much, some is allowed, some is not.
18            The short answer is yes.  Can you make certain
19   modifications to make a facility more accessible without doing
20   the entire thing?  Yes.  That is generally allowed.
21            MR. SHORE:  Thank you.  No further questions.
22            THE COURT:  Do you want recross?
23            MR. STAMATELATOS:  No, your Honor.
24            THE COURT:  All right.  So, Mr. Geoxavier, you are
25   excused.
```

1AC5kreT                          Geoxavier – redirect

1          THE COURT:  Are you planning more?

2          MR. STAMATELATOS:  No, your Honor.

3          THE COURT:  Thank you, Mr. Geoxavier.  Thank you.

4          Let me say to the parties, I will take a sentencing

5    that will go at least an hour, perhaps longer, so why don't you

6    come back here at 12:15.  All right?  You may use the cafeteria

7    or whatever else.

8          MR. STAMATELATOS:  Your Honor, may we use the witness

9    room perhaps, if that's fine with you?

10          THE COURT:  That's fine.  Okay.

11          (Recess)

12          THE COURT:  We will now resume with the plaintiff's

13    case.  So, Mr. Shore, who are you calling next?

14          MR. SHORE:  The plaintiff rests.

15          THE COURT:  You rest.  You are not calling the

16    defense?

17          MR. SHORE:  No, I --

18          THE COURT:  I thought you said you were going to call

19    the defense expert as well.

20          MR. SHORE:  Defense counsel has indicated he is going

21    to call his experts.

22          THE COURT:  All right.  So who are you planning to

23    call, Mr. Stamatelatos?

24          MR. STAMATELATOS:  I have Mr. Georgopoulos, the

25    architect, and Mr. Gentile who is the accountant for the Second

1AC5kreT

```
 1   Avenue Diner, your Honor.
 2              THE COURT:  All right.  So, who do you want to call
 3   first?
 4              MR. STAMATELATOS:  We will do the accountant since he
 5   has to leave, your Honor.  That's fine.
 6              THE COURT:  Have a seat right over here.  We are going
 7   to go until 1:00 and then I have a meeting until 2:00 -- sorry
 8   about that -- and maybe we can finish -- Mr.Gentile is it?
 9              THE WITNESS:  Yes.
10              THE COURT:  Hopefully we can finish you by 1:00.  We
11   will see.
12              Could you stand and raise your right hand?
13    DAVID GENTILE,
14        called as a witness by the Defendant,
15        having been duly sworn, testified as follows:
16   DIRECT EXAMINATION
17   BY MR. STAMATELATOS:
18   Q.  Mr. Gentile, are you an accountant?
19   A.  I am.
20   Q.  How long have you been an accountant for?
21   A.  25 years.
22   Q.  Are you licensed in New York State?
23   A.  As a CPA, yes.
24   Q.  How many years are you licensed in New York as a CPA?
25   A.  About 10 years.
```

1  Q.  What is your area of expertise in the CPA field?

2  A.  I'm a general practitioner.

3  Q.  Do you do restaurants?

4  A.  Yes.

5  Q.  Income taxes and tax related issues for restaurants and

6  diners?

7  A.  I do.

8  Q.  Are you the accountant for the Second Avenue Diner Corp.

9  which operates out of 1066 Second Avenue in Manhattan?

10  A.  I am.

11          MR. STAMATELATOS:  May I approach the witness, your

12  Honor?

13          THE COURT:  Yes.  You don't have to ask.

14          MR. STAMATELATOS:  If you can look at Defendant's

15  Exhibit 5, 6, 7 and 8?

16          THE COURT:  5 through 8, you said?

17          MR. STAMATELATOS:  Yes.  Those are tax returns for

18  J.J.N.K. Inc.

19          I apologize, your Honor.  Plaintiff's Exhibit 6 is the

20  2010 tax return.

21          THE COURT:  Defendant's Exhibit 5 through 8 and

22  Plaintiff's Exhibit 6.

23          MR. STAMATELATOS:  Is the 2010 tax return.

24          THE WITNESS:  2008.  It is different here.  Exhibit 6

25  is a 2008 tax return.

1           THE COURT:  No.  I think we are talking about

2    Plaintiff's Exhibit 6 and Defendant's Exhibit 6.

3           THE WITNESS:  Sorry.

4           THE COURT:  That's all right.

5           We have the tax returns for those, for the relevant

6    years.

7           MR. SHORE:  They're offered into evidence as

8    Defendant's Exhibit as well, right?

9           THE COURT:  I'm not sure if 8 is in as a defendant's

10   exhibit.  It is in as plaintiff's exhibit.  In any event, I

11   have it.  Let's go.

12          MR. STAMATELATOS:  Thank you.

13   BY MR. STAMATELATOS:

14   Q.  If you can look at Plaintiff's Exhibit 6 which is a 2010

15   tax return for Second Avenue Diner Corp.?

16   A.  Yes.

17   Q.  Could you review that return, please?

18   A.  I'm familiar with the return.

19   Q.  Can you tell the Court who prepared this return?

20   A.  Myself.

21   Q.  And can you tell the Court what the gross sales for the

22   Second Avenue Diner were for the year 2010?

23   A.  $615,799.

24   Q.  Did the Second Avenue Diner operate at a profit or at a

25   loss for the year 2010?

1AC5kreT                          Gentile - direct

```
 1   A.  At a profit.
 2   Q.  If you can look at --
 3           THE COURT:  What was the profit?
 4           THE WITNESS:  $23,383.
 5           THE COURT:  That's the calendar year 2010?
 6           THE WITNESS:  Yes, sir.
 7   BY MR. STAMATELATOS:
 8   Q.  If you can look at the last page of that report it should
 9   indicate 9.1 at bottom of the page?
10   A.  Yes.
11   Q.  Which at the top installation, alternative minimum tax
12   depreciation report?
13   A.  Yes.
14   Q.  If you can look at what is noted as no. 1 leasehold
15   improvements as a cost or basis of $43,500?
16   A.  Yes.
17   Q.  Can you explain to the Court what that is?
18   A.  In October of 2003 there was an acquisition of a
19   previous -- this is based on my recollection on conversations
20   with the taxpayer --
21           MR. SHORE:  Objection.  Hearsay.
22           THE COURT:  Well, I just want to understand what this
23   item is on the return.  Presumably this is a return that you
24   prepared?
25           THE WITNESS:  Yes, I did.
```

1AC5kreT                          Gentile - direct

1              THE COURT:  But it is all based on information that

2    was provided by the taxpayer, correct?

3              THE WITNESS:  Yes.  That's correct, your Honor.

4              THE COURT:  So you're explaining the first item,

5    leasehold improvements?

6              THE WITNESS:  Yes.

7              THE COURT:  10/1/03.  What was your understanding as

8    to what that stands for, what that $43,500 amount is?

9              THE WITNESS:  That amount was as part of the

10   acquisition, the acquisition which is the purchase of the

11   existing -- the business that was existing, there was an

12   allocation of those assets and as part of the allocation of

13   those assets $43,500 was the fair market value of the leasehold

14   improvements at that time back on October 1, 2003.

15             THE COURT:  So, leasehold improvements from when to

16   when?

17             THE WITNESS:  That would be at that date the value of

18   those improvements in that location.

19             THE COURT:  In 2003 Second Avenue Diner Corp.

20   purchased the business that was operating as the Plaza Diner,

21   correct?

22             THE WITNESS:  Correct.

23             THE COURT:  I forget who they bought it from.  Do you

24   remember?

25             THE WITNESS:  No.


           SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1          MR. STAMATELATOS:  There is a document, if I may

2    introduce it.

3          THE COURT:  I don't think it matters.

4          In any event, this $43,500 amount here relates to the

5    cost of -- the value of improvements made?

6          THE WITNESS:  No.

7          THE COURT:  So, what is it?

8          THE WITNESS:  So, when the asset was negotiated at

9    fair market value for the purchase price, I believe the

10   purchase price of the business was approximately $60,000 and of

11   that $60,000 we allocate for accounting purposes what makes up

12   the $60,000 because they have certain values for tax purposes.

13         THE COURT:  Okay.

14         THE WITNESS:  Of that, a portion of the value was

15   leasehold improvements of a total purchase price of 60.  We

16   allocated or it was allocated at $43,000 for, quote unquote,

17   leasehold improvements or improvements to the property.

18         THE COURT:  And, did you have an understanding as to

19   what the improvements were?

20         THE WITNESS:  What generally they are in a diner,

21   because I service many diners, that would probably be kitchen.

22         THE COURT:  In this particular case --

23         THE WITNESS:  In this particular case?

24         THE COURT:  -- what the 43,500 refers to.

25         THE WITNESS:  Specifically, no, I would not know.

1AC5kreT                        Gentile - direct

 1          THE COURT:  Okay.

 2          Go ahead.  Sorry.

 3   BY MR. STAMATELATOS:

 4   Q.  Now, if the Second Avenue Diner has to make some

 5   alterations, renovations so that it is made compliant with the

 6   Americans with Disabilities Act and it loses some of the

 7   seating capacity, would that affect the business of the Second

 8   Avenue Diner at all?

 9   A.  I want to make sure I understand the question.

10          So, if they were losing seating capacity would --

11   Q.  Let me rephrase it.  I will withdraw that.

12          Do you know how many seats there are presently in the

13   Second Avenue Diner?

14   A.  Approximately 50 seats.

15   Q.  So, let's assume that they have to make renovations so it

16   is compliant with the American with Disabilities Act Code, they

17   would have to remove some of the seating.  Would that impact on

18   the business of the Second Avenue Diner doing business as Plaza

19   Diner?

20   A.  Yes.

21   Q.  Can you tell the Court how that would impact the Plaza

22   Diner?

23   A.  How a restaurant works, generally, I have been to this

24   restaurant a few times, there is limited seating capacity of a

25   restaurant of 50 seats.  If you remove seats then the busy

1    times and generally the business runs as a busy breakfast,

2    lunch and/or dinner, so if you are removing seats then gross

3    sales will come down because people need to sit in a booth or

4    table and eat and if you have limited seating you have limited

5    people paying.

6            THE COURT:  Well, can you determine how much gross

7    sales would come down if you lost five seats?

8            THE WITNESS:  Based on my conversation, given that

9    there is only 50 seats in the restaurant, it would be safe to

10   say that between 10 percent -- five seats could be 10 percent

11   of total seating capacity.

12           THE COURT:  Would that mean 10 percent of total

13   profits, total income?

14           THE WITNESS:  Given -- and this is the question that I

15   had looked at prior -- given that the business generally

16   generates the bulk of its revenue during breakfast, lunch and

17   dinner, those windows of time are limited where people are

18   actually limited so I would not say a flat 10 percent but it

19   could be as high as 7 percent or even 8 percent given that,

20   because it is only 50 seats and if you would go there at 5:30,

21   6:00, the place would be busy, there may be a line outside.

22           THE COURT:  But there are other times in the day where

23   they're generating income and they're not approaching capacity

24   for the 50 seats, right?

25           THE WITNESS:  That's correct.  But generally in the

1    business of and given my experience, certain businesses could

2    do business throughout the day and certain businesses just have

3    their, where they have a high capacity.  This store, it is

4    based on what I have seen and based on my understanding, this

5    has a high capacity only during certain periods of time during

6    the day given its location because of the foot traffic and

7    people going for lunch.  So, if you lose seating capacity

8    during those busy times, the store is empty between 10:00 and

9    say 11:30, empty, and then you'll -- I'm not saying this store

10   but generally some restaurants would be empty and also between

11   2:00 p.m. and 5:00 p.m. the store would be empty, not a soul in

12   the store, but as if the clock went off at 5:30 people come in

13   and they run until 7:00 or 8:00 and it empties out again.

14          So, some of the these businesses have cycles which is

15   who you lose capacity when there is limited capacity.  That

16   could be a phenomena of limiting the number of seats in a store

17   of this size.

18          THE COURT:  But it is not simply a matter of saying 5

19   seats is 10 percent of total capacity so it would be 10 percent

20   less revenue.  You can't say that, right?  It has to be less

21   than that, right?

22          THE WITNESS:  Generally, yes, but in some cases it

23   might be -- and I have been involved and the accountant for

24   stores where I have actually seen not necessarily, but business

25   is so concentrated to one specific time that if you don't have

1  enough servers behind the counter and you can't service those

2  customers then you will lose those customers because there is

3  limited capacity to serve the customers within their window of

4  time to eat.

5          THE COURT:  All right.  Go ahead.

6  BY MR. STAMATELATOS:

7  Q.  What would the loss be?  Would it be profit or would it be

8  a loss in the sales?

9  A.  Well, generally speaking, and say that if we are saying

10  five seats making 10 percent of the total capacity, say we have

11  a 50 percent where it impacts the store at, I'd say 5 percent,

12  it would be, of sales.

13  Q.  Of sales?

14          THE COURT:  Of gross 5 percent after of the

15  six-hundred-something-thousand.

16          THE WITNESS:  That's being conservative to be

17  cautious, so 10 percent would be the max and 5 percent would be

18  lowest but the --

19          THE COURT:  5 percent off of 16, right?

20          THE WITNESS:  Yes.

21          THE COURT:  So that's basically about 30 grand, right?

22          MR. SHORE:  Yes.

23  BY MR. STAMATELATOS:

24  Q.  How about the expenses?  Let's say the Plaza Diner loses 5

25  percent of its gross sales, will it lose -- would it still have

1    the same expenses basically?

2    A.  Well, you have both bearable cost and you have fixed cost

3    in a business such as this so the variable costs are the cost

4    of goods sold, the food product that you are actually servicing

5    or selling.  Fixed cost in a store similar to this would be the

6    labor cost of running the kitchen.  At a certain level at this

7    minute changed in business and because this is not a very busy

8    store based on this average, about $12,000 a week in sales, the

9    fixed costs don't change.  The rent wouldn't go down.  The

10   utility bill wouldn't go down because the walk-in box is the

11   same, the lights are still on in the store.  I mean, some of

12   the variable costs, food cost would go down, supplies would go

13   down, but that generally is, in this business, makes up about

14   20, 25 percent of total sales.  So, on $30,000 loss in business

15   that's about $7,500 indirect cost so you would lose about

16   $22,500 to the bottom line.

17           THE COURT:  Okay.

18           THE WITNESS:  And also the ability to bulk purchase,

19   it could actually be higher than that because when you are

20   buying in bulk you get discount in pricing.  So, if you are not

21   buying in bulk it might be higher than that.

22   BY MR. STAMATELATOS:

23   Q.  So, if I understand you correctly, the $43,500 for

24   leasehold improvements which says date acquired October 1,

25   2003, was not that Second Avenue Diner purchased and made

1AC5kreT                      Gentile - direct

1    improvements to the store, is that correct?

2    A.   That's correct.  That was part of the acquisition.

3    Q.   It is part of the prior business and was allocated for tax

4    purposes?

5            MR. SHORE:  Objection.  Asked and answered.

6            THE COURT:  Well, I'm not sure I understood it so I

7    will allow that.  I overruled the objection but so I'm clear,

8    you don't know what those improvements were?  You prepared this

9    return but you don't know what the 2003 leasehold improvements

10   were that are $43,500?

11           THE WITNESS:  That's correct.

12           THE COURT:  So it could be bathroom renovation in

13   1998?

14           THE WITNESS:  No, it could not.

15           THE COURT:  It could not.

16           THE WITNESS:  It could very well be.  I'm sorry, but

17   generally just to clarify only that I know the business in

18   general and the accounting terminology for leasehold

19   improvements.  The classification of leasehold improvements is

20   purely classification to designate the purchase price so if

21   there was a fair -- if $60,000 is the purchase price and then

22   we have to designate a portion of that purchase price toward

23   different things of that value in the store, we would bulk

24   whatever the improvements that the store would be as compared

25   to a blank store with no lighting, no kitchen.  So, in essence,

1    we look at that at that present time and we allocate a portion

2    of $60,000 purchase price towards leasehold, towards covenant

3    not to compete, goodwill, stuff of that nature but the

4    leasehold improvements would include stuff that they had.

5              THE COURT:  A fancy antique cash register that gave it

6    character?

7              THE WITNESS:  Yes.

8              THE COURT:  Or a mirror behind the counter?

9              THE WITNESS:  Or ventilation or bathroom fan.

10             THE COURT:  But you don't know what improvements were

11   considered to tally up $43,500?

12             THE WITNESS:  No, but that would be the store as you

13   see it.

14             THE COURT:  All right.

15   BY MR. STAMATELATOS:

16   Q.  So, am I correct then when you come with a 5 percent loss

17   of the seating capacity, the Plaza Diner would lose gross sales

18   it would have, is that correct, the assumption that I would

19   make?

20   A.  That's correct.

21             MR. STAMATELATOS:  I have no further questions, your

22   Honor.

23             THE COURT:  All right.

24             Mr. Shore?

25   CROSS EXAMINATION

1AC5kreT                    Gentile - cross

 1   BY MR. SHORE:

 2   Q.  Is it true that $17,500 there are in unknown changes to the

 3   premises at Second Avenue Diner Corp. that you're unaware of

 4   from 2003 on the no. 1 leasehold improvements?

 5          THE COURT:  Wait.  I can't hear you.

 6   Q.  Under item 1, leasehold improvements it states $43,500.

 7   I'm asking him for clarification.  He stated that $43,500 he

 8   did not know what those were for so I'm asking for

 9   clarification.  Is that correct, you don't know what exactly

10   that money went to?

11   A.  The $43, 500?

12   Q.  Yes.

13   A.  I know it went to leasehold improvements.  The detail of

14   leasehold improvements I would not know.

15          THE COURT:  Do you just not remember now?  Is there a

16   document someplace that you relied on to come up with $43,500?

17          THE WITNESS:  Yes, there is.  I don't have a document

18   but there is a, on the purchase when the -- there was a bulk

19   sale that was filed with the State.  There was an allocation of

20   the assets of the purchase price and that the allocation of

21   that, the sale between the attorneys that handled the sale,

22   they allocated $43,500 toward the leasehold improvements of the

23   property.

24          THE COURT:  Mr. Shore?

25   BY MR. SHORE:

1AC5kreT                          Gentile - cross

1    Q.  You stated the gross sales would reduce as well as the cost

2    of the goods if five seats were removed?

3    A.  Yeah.  Generally, yeah.  There is a cost per meal in

4    preparing a meal and that would be in the cost of goods sold

5    section as we talked about.

6    Q.  How many diners or restaurants have you dealt with?  Or how

7    many restaurants and diners have you been accountant for?

8    A.  In my career?

9    Q.  Yes.

10   A.  At least a hundred.

11           THE COURT:  A hundred.  Wow.

12   Q.  Do you actually purchase goods for the restaurants and

13   diners?

14   A.  I've owned restaurants and diners myself.

15   Q.  With regards to the Plaza Diner, did you review their books

16   and records?

17   A.  Second Avenue Corp.?

18   Q.  Second Avenue Diner.

19   A.  Yes.

20   Q.  Did you read their books and records?

21   A.  Of course.

22   Q.  Do you have them in your possession?

23   A.  No.

24   Q.  Who has those records?

25   A.  The taxpayer.  I would imagine the taxpayer would have

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AC5kreT                          Gentile - cross

 1   them.  I'm not certain.

 2   Q.  Do you know if the Second Avenue Diner Corp. accepts only

 3   credit cards or do they accept cash?

 4   A.  I don't -- I don't --

 5   Q.  You don't know the answer to that question?

 6   A.  No.

 7   Q.  You said you have been inside the Second Avenue Diner Corp.

 8   before?

 9   A.  Yes.

10   Q.  You stated that the removal of five seats would result in a

11   loss of sales and revenue to the property?

12   A.  Given my understanding of how that business specifically

13   runs being capacity limited at times during the day, that it

14   would have an impact on sales.

15   Q.  When you first walked into the Plaza Diner, what is the

16   first thing you see?

17   A.  There is a booth.

18   Q.  How many doors do you have to go through to get to the

19   booth?

20   A.  You walk in the front door and you go to the right and

21   there is a booth right in front of you.

22   Q.  Is there a second door?

23   A.  You walk in.  To the best of my recollection I haven't been

24   there in about a year.

25              THE COURT:  This is beyond the scope.  He is

1    testifying, really, about tax returns, not about the layout of

2    the restaurant.

3              MR. SHORE:  Well, he did state that if, you know, five

4    seats were removed --

5              THE COURT:  Right.

6              MR. SHORE:  -- then it would result in a loss of --

7              THE COURT:  Clearly he talked about that.  You can ask

8    him about how he comes to that conclusion but I'm not sure what

9    the layout of the restaurant has to do with it.

10   BY MR. SHORE:

11   Q.  Are you aware there is a vestibule that is at the Plaza

12   Diner?

13   A.  I recall, yes.

14   Q.  So, if that vestibule were removed the restaurant would not

15   lose any seating.  Is that a possibility?

16             MR. STAMATELATOS:  Objection, your Honor.  He is not

17   an expert in that field, your Honor.

18             MR. SHORE:  He is not expert in removal of seating

19   either.

20             THE COURT:  He was asked about removal of seating and

21   how it would affect revenue.  That is he is qualified to

22   answer.  I don't think he is qualified to answer whether or not

23   you could restore seating or add seating based on taking out a

24   vestibule.  That's for some other expert but not this guy.  No

25   offense, Mr.Gentile, but unless --

1AC5kreT                    Gentile – cross

1              THE WITNESS:  None taken, your Honor.

2              THE COURT:  Are you an architect also?

3              THE WITNESS:  No.

4              THE COURT:  Any construction experience?

5              THE WITNESS:  No.

6    BY MR. SHORE:

7    Q.  What diners do you own?

8    A.  No diners, not now.  I have had Flaming Embers, places on

9    Bell Boulevard, Murphy's.  I own a place right now called Pure

10   in Whitestone, J&A Health Trends which is a food store.  I had

11   a place in Brooklyn on Willoughby Street which was a diner-type

12   restaurant.  The one on 86th Street was diner-type.

13             THE COURT:  Flaming embers?

14             THE WITNESS:  Yes.  66th between Second and Third.  It

15   was a long time ago, 2005.

16   BY MR. SHORE:

17   Q.  You estimate 7 to 8 percent of the gross sales would

18   decrease, that's just an estimate?  You haven't done any

19   financial analysis?

20   A.  I have not done financial analysis.

21             MR. SHORE:  No further questions.

22             THE COURT:  Any redirect?

23             MR. STAMATELATOS:  No redirect, your Honor.

24             THE COURT:  Okay, Mr.Gentile.  Thank you.

25             THE WITNESS:  Thank you.

1AC5kreT                          Gentile – cross

1           THE COURT:  You may step down.

2           Why don't we start the next witness.

3           MR. STAMATELATOS:  We can, your Honor.

4    Mr. Georgopoulos.

5           THE COURT:  Okay.

6     PANAGIS GEORGOPOULOS,

7        called as a witness by the Defendant,

8        having been duly sworn, testified as follows:

9           THE COURT:  You may proceed, Mr. Stamatelatos.

10   DIRECT EXAMINATION

11   BY MR. STAMATELATOS:

12   Q.  Mr. Georgopoulos, if you can look at this document that I

13   place in front of you?

14           THE COURT:  What is the number?

15           MR. STAMATELATOS:  Defendant's Exhibit 14, your Honor.

16           THE COURT:  It is in evidence?

17           MR. STAMATELATOS:  Yes, your Honor.

18           THE COURT:  Okay.

19   Q.  Is that a report that you generated dated June 29, 2011?

20   A.  Yes, it is.

21   Q.  And does that report pertain to an inspection that you did

22   at the Plaza Diner located at 1066 Second Avenue, New York?

23   A.  Yes.

24   Q.  Are you an architect?

25   A.  Yes, I am.

1    Q.  Are you licensed in the State of New York?

2    A.  Yes, I am.

3    Q.  How long have you been licensed in the State of New York?

4    A.  I've been licensed 30 years.  More than 30 years.

5    Practicing 40 years.

6            THE COURT:  Practice what?

7            THE WITNESS:  Practicing 40 years.  I'm 30 years

8    resident.

9            THE COURT:  Keep your voice up.

10           THE WITNESS:  Yes.

11   BY MR. STAMATELATOS:

12   Q.  Do you specialize in any particular areas in architecture?

13   A.  I do stores, residential as well as single family homes,

14   but mainly stores and restaurants.

15   Q.  Can you tell us when you visited the Plaza Diner what was

16   the purpose of your visit to the Plaza Diner?

17   A.  I was asked to evaluate existing conditions --

18   Q.  Evaluate people?

19   A.  -- with reference to handicap accessibility.

20           THE COURT:  When did you go?

21           THE WITNESS:  I'm sorry?

22   BY MR. STAMATELATOS:

23   Q.  When did you go?

24   A.  In June, when I prepared this report.

25           THE COURT:  How long before this report?

1AC5kreT                        Georgopoulos - direct

1          THE WITNESS:  It was about a week before.

2          THE COURT:  All right.  You just went the one time or

3    you went multiple times?

4          THE WITNESS:  One time I went there, your Honor.

5          THE COURT:  For how long were you there?

6          THE WITNESS:  I was there for a couple of hours.

7    BY MR. STAMATELATOS:

8    Q.  And let me ask you this:  There is no ramp at the Plaza

9    Diner, permanent ramp, correct?

10   A.  No, there isn't.

11   Q.  There is a step at the entrance of the Plaza Diner?

12   A.  Yes, there is.

13   Q.  Can you tell us what is the height of that step?

14   A.  Approximately eight inches.

15   Q.  Now, the plaintiff is seeking that the Plaza Diner install

16   a permanent ramp either on the Second Avenue side of the diner

17   or the 56th Street side of the diner.  Is that possible?

18   A.  That is not possible.

19   Q.  Can you tell us Court why that is not possible?

20         THE COURT:  Not possible?

21         THE WITNESS:  It is not possible.

22         THE COURT:  It is impossible to build a ramp?

23         THE WITNESS:  Impossible.

24         THE COURT:  I'm all ears.  Why is it impossible?

25   BY MR. STAMATELATOS:

1AC5kreT                         Georgopoulos - direct

1    Q.  If you can tell the Court why it is not possible?

2    A.  Due to the construction of the new subway train there will

3    be an exit/entrance to the train on 55th Street.  The transit

4    authority does not permit permanent ramps.

5              THE COURT:  They do not permit what permanent ramps?

6              THE WITNESS:  Permanent ramps in that location.

7              THE COURT:  How do you know this?

8              THE WITNESS:  Specifically there was revocable consent

9    by the Department of Transportation clearly indicating that

10   there is no ramps, permanent ramps permitted within 13 feet of

11   the corner.  Within 13 feet of the corner.

12             THE COURT:  The entrance is going to be on 55th or

13   56th?

14             THE WITNESS:  The present address on Second Avenue

15   now?

16             THE COURT:  No.  I'm saying the entrance to the

17   subway.

18             THE WITNESS:  The entrance to the subway is on 55th.

19             THE COURT:  It is on 55th.

20             THE WITNESS:  It is going to be on 55th but the

21   station extends underneath this sidewalk.  The front wall of

22   the building, it's the wall of the subway station.

23             THE COURT:  How do you know this?

24             THE WITNESS:  I investigated that.

25             THE COURT:  Well, what steps did you take to

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    investigate it?

2                THE WITNESS:  I went to the Transit Authority to find

3    the records of that.

4                THE COURT:  Find what records?

5                THE WITNESS:  Of the new subway system that is being

6    constructed as of now -- the new subway train rather.

7                THE COURT:  Let's back up.

8                You said Department of Transportation will not allow a

9    ramp to be built within a certain distance of entrances to the

10   subway, is that correct?

11               THE WITNESS:  Yes, your Honor.

12               THE COURT:  And what is the distance?

13               THE WITNESS:  13 feet within the corner.

14               THE COURT:  13 feet --

15               THE WITNESS:  Within the corner of 56th and Second

16   Avenue.

17               THE COURT:  Even though the entrance to the subway

18   will not be on 56th?

19               THE WITNESS:  Yes.

20               THE COURT:  Doesn't matter?

21               THE WITNESS:  It doesn't matter.

22               THE COURT:  What is your understanding -- where did

23   you get that understanding from?  Someone told you that or you

24   read it some place?

25               THE WITNESS:  No, no, no.  It's been -- I'm sorry.  I

 1   didn't bring the records of the Department of Transportation.

 2   It's not permitted, clearly.

 3          THE COURT:  Well, you learned this by reading a

 4   document or by speaking to a person?

 5          THE WITNESS:  By a document.  It is a directive from

 6   the Department of Transportation.

 7          THE COURT:  When did you read this document?

 8          THE WITNESS:  Three weeks ago.

 9          THE COURT:  Three weeks ago?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  Three weeks ago was in September so in

12   September, long after you did this report?

13          THE WITNESS:  Yes, your Honor.  I have searched to

14   find grounds and possible solutions to this problem.

15          THE COURT:  You don't have the document that you

16   looked at with you today?

17          THE WITNESS:  I'm sorry.  I don't.

18          THE COURT:  Okay.  Go ahead.

19   BY MR. STAMATELATOS:

20   Q.  And prior to you finding this document, did you do any

21   other research to see whether a permanent ramp can be

22   constructed at the Plaza Diner?

23   A.  No, I did not.

24   Q.  Now, assuming that a ramp can be built at the Plaza Diner,

25   assuming consent is given by the City and the Department of

1AC5kreT                          Georgopoulos - direct

1   Transportation and for that ramp to be ADA compliant, can you

2   tell us approximately the size of the ramp?

3   A.  I have done a sketch and design.  The ramp must be 15 and a

4   half feet long including the platform.

5             MR. SHORE:  Can you repeat?

6             THE COURT:  I didn't hear either.  Are you looking at

7   a document?  What are you looking at?

8             THE WITNESS:  I did a sketch here.

9             THE COURT:  You did a sketch?

10            THE WITNESS:  For my own reference.

11            THE COURT:  That is not in evidence.

12            MR. STAMATELATOS:  I don't have a copy.  I wasn't

13  aware that he had a sketch, your Honor.

14            THE COURT:  When did you do the sketch?

15            THE WITNESS:  Again, I did this like a couple of weeks

16  ago.

17            THE COURT:  Couple of weeks ago you did this sketch?

18            THE WITNESS:  Yes, your Honor.  I was preparing myself

19  to testify.

20            THE COURT:  All right.  So I assume, Mr. Shore, have

21  you seen this sketch?

22            MR. SHORE:  No, your Honor.

23            THE COURT:  So, is this something that you are seeking

24  to introduce into evidence, Mr. Stamatelatos?

25            MR. STAMATELATOS:  If I can take a minute to look at

1    it, your Honor?  I wasn't aware that he had a sketch.

2              THE WITNESS:  It is nothing official.

3              MR. SHORE:  How many -- what amount of inches did he

4    say for the ramp?

5              THE WITNESS:  13 feet. 13, 1-3.

6              MR. STAMATELATOS:  I am -- I would like to introduce

7    it if the Court will allow him to look at his notes.  It is a

8    rough sketch to refresh his recollection.

9              THE COURT:  That's fine.  I just want -- if he has got

10   notes then notes are things probably the plaintiff should able

11   to look at.

12             THE WITNESS:  These are my notes.

13             THE COURT:  Approximately.

14             THE WITNESS:  Approximately.

15             THE COURT:  You will get a chance to look at it before

16   you do the cross.  Do you need the sketch back?

17             So 13 feet, that's how long the ramp would have to be?

18             THE WITNESS:  Including the platform.  We need a

19   platform in front of the door entrance to be five by five.

20             THE COURT:  So, what you call a platform would be the

21   flat area right in front of the door?

22             THE WITNESS:  Yes, your Honor.

23             THE COURT:  Five by five?

24             THE WITNESS:  Yes.

25             THE COURT:  And then the ramp would then be eight feet

1AC5kreT                        Georgopoulos - direct

1   extended from that platform?

2           THE WITNESS:  Yes.

3           THE COURT:  And the incline of what, one inch per

4   every 12 inches?

5           THE WITNESS:  One inch to a foot, yes.

6   BY MR. STAMATELATOS:

7   Q.  Can you tell us how wide the ramp would be?

8   A.  The width of it must be five feet.

9   Q.  What do you think the cost of something like that would

10  entail?

11  A.  I guesstimated a cost installing the ramp in that

12  restaurant, I estimate $12,000.

13          THE COURT:  $12,000 to build the ramp?

14          THE WITNESS:  To build a ramp and rail around it.

15          THE COURT:  Ramp, rail, and platform?

16          THE WITNESS:  And platform.

17  BY MR. STAMATELATOS:

18  Q.  When you talk about platform, do you mean the landing?

19  A.  The landing.  Sorry.

20          THE COURT:  I understand.  $12,000.  Okay.

21  Q.  Now, once the platform, the ramp is there, can somebody

22  that's handicapped and in a wheelchair still access the diner?

23  A.  I don't believe so.  To my experience I don't believe so.

24  You need certain distances from the door to the wall plus

25  certain distance in the vestibule.

1AC5kreT                        Georgopoulos - direct

1   Q.   So, there is a vestibule at the Plaza Diner?

2   A.   There is a vestibule, yes.

3   Q.   Does the vestibule conform to the ADA code?

4   A.   No, it does not.

5   Q.   What would one have to do to make it comply with the ADA

6   Code?

7   A.   I have measured the vestibule, it is about a five foot

8   depth.  It has to be enlarged to seven feet.

9   Q.   Seven feet by how many feet?

10  A.   By five feet.

11          THE COURT:  What is it currently?

12          THE WITNESS:  It is five by four.

13          THE COURT:  Five by four.  And it would be need to be

14  extended to five by seven.

15          THE WITNESS:  Five by seven.

16          THE COURT:  Five by seven.  Five by four would have to

17  be extended to seven feet?

18          THE WITNESS:  To seven feet.

19  BY MR. STAMATELATOS:

20  Q.   So, if one changes the vestibule, would that result in any

21  loss of seating capacity to the Plaza Diner?

22  A.   Yes, it would.  It would have an attached booth adjacent to

23  the vestibule which will have to be eliminated.

24  Q.   And why is that?  Why does the booth have to be eliminated?

25  A.   Because if you take two feet from that booth then it

1   becomes useless.

2   Q.  And how many seats would the restaurant lose if that booth

3   is removed?

4   A.  It would loose four seats.

5   Q.  Do you know whether the aisle --

6            THE COURT:  Wait.  Before we do that maybe I'm getting

7   ahead of you, but what would it cost to reconfigure the

8   vestibule to be compliant with the ADA?  Have you got that?

9            THE WITNESS:  I know in my affidavit I tried to -- I'm

10  not sure, maybe $5,000 to $10,000.  I'm not sure because it's a

11  glass vestibule.  When you move it -- the wall towards the

12  booth -- you have to move the door as well, and then the

13  seating, it's going to be damaged and the floor as well as the

14  exterior storefront of the restaurant.  It's all interconnected

15  so moving the wall two feet it creates a big problem.

16           THE COURT:  Can we stop here, have lunch, and then

17  come back at 2:00?  I would normally not take as long as lunch

18  but I'm on the grievance committee for the court house and I

19  have to do that one.

20           MR. STAMATELATOS:  That's fine, your Honor.

21           THE COURT:  So, Mr. Georgopoulos, you can be here at

22  2:00?

23           THE WITNESS:  I will be here, your Honor.

24           THE COURT:  All right.  Thank you, all.

25           (Luncheon recess)

1AC5kreT                          Georgopoulos - direct

1              (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                            2:03 p.m.

3          THE COURT:  Mr. Georgopoulos, why don't we have you.

4    come back up.  I hope everybody had a better lunch than me.

5          MR. STAMATELATOS:  Can you read us the last question?

6          (Record read)

7    BY MR. STAMATELATOS:

8    Q.  There are two bathrooms at the Plaza Diner?

9    A.  Yes, there are.

10   Q.  Are those two bathrooms ADA compliant?

11   A.  No, they're not.

12   Q.  What would it require for those two bathrooms to become ADA

13   compliant?

14   A.  They will have to be demolished, practically rearranged.

15   The walls must be rearranged and the fixtures to be relocated.

16   Q.  So, it is my understanding then as it presently exists by

17   not enlarging the bathrooms they cannot be made ADA Complaint?

18   A.  No.  Not as it presently is, no.

19         THE COURT:  Well, in what ways are the bathrooms not

20   compliant?

21         THE WITNESS:  They're not wide enough.

22         THE COURT:  So size?

23         THE WITNESS:  They're supposed to be five foot wide by

24   seven.

25         THE COURT:  Five by seven?

1          THE WITNESS:  Five by seven is the minimum size of the

2     bathroom.

3          THE COURT:  How big is the bathroom as currently

4     configure.

5          THE WITNESS:  One is --

6          MR. STAMATELATOS:  Look at the report.  Length wise it

7     is bigger, it is like eight feet long by four and a half feet

8     wide.  The other one is four by five and a half.

9          THE COURT:  Four by five and a half?

10         THE WITNESS:  Yes, your Honor.

11         THE COURT:  Other than size in what other ways are the

12     bathrooms not compliant?

13         THE WITNESS:  Well, the doors must be three feet wide

14     which I believe they are.

15         THE COURT:  So they are.

16         THE WITNESS:  The doors are wide, they're three

17     footers, both of them.

18         THE COURT:  What about grab bars?

19         THE WITNESS:  The grab bars must be two grab bars in

20     each bathroom, one behind the toilet and one next to it.

21         THE COURT:  And is that the case when you went to the

22     restrooms.

23         THE WITNESS:  One bathroom has two grab bars, the

24     other one has one.

25         THE COURT:  And the grab bars were in the right

1    location or higher or lower, different?

2              THE WITNESS:  They were in the right location.

3              THE COURT:  They were in the right location.

4              There has been talk about lack of insulation or

5    something that would prevent the pipes under the sink from

6    being exposed?

7              THE WITNESS:  Yes.

8              THE COURT:  Do you understand that?

9              THE WITNESS:  Yes.  Under the sink the wheelchair

10   person might touch the hot pipe under the sink.

11             THE COURT:  So you wouldn't have to demolish the

12   bathroom to insulate the pipes or install a grab bar?

13             THE WITNESS:  No.

14             THE COURT:  How much would it cost to insulate the

15   pipes.

16             THE WITNESS:  To insulate the pipes only?

17             THE COURT:  Yes.

18             THE WITNESS:  $500.

19             THE COURT:  $500?

20             THE WITNESS:  Something like that.

21             THE COURT:  Why?  What would be entailed?

22             THE WITNESS:  We usually cover the pipes with

23   protective metal covers.

24             THE COURT:  How much does it cost to purchase and

25   install a grab bar?

1AC5kreT                    Georgopoulos - direct

1    A.   A grab bar is $500 to $300.  $500?  You might have to break

2    the wall, put reinforcing the wall.  $500 to $1,000.

3              THE COURT:  Any other violations?  A mirror has to be

4    in a different location, is that true?

5              THE WITNESS:  The mirror might have to be lower.

6    Usually you would put the mirror on an angle, a slight angle.

7              THE COURT:  How much would that cost to make

8    compliant?

9              THE WITNESS:  $200.

10             THE COURT:  Any other things you can think about?

11   Soap dispenser or anything like that?

12             THE WITNESS:  I don't recall, your Honor.

13             THE COURT:  Okay.

14             THE WITNESS:  I don't remember soap dispenser.

15             THE COURT:  All right.

16   BY MR. STAMATELATOS:

17   Q.   Now, the aisle which leads from the vestibule to the

18   bathroom, is that ADA complaint?

19   A.   No, it is not.

20             THE COURT:  What is wrong with it?

21             THE WITNESS:  It's 34 inch -- 33 inches wide.

22             THE COURT:  How wide does it need to be?

23             THE WITNESS:  It needs to be 36 inches minimum.

24   BY MR. STAMATELATOS:

25   Q.   If we have to, if the Plaza Diner has to make the bathrooms

1AC5kreT                          Georgopoulos - direct

1   ADA complaint --

2               THE COURT:  The bathrooms or the aisle?

3               MR. STAMATELATOS:  The bathroom.

4               THE COURT:  I thought were talking about the aisles.

5   BY MR. STAMATELATOS:

6   Q.  I will just do the bathrooms.

7   A.  In the middle of the restaurant there is a row of three,

8   two people seating, that has to be eliminated.

9   Q.  Why does that have to be eliminated?

10  A.  In order to make the aisle wide enough, the booths are

11  small, very small the way they are now, cannot be reduced.

12  Let's say to replace the booths and make them smaller to

13  increase the aisle it has to be eliminated.

14              THE COURT:  You need to have three inches in the

15  aisle, right, according to what you just said?

16              THE WITNESS:  Yes, your Honor.

17              THE COURT:  Is it possible to shave on inch or two on

18  the tables on either side of the aisle?

19              THE WITNESS:  It is not the tables, it is the booth.

20  In other words, you have to replace all the booths.

21              THE COURT:  You would have to replace all of the

22  booths.

23  BY MR. STAMATELATOS:

24  Q.  Would you have to replace all the booths?

25  A.  Because of the way they are constructed you cannot really

1  shave.  If you insist, it has to be -- the whole thing must

2  be -- the structure of the booth is such that it has to be

3  reconstructed.

4          THE COURT:  Can you show the witness Plaintiff's

5  Exhibit 15, no. 24?

6          MR. STAMATELATOS:  15-24.

7          THE COURT:  Yes, the photograph.  I think it is of the

8  aisle.

9          Do you have that, Mr. Shore?

10         MR. SHORE:  Yes, I do, your Honor.

11         THE COURT:  Do you have it?

12         THE WITNESS:  Yes.

13         MR. SHORE:  Yes.

14         THE COURT:  Looking at that photo Mr. Georgopoulos.

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  That's a pretty good picture of the aisle,

17  right?

18         THE WITNESS:  Yes.

19         THE COURT:  So, you are saying there is no way to add

20  three inches to that aisle without basically taking out the

21  booths and replacing them with something else?

22         THE WITNESS:  As we can see, there is an expensive

23  wood or cap wrapping around the sides.  It is very difficult to

24  alter the booths on both sides.

25  BY MR. STAMATELATOS:

1   Q.  Let me ask you this.  Let's say you do make the booths

2   shorter so the aisle is wider, would those booths be ADA

3   complaint?

4              THE COURT:  The booths have to be ADA complaint?

5              THE WITNESS:  I don't think so.  They're very tight

6   the way they are now.  They are very small for a normal person

7   to sit in.  It is very tight and small, too.  Like, we can see

8   one person sitting, his body is projecting beyond the booth.

9   They're very small.

10             THE COURT:  All right.

11  BY MR. STAMATELATOS:

12  Q.  So, if one had to demolish the bathrooms and make them ADA

13  compliant, would the Plaza Diner lose any seating because of

14  that?

15  A.  It would definitely lose at least one -- at least one

16  booth.

17  Q.  Where would that booth be?  Which booth are you talking

18  about?

19  A.  The last booth next to bathrooms.

20  Q.  And how many seats would that be?

21  A.  It would be four seats.

22  Q.  Now, do you have an estimate of what it would cost to

23  change the vestibule, change the bathrooms to change the aisle,

24  change the booths?  What would that cost the Plaza Diner?

25  A.  As I have in my report, I thought again -- and again, this

1   is a very conservative estimate -- it would be about $13,000 to

2   change -- to rearrange the bathrooms, $10,000 about to --

3   $5,000 to $10,000 as I said for the vestibule.  And then to

4   rearrange the seating it would be the in the area of $45,000 to

5   $50,000.

6                THE COURT:  $45,000 to $50,000?

7                THE WITNESS:  I have $65,000 total, which includes the

8   bathrooms, the vestibule, and the rearrangement of the seating.

9   BY MR. STAMATELATOS:

10  Q.  Now, is there another aisle which is between the middle row

11  of booths an the stools at the counter?  Is there another

12  aisle?

13  A.  There is another aisle there.

14  Q.  Do you know the width of that aisle?

15  A.  I don't recall, but it is definitely less than three feet.

16  Q.  So, is that the reason why you say one would have to

17  basically remove that middle aisle of booths which contains six

18  seats?

19  A.  Definitely.  In order for the access to be accomplished in

20  the bathrooms the middle aisle must be removed.

21  Q.  So, if one has to change the vestibule, make the aisles

22  accessible according to the ADA code and change the bathrooms,

23  how many seats would the Plaza Diner lose?

24  A.  It would lose like 10 to 12 seats.

25                MR. STAMATELATOS:  I have no further questions, your

1   Honor.

2          THE COURT:  Mr. Shore, cross-examination.

3   CROSS EXAMINATION

4   BY MR. SHORE:

5   Q.  Is it your opinion that a permanent ramp can be installed

6   outside the Plaza Diner located at 1066 Second Avenue?

7          THE COURT:  I didn't hear the question.

8          THE WITNESS:  I'm sorry, will you repeat?

9   Q.  Is it your opinion that a permanent ramp can be installed

10  outside of the Plaza Diner directly adjacent to the restaurant

11  on Second Avenue?

12  A.  On Second Avenue, on my opinion you cannot have a permanent

13  ramp.

14  Q.  What is the reason for your opinion -- other than the

15  Department of Transportation issue that you raised earlier.

16  Have any other reason that a permanent ramp cannot be

17  installed?

18  A.  I believe the main reasons, they don't permit this

19  condition because at the turn of the corner you cannot have

20  obstacles beyond the corner of the building.

21         THE COURT:  This is the Department of Transportation?

22         THE WITNESS:  The Department of Transportation or

23  Department of Buildings.

24         THE COURT:  Or Department of Buildings.

25         THE WITNESS:  Department of transportation.

1   Department of Buildings does not have jurisdiction beyond the

2   property line of the property.  It is a sidewalk issue.

3   BY MR. SHORE:

4   Q.  Doesn't Department of Buildings issue permits for ramps?

5   A.  They do, as long as you have approval from the Department

6   of Transportation and this is a revocable con sent for this

7   which -- it is a revocable consent.

8   Q.  Revocable consent?

9   A.  Revocable consent.

10  Q.  Can you explain what that means?

11  A.  It is a special permit that you will have to pay rent every

12  year as long as their ramp exists, otherwise the Department of

13  Transportation might come in and remove the ramp.

14  Q.  You're basically stating that in order to have a ramp you

15  have to pay rent to the Department of Transportation?

16  A.  You have to have a revocable consent.  They call it

17  revocable consent.  That means that they give you the, I

18  suppose -- I'm not a lawyer, but they give you the permit to

19  have it but it can be removed as per their jurisdiction at any

20  time.

21  Q.  Do you know where the entrance for the Second Avenue subway

22  is going to be installed?

23  A.  One entrance would be at the corner of 55th Street.

24  Q.  Do you know where the --

25  A.  And Second Avenue.

1AC5kreT                    Georgopoloulos - cross

1    Q.  Do you know where the Second Avenue diner is located?

2    A.  On 56th Street, of course.

3    Q.  You stated on your review of the document three weeks ago

4    which was the basis for your opinion that the Department of

5    Transportation would not allow a ramp to be built outside the

6    Plaza Diner, is that correct?

7    A.  Yes.

8    Q.  And you also stated that you hadn't received any other

9    information, either verbal or written or by any other means

10   regarding that issue, is that correct?

11   A.  Well, I spoke to them and they referred me to this

12   directive.

13   Q.  When did you speak to them?

14         THE COURT:  Them being the Department of

15   Transportation?

16         MR. SHORE:  Yes.

17         THE COURT:  I'm asking the witness.

18         THE WITNESS:  Three weeks ago, your Honor.  Three or

19   four weeks ago before I obtained the directive.  They directed

20   me on how to go, where to find the regulations.

21         THE COURT:  No.  My point is you say you spoke to

22   them.  Who did you speak to?

23         THE WITNESS:  Department of Transportation.

24         THE COURT:  Who?  Did you just call a number or did

25   you have an actual person that you were directed to?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1           THE WITNESS:  I called the number.

2           THE COURT:  Was there any actual person that you spoke

3    to that you know?  Do you know their name?

4           THE WITNESS:  I don't remember his name.

5    BY MR. SHORE:

6    Q.  Did you go to the Department of Transportation?

7    A.  No.  I downloaded this from the system.

8    Q.  From what system?  Online?  The internet?

9    A.  Online.

10   Q.  Did you review a document online?

11   A.  Yes, I did.

12   Q.  What was the name of it?

13   A.  May I please ask my lawyer if they have it?

14          THE COURT:  Well, do you remember the name?

15          MR. STAMATELATOS:  If I may, your Honor, somebody has

16   brought a copy of the document.

17          THE COURT:  Well, you can get into this on redirect.

18   If you want to look at it now, Mr. Shore, you can do that.

19          MR. SHORE:  Sure.  I will take a look at the document.

20   BY MR. SHORE:

21   Q.  Without this revocable consent, without the subway issue,

22   could a ramp be built outside the Plaza Diner?  If a subway

23   wasn't being built on Second Avenue could a permanent ramp be

24   built?

25   A.  Not in my opinion.

1   Q.  Why is that?

2   A.  It is there described in the report.

3   Q.  You stated the first time you found out about this

4   Department of Transportation issue was three weeks ago,

5   approximately?

6   A.  Three to four weeks ago, yes.

7   Q.  And you had no other -- you had no other knowledge the

8   Second Avenue subway not allowing a permanent ramp, is that

9   correct?

10  A.  Well --

11  Q.  It is a yes or no answer.  I think you have already

12  testified to it as well.

13  A.  No.

14          THE COURT:  Well, in your report which is dated June

15  29th you wrote:  Due to the proximity of the existing subway

16  tunnel, the floor elevation and structural members cannot be

17  revised.  The tunnel existed prior to the renovation of the

18  store and is now part of the new subway tunnel for the Second

19  Avenue subway line with future entrance at 56th Street.  Is

20  this part of what you're saying now, that they can't build a

21  ramp or what you are saying is that after you wrote this report

22  you learned new information?

23          THE WITNESS:  When I wrote this my thought was I was

24  trying to explain that there is no way to change the elevation

25  of the restaurant itself by eliminating the step or having a

1    ramp inside the restaurant.

2              THE COURT:  What you wrote is the Department of

3    Transportation officials said no permits are being given in

4    that area for permanent structures.  So, you had a conversation

5    with someone from the Department of Transportation?

6              THE WITNESS:  Yes, I did.

7              THE COURT:  And who was that?  Who did you speak to?

8    Do you know?

9              THE WITNESS:  I don't remember specific names, your

10   Honor.

11             THE COURT:  They said -- whoever it was you spoke to

12   said that there were no permits being given for permanent

13   structures in the vicinity of Second Avenue on 56th Street?

14             THE WITNESS:  Yes.  Yes.

15             THE COURT:  Go ahead.

16             MR. SHORE:  Your Honor, this document is dated

17   November 16th, 2005.  I see no reason to --

18             THE COURT:  You don't have to do anything with it.

19             MR. SHORE:  The document that was handed to me by

20   defense counsel is dated 2005 regarding revocable consents --

21             THE WITNESS:  Can I please?

22             MR. SHORE:  It is inapplicable to this matter.

23   BY MR. SHORE:

24   Q.  So, when you wrote your report June 29th, 2011, what was

25   the basis for you stating that the subway tunnel, the floor

1AC5kreT                        Georgopoloulos - cross

1    elevation and structural members could not be revised?  What

2    was the basis for you putting in the subway tunnel as a reason

3    for not being able to install a permanent ramp outside the

4    diner if you haven't talked to anyone or you haven't reviewed

5    any report?

6    A.  I applied for a change of interest in another building on

7    56th street and was rejected.

8    Q.  Was building was it?

9    A.  The building adjacent to this building.

10   Q.  What was the number of the building?

11   A.  I don't recall.  It is immediately next to it, less than.

12   100 feet.

13   Q.  Is it a residence or?

14   A.  Commercial.

15   Q.  A what?

16   A.  It is a commercial building.

17   Q.  Commercial building.

18          And when you say adjacent is it north, south, east or

19   west of the entrance door?

20   A.  East of this building.  The adjacent building east of this

21   building.

22   Q.  On the other side of the street of Second Avenue?

23   A.  No, on the same side, east of this building on 56th.

24   Q.  Who is the owner of the building?

25   A.  The same owner.

1AC5kreT                          Georgopoloulos - cross

1    Q.  When you say the same owner you mean J.J.N.K. Corp?

2    A.  Yes, sir.

3    Q.  Are you related to anyone from J.J.N.K. Corp?

4    A.  No.

5    Q.  Because earlier you stated we would lose seating if changes

6    to the vestibule were made.  When you say we, who are you

7    referencing?  Were you referencing you and --

8    A.  I'm sorry?  Repeat.

9    Q.  Are you related to anyone from Second Avenue Diner Corp.?

10   A.  No, sir.

11   Q.  Are you personal friends with anybody from Second Avenue

12   Diner Corp.?

13   A.  No, sir.

14   Q.  Are you personal friends with anybody from J.J.N.K. Corp?

15   A.  I know the people.  I don't --

16   Q.  How long have you known them?

17   A.  30 years.

18             THE COURT:  Who do you know at J.J.N.K.?

19             THE WITNESS:  Mr. Kalas.

20             THE COURT:  Which one?

21             THE WITNESS:  Jerry Kalas.

22             THE COURT:  Jerry.

23             THE WITNESS:  Yes.

24             THE COURT:  Is that the father of John Kalas?

25             THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1        THE COURT:  Father of Nick Kalas?

2        THE WITNESS:  Yes.

3        THE COURT:  All right.

4   BY MR. SHORE:

5   Q.  Have you been charged any fee to appear today or provided

6   your report or expert affidavit?

7   A.  Yes.  Of course.

8   Q.  What was the fee?

9   A.  $5,000.

10  Q.  $5,000; $5,000 for what?

11  A.  To prepare the report; for my time and today.

12  Q.  When were you retained by -- who were you retained by?

13  A.  Jerry Kalas.

14  Q.  Does Jerry Kalas have any involvement with J.J.N.K. Corp.?

15  Is Jerry Kalas an owner or principal of J.J.N.K. Corp. are you

16  aware of?

17  A.  I don't know.

18  Q.  Are you here on behalf of anyone?  Are you here on behalf

19  of an individual who is not a part of this case?

20        MR. STAMATELATOS:  Objection, your Honor.  Leading.

21  He is testifying as to his report and opinion as to the Second

22  Avenue Diner, your Honor.

23        THE COURT:  Sustained.  He is an expert -- he is the

24  defendant's expert.  You can explore who is paying him and what

25  the relationship for bias is but he is clearly the defense

1  expert.

2  BY MR. SHORE:

3  Q.  When were you first retained by Jerry Kalas in this matter?

4  A.  I first found out when they called me about this last June.

5  Q.  In June of 2011?

6  A.  Yes.

7  Q.  Had you ever appeared in this court house prior to June of

8  2011?

9  A.  No.

10  Q.  Regarding this case?  No?

11  A.  No.

12  Q.  Do you know what court house you're in?

13  A.  Do I know the court house I'm in?

14  Q.  Do you know what court house you are in, what the address

15  is?

16  A.  Yes.

17  Q.  What is it?

18  A.  500 Pearl Street.

19  Q.  You are stating that you have never appeared at a

20  settlement conference or a court conference before on this

21  case?

22  A.  I've been here before but it was after -- you are asking me

23  before June 11?

24  Q.  Have you appeared on any -- have you appeared at a

25  settlement conference in this case?

1    A.  I have been here once but I don't -- I did not appear

2    anywhere to anybody.

3    Q.  You were here on a settlement conference regarding this

4    case previously, regarding this matter?

5    A.  I was here but I did not appear anywhere.  I did not -- I

6    was here but I did not speak or say anything.

7    Q.  And it involved this case, correct?

8    A.  Involving this case.

9             THE COURT:  When was that?  Was it before or after

10   June?

11            THE WITNESS:  It was after June, I believe.  I don't

12   recall.

13            It was after June, wasn't it?

14   BY MR. SHORE:

15   Q.  You didn't speak or give an estimate of how much the

16   bathroom would cost to renovate at that time?

17   A.  Yes.  Yes, I did.

18   Q.  You did.  And what was that amount?  You're under oath.

19            MR. STAMATELATOS:  I'm going to object, your Honor.

20            THE WITNESS:  I don't recall.  I remember I --

21            THE COURT:  Wait.  Don't answer yet.

22            What is your basis for the objection?

23            MR. STAMATELATOS:  Your Honor, if it was during the

24   settlement conference before Magistrate Peck it is not allowed,

25   your Honor.  If that's what Mr.  --

1           THE COURT:  I have no idea what it was.

2           MR. SHORE:  It was --

3           THE COURT:  All right.  So --

4           MR. SHORE:  -- settlement conference.

5           THE COURT:  You are trying to impeach him for what,

6    saying something different on a prior occasion?

7           MR. SHORE:  Yes.

8           THE COURT:  I don't know what your arrangement was

9    with Judge Peck, I wasn't involved in that.

10          MR. SHORE:  I think it is confidential, your Honor, so

11   out of respect for Judge Peck I will strike it from the record.

12          THE COURT:  All right.

13   BY MR. SHORE:

14   Q.   Now, you stated -- did you review the document regarding

15   the Department of Transportation online or did you go to the

16   Department of Transportation and review the document pertaining

17   to the subway?

18   A.   Online.

19   Q.   What was the website address?

20   A.   Department of Transportation is at 55 Worth Street.

21   Q.   Can you repeat that, please?

22   A.   55 Worth Street.

23   Q.   That's the name of the internet address, 55 Water Street

24   or?

25   A.   Department of Transportation address.

1   Q.  My question is did you look online or did you go to the

2   Department of Transportation?

3   A.  I looked online.

4   Q.  And what website did you go to?

5   A.  It's in Google.

6   Q.  Do you remember the --

7           MR. STAMATELATOS:  I object, your Honor.

8           THE WITNESS:  I don't --

9           MR. STAMATELATOS:  I object.  I don't know where is he

10  going with this line of questioning.

11          THE COURT:  It is testimony about him looking at a

12  document from the Department of Transportation.  I think it is

13  clearly --

14          MR. STAMATELATOS:  Mr. Shore didn't want to introduce

15  it, your Honor.

16          THE COURT:  So what.  He's testified about having gone

17  to the Department of Transportation's website.  It is fair

18  game.

19          Go ahead.

20          THE WITNESS:  What is the question again?

21  BY MR. SHORE:

22  Q.  So, the document you reviewed is on the Department of

23  Transportation website?

24  A.  I have downloaded it in my office.  I did not take it from

25  the Department of Transportation.

1    Q.  But the sole basis for you stating that a permanent ramp

2    can't be built because of the installation of the Second Avenue

3    subway is based on a document you reviewed on the Department of

4    Transportation website, is that accurate?

5    A.  You -- I guess I misinterpret myself.  The ramp cannot be

6    installed anywhere in New York within 15 feet from the corner

7    of any building regardless whether it is subway or not subway.

8          THE COURT:  Wait.  Is this anything to do with the

9    subway or it is irrelevant?

10          THE WITNESS:  It is irrelevant, your Honor, to my

11    understanding.

12          THE COURT:  Okay.

13    BY MR. SHORE:

14    Q.  Now, you're stating that any place of public accommodation

15    or any building cannot have a ramp within 15 feet of the

16    corner?

17    A.  Yes.

18    Q.  Where did you receive that information from?  What is the

19    basis for your saying that?

20    A.  Department of Transportation.

21    Q.  The Department of Transportation does not issue building

22    permits.  Are you aware of that?

23    A.  Yes, I know.

24    Q.  So, why are you stating that the Department of

25    Transportation would --

1   A.   In order to obtain building department permit you have to

2   have a Department of Transportation approval permit prior to

3   the building department permit.

4   Q.   How many building permits have you been involved in

5   applying for?

6   A.   Hundreds, if not thousands.

7   Q.   What is your background?  Where did you go to college?

8   A.   City University of New York.

9   Q.   What year did you graduate?

10  A.   '76.

11  Q.   Have you ever been convicted of any crimes?

12        MR. STAMATELATOS:  Object, your Honor.  I don't know

13  where Mr. Shore is going with this questioning.

14        THE WITNESS:  No, sir.

15        THE COURT:  Do you have a good faith basis to ask that

16  question?  Do you think he has been convicted of a crime?

17        MR. SHORE:  He has basically perjured himself in his

18  expert affidavit and during the testimony today stating that

19  the subway had something to do with not being able to install a

20  permanent ramp so he has perjured himself in his expert

21  affidavit and he has also perjured himself during the testimony

22  today.

23        THE COURT:  That's a pretty strong accusation.  I

24  would step lightly if I were you.  But, do you have a basis to

25  believe that Mr. Georgopoulos has been convicted of a crime?

1        MR. SHORE:  No, I'm just inquiring into his background

2   as I would in a deposition.

3        THE COURT:  But this is not a deposition and so if you

4   have a good faith basis to ask certain questions -- just watch

5   it.

6        MR. SHORE:  Okay.

7   BY MR. SHORE:

8   Q.  Where did you receive your training to become an architect?

9        MR. STAMATELATOS:  I object, your Honor.  Is Mr. Shore

10  trying to show that Mr. Georgopoulos is not an expert and

11  cannot testify today?

12       THE COURT:  Maybe.  I am being asked to rely on his

13  testimony.  If Mr. Shore wants to impeach the credibility of

14  the witness, he is free to do that.  If he wants to impeach his

15  credential as an expert, he can do that.

16  BY MR. SHORE:

17  Q.  Where did you receive your training to be an architect?

18  A.  Practicing architecture I graduated six years.  I have a

19  masters in city planning.

20  Q.  Where did you graduate from?

21  A.  City University of New York.

22  Q.  When did you become a registered architect?  What year?

23  A.  '82.

24       THE COURT:  Registered or is it licensed?  What is the

25  process?

1AC5kreT                    Georgopoloulos - cross

1        THE WITNESS:  Licensed.  Registered.

2        THE COURT:  Licensed 1982.

3   BY MR. SHORE:

4   Q.  Has your architectural license ever been revoked?

5   A.  No.

6   Q.  Has it been -- do you have to renew an architectural

7   license?

8   A.  Of course.  Every three years.

9   Q.  Have you renewed it every three years since 1982?

10  A.  Yes.  Indeed.

11  Q.  From 1982 to present can you tell me a little bit about

12  your employment history?

13  A.  Since 1987 I'm employed on my own, I have my own firm.

14  Q.  What about --

15  A.  Prior to that I was working for several architecture firms.

16  Q.  What is the name of law firm -- or excuse me, your

17  architectural firm?

18  A.  P. Georgopoulos Architects, P.C.

19  Q.  And what does -- are you the only employee at your firm?

20  A.  Yes.

21  Q.  And who are your typical clients?

22  A.  Al Moore Realty.

23  Q.  What type of matters do you work on for Al Moore Realty?

24  A.  What type of what?

25  Q.  What type of matters do you work on for Al Moore Realty?

1   A.  Mostly apartments, apartment buildings.  Some commercial.

2   Q.  And what, exactly, do you do for the commercial and

3   residential buildings as an architect?  Are you involved in

4   design?

5   A.  Design and construction supervision, building department

6   approvals.

7   Q.  Isn't it true that to obtain a permit for a permanent ramp

8   you have to apply for one from the New York City Department of

9   Buildings?

10  A.  Yes, it is.

11  Q.  Do you know if the defendants have applied for a permit in

12  this case?  For a permanent ramp?

13  A.  I don't think they did.  I'm not sure.  I don't think they

14  applied.

15  Q.  Is that based on advice you gave them?

16  A.  No.

17  Q.  Did you ever advise them as to whether a permanent ramp can

18  or cannot be installed prior to the expert report dated June

19  29th, 2011?

20  A.  No.

21  Q.  Do you know how many feet the entrance door of the Plaza

22  Diner is from the corner of 56th Street?  Have you measured it?

23  A.  One foot.  One or two feet.

24  Q.  Are you familiar with the Mayor's Office of People with

25  Disabilities?

1   A.  Yes, I am.

2   Q.  Are you aware that they grant waivers for places of public

3   accommodation to build ramps?

4   A.  Yes, I do.

5   Q.  Do you know how many inches the waiver is?

6           THE COURT:  Inches the waiver is?

7           THE WITNESS:  How many inches?

8           THE COURT:  I don't understand the question.

9   BY MR. SHORE:

10  Q.  Isn't it true that the New York City Mayor's Office of

11  Disabilities grants a waiver to restaurants to build permanent

12  ramps out towards the street onto the sidewalk up to 44 inches?

13  A.  Yes, I am.

14  Q.  You're aware of that statement and you are affirming it is

15  true?

16  A.  Possible.  It is a waiver.  I'm not sure if I can.  Yes, it

17  is a waiver.  You have to apply to see if it is possible to get

18  it.

19  Q.  Well, a waiver is a waiver.  Basically what a waiver

20  states, basically, that you don't need to apply for a permit,

21  you are waived from applying for a permit.  That's what I'm

22  referencing.

23  A.  Waive to apply for a permit?

24  Q.  Yes.

25  A.  From the building department?

1   Q.  Yes.

2   A.  I don't think you can get a waiver from applying for a

3   permit.  I have never done that.

4   Q.  So, you're not aware that you can obtain a waiver from that

5   department?

6   A.  No, sir.  I'm sure you can get a waiver but still you have

7   to file with the Department of Buildings to obtain a permit.

8              THE COURT:  Where does the property line end for the

9   diner?

10             THE WITNESS:  At the face of the wall.

11             THE COURT:  Face of the building?

12             THE WITNESS:  Yes.

13             THE COURT:  And the ramp, the permanent you would be

14  talking about would be how wide?  How many inches from the

15  property line.

16             THE WITNESS:  It must be five feet.  That's my

17  experience.

18             THE COURT:  60 inches?

19             THE WITNESS:  60 inches.

20             MR. SHORE:  60 inches wide.

21             THE WITNESS:  As you are saying you can probably get a

22  waiver if you have a 40 inches ramp.  I'm not sure of that.

23  BY MR. SHORE:

24  Q.  You stated earlier under direct that the width of the ramp

25  would have to be 60 inches?

1   A.  60 inches.

2   Q.  What is your basis for that statement?  What statutory

3   authority or standards are you addressing or citing to?  Why

4   would it have to be 60 inches, the ramp and width?

5   A.  Because you need a rail -- a rail up against the wall and

6   the rail to the exterior and the minimum width in between, it

7   has to be 36 inches minimum between the rails.

8   Q.  Between the rails?

9   A.  Between the rails.

10  Q.  It has to be how many inches?

11  A.  36 inches minimum.  But the ramp itself --

12  Q.  So, you are stating the rails itself would take up how many

13  inches?

14  A.  The concrete must be beyond the rail.  The concrete

15  platform and ramp must project beyond the rail.

16  Q.  Are you familiar with what the ADAG said?

17  A.  Yes.  Of course I am.

18  Q.  Have you reviewed the installation guidelines regarding the

19  installation of a ramp according to ADAG standards prior to

20  today?

21  A.  Yes.

22  Q.  Have you reviewed it in regard to this case particularly?

23  A.  From experience.  I did not do it with regard to this case

24  particularly.

25  Q.  Is it possible that the ADAG standards allow for less than

1   50 inches in width for a ramp?

2   A.  It's possible.

3   Q.  So, you don't necessarily need 50 inches in width to

4   provide –– to make it accessible?

5           MR. STAMATELATOS:  Object, your Honor.  He never

6   testified that they need 60 inches.

7           MR. SHORE:  He did testify on direct.

8           THE COURT:  I don't need the lawyers to argue.

9   Overruled.

10          Go ahead.

11  BY MR. SHORE:

12  Q.  So, the maximum width for installing a ramp would be five

13  feet or 60 inches but the ramp could also be less than that,

14  correct, the width of a permanent ramp?

15  A.  Please, let me explain.

16          The concrete of the ramp must be 60 inches.  When you

17  install the handrails left and right you are losing width on

18  the ramp.  Last you need protection at the bottom of the rail

19  so that the small wheels of the wheelchair do not project over

20  beyond the concrete.  It is probably difficult to explain how

21  it works.  I'm talking about the concrete, not the rail, the

22  concrete.

23  Q.  What did you say earlier the cost estimate was for

24  installing such a ramp?

25  A.  About $12,000.

1AC5kreT                    Georgopoloulos - cross

1    Q.  Are you aware that there is tax incentives for installing

2    and making places more readily achievable -- readily accessible

3    for people with disabilities?

4    A.  I'm not aware of that, no.

5            THE COURT:  What is your understanding of the 15 foot

6    requirement that you talked about before, the Department of

7    Transportation --

8            THE WITNESS:  Yes, your Honor.

9            THE COURT:  -- 15 feet of clearance from what to what?

10           THE WITNESS:  15 feet from the corner of a building.

11           THE COURT:  15 feet from the corner of a building?

12           THE WITNESS:  Of the building.

13           THE COURT:  What?  What is the case?

14           THE WITNESS:  Up to 15 feet from the corner of a

15   building you cannot have a ramp projecting into the sidewalk.

16   It has to be beyond 15 feet.

17           THE COURT:  So, 15 feet from the street or 15 feet

18   from -- what do you measure the 15 feet from, the corner of the

19   building to the street?

20           THE WITNESS:  If we assume we have a ramp, let's say

21   along Second Avenue --

22           THE COURT:  Let's use a photo.  Let's go to

23   Plaintiff's Exhibit -- I think it is the best photo we have, so

24   Plaintiff's Exhibit 15, photo 1, the top photograph.  Do you

25   see that?  Go to the first page of 15.  Looking at the top

                SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

1AC5kreT                    Georgopoloulos – cross

 1   photograph it says Plaza Diner.

 2              THE WITNESS:  Yes.

 3              THE COURT:  On one side where the main entrance is it

 4   says Plaza Diner where there is a window with no entrance,

 5   correct?

 6              THE WITNESS:  Yes.

 7              THE COURT:  Do you see that?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Where is Second Avenue in this photo?

10              THE WITNESS:  From the corner of the building.

11              THE COURT:  So Second Avenue, the woman in the coat

12   with her handbag on her shoulder is on Second Avenue?

13              THE WITNESS:  Yes, your Honor.

14              THE COURT:  And the kid with a soda in his hand, he is

15   on 56th -- facing 56th Street, is that correct?

16              THE WITNESS:  Yes.

17              THE COURT:  Looking at this photograph, if the ramp

18   was to the left of the door where does the 15 feet get

19   measured?

20              THE WITNESS:  From the corner that we see.

21              THE COURT:  From the corner of the building?

22              THE WITNESS:  Of the building.  In this case the

23   building is at the property line.

24              THE COURT:  At the corner of this building back to

25   where there is a dark blind that looks like where it is is

1AC5kreT                          Georgopoloulos - cross

1    where the Plaza Diner ends; how many feet is that?

2             THE WITNESS:  15 feet -- oh, the width of the building

3    is I believe 20 feet maybe.

4             THE COURT:  20 feet.

5             So, you're saying a ramp would have to be 15 feet away

6    from that corner where the building -- well, the corner that is

7    depicted on the building in this photograph.  That's what you

8    are saying?

9             THE WITNESS:  Yes, your Honor.

10            THE COURT:  That's based on Department of

11   Transportation regulations?

12            THE WITNESS:  Yes.

13            Same thing along 56th Street when we look on 56th

14   Street along 56th Street.

15            THE COURT:  Yes.

16            THE WITNESS:  There is a trap door on the sidewalk,

17   this is, let's say, about 15 feet.  The ramp can be beyond the

18   trap door.

19   BY MR. SHORE:

20   Q.  If you are stating that Department of Transportation

21   regulations provide that no ramp can be built within 15 feet of

22   the corner of a building, doesn't that apply to almost any

23   building?

24   A.  To my understanding, yes, any building.

25   Q.  So, you are basically stating in the New York -- the

             SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1   Department of Transportation prevents ramps from being built

2   throughout the city, is that correct?

3   A.  I'm sure they do.  Yes, they do.

4           THE COURT:  You are talking about buildings on a

5   corner, right?  You are saying not the interior of a block

6   building.

7           THE WITNESS:  On interior blocks they do.  Not on the

8   corner.  That's my understanding.

9           THE COURT:  I'm just not sure I understand you.  The

10  15 foot requirement that you have been talking about from the

11  Department of Transportation, that pertains to buildings that

12  are on the corner or any building?

13          THE WITNESS:  Corner buildings.

14          THE COURT:  Corner buildings.  All right.

15  BY MR. SHORE:

16  Q.  When you stated the width of the building is 50 feet --

17          THE COURT:  The width of the building?

18  A.  Not the width.  The width is about 20 feet.

19  Q.  25 feet?

20  A.  The length is probably 50.

21  Q.  From the corner to the end?

22  A.  Along 56.

23  Q.  What about the right side of the entrance door to the end

24  of Plaza Diner, where is the width?

25  A.  I'm sorry.  Say that again?

1   Q.  What is the width of the Plaza Diner from the right side of

2   the corner door -- the right side of the entrance door to the

3   north side of the Plaza Diner?

4   A.  It's like a foot or so less than the entire width of the

5   building.  The building ends at the white marble.

6   Q.  So, you're stating from the corner of the building to the

7   north side of the door is one foot?

8   A.  One and a half, one foot.  I didn't measure it.

9   Q.  So, it would be approximately 12 to 16 inches from the

10  corner of the building to the north side of the --

11  A.  To the north side of the door?

12  Q.  Yes, right, towards the same -- where the person and the

13  lady in the handbag is, that side of the door.

14  A.  I don't understand.  There is no door there.  I'm sorry.

15  Q.  You don't see a door on the top side, on the picture?

16  A.  There is only one door to the building.

17  Q.  Yes, I know, for the entrance?

18          THE COURT:  I don't understand the question.  What is

19  the question?

20          THE WITNESS:  I don't understand the question.

21  Q.  I'm asking from the corner of the building to the far side

22  of the entrance door how many inches is it, approximately?

23  A.  The far side to the entrance door.

24  Q.  If I can show him?

25          THE COURT:  You can direct him.

1    A.   Including the width of the door you mean?

2    Q.   From here to here, how many feet?

3    A.   It is about four and a half feet.

4    Q.   And from here to here?

5    A.   One and a half.  I did not measure it.

6    Q.   You didn't --

7    A.   I didn't measure exactly the width of the column.

8    Q.   Just so we're clear, the Second Avenue subway would have no

9    effect on the installation of a permanent ramp an this

10   location, it is based solely on the alleged 15 feet Department

11   of Transportation prohibition on installing a permanent ramp in

12   the corner of a building, is that correct?

13   A.   I cannot answer with confidence.  I am doing another

14   restaurant on 86th and Second Avenue and I am in the process of

15   obtaining a permit from these people.  I don't know if I will

16   get that.  I can't tell you for sure.

17   Q.   Is there any -- would the Plaza Diner be at least allowed

18   to apply for a permit or are you stating that this, that the

19   subway or the 15 inch, do either of those prevent them from

20   applying for a permit?

21   A.   No, I'm not saying nobody is preventing you from applying

22   for a permit.  I'm not applying for a permit.  The Second

23   Avenue Corp., nobody is preventing them to apply for a permit.

24   Q.   So they can apply for a permit and it is up to the

25   Department of Buildings to decide?

1    A.  They can apply for a permit.  We don't know if it is going

2    to be rejected or not.  This is up to the Department of

3    Transportation again.  We apply for a permit to the building

4    department.

5    Q.  So, Department of Buildings will either --

6    A.  It requests Department of Transportation approval.

7    Q.  With regards to the width and length -- the length of the

8    ramp, you believe there is enough room to install a permanent

9    ramp length-wise on Second Avenue?

10   A.  Length-wise it works.  It's okay.

11            MR. SHORE:  I don't have any other questions.

12            THE COURT:  All right, redirect?

13            MR. STAMATELATOS:  Yes, your Honor.

14            THE COURT:  Okay.

15            MR. SHORE:  Actually, your Honor, can I ask one on

16   question?

17   Q.  Are you familiar with local law 57 -- New York City local

18   law 57?

19   A.  No, I'm not.

20   Q.  What is your basis for stating that a unisex bathroom

21   cannot be installed in the premises?

22   A.  If you can please be specific?  One bathroom unisex or --

23   Q.  One bathroom unisex.

24   A.  One bathroom for the entire restaurant?

25   Q.  Yes.

1AC5kreT                          Georgopoloulos - cross

1   A.  Based on the amount of occupants you cannot have one

2   bathroom as per code.

3   Q.  What about one -- what about two restrooms, one which is

4   unisex; what is the basis for stating that that, that you

5   cannot have a unisex bathroom?

6   A.  From what I understand it might be a problem with the

7   liquor license.

8   Q.  Is there a specific section or statute within the liquor

9   license that states that you have to have -- that you cannot

10  have a unisex bathroom?

11  A.  You have to apply for the liquor license again.

12  Q.  Are you stating --

13  A.  They might object.

14  Q.  They might object to it.

15          There is no requirement with regards to how many

16  bathrooms you have to have?

17  A.  You have to have two bathrooms, I know.  I'm not sure if

18  they will accept one unisex and one small bathroom.

19  Q.  And the ADAG standards, do they allow for a unisex

20  bathroom?  Are you aware that Americans with Disabilities has

21  guidelines that state that you can have a unisex bathroom

22  within a restaurant?

23  A.  You can have a unisex bathroom in a restaurant.

24  Q.  You can?

25  A.  Yes, you can.

1          MR. SHORE:  No further questions.

2          THE COURT:  Okay, Mr. Stamatelatos.

3          MR. STAMATELATOS:  Yes, your Honor.

4    REDIRECT EXAMINATION

5    BY MR. STAMATELATOS:

6    Q.  Your Honor, I would like the Court to get some clarity,

7    Mr. Georgopoulos.  We're in New York City.  If I want to build

8    a permanent ramp, for example, or the Plaza Diner wants to

9    build a permanent ramp in front of its diner, what code is

10   going to apply, the Americans with Disabilities Act and

11   guidelines or the New York City Department of Buildings code

12   and the New York City Department of Transportation code?  Which

13   rules from which governmental agency is going to apply?

14         MR. SHORE:  Objection, your Honor.  There is no

15   Department of Transportation code.

16         MR. STAMATELATOS:  Of course, there is.

17         THE COURT:  I'm going to allow the question.  I don't

18   know if there is an answer to it but go ahead.

19         Can you answer the question?

20   Q.  Or do you want me to give you an example that Mr. Shore

21   said?

22         You testified that the ramp has to be five feet wide

23   if it's about to be built on Second Avenue, correct?

24   A.  Uh-huh.

25         THE COURT:  You have to say yes or no.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   A.  Yes.  I'm sorry.

2   Q.  Mr. Shore said that the ADAG standards say it can be 44

3   inches?

4   A.  Yes.

5   Q.  So, if I want to build a permanent ramp or the Plaza Diner

6   wants to build a permanent ramp in front of its diner, which

7   code is going to apply?

8   A.  It would definitely be an ADA code.  It's -- I believe it

9   is not the building department code or the transit authority

10  code, it is the ADA code to be sufficient for ADA compliance.

11  Q.  Sir, if you can look at the photograph, I believe in your

12  report if you can have a look at your report, the expert

13  report, it is in front of you, I believe there is a picture

14  that you took which shows the front of the Plaza Diner.  Do you

15  see that?

16  A.  Yes, I do.

17  Q.  Do you see telephone booths in that photograph in front of

18  you?

19  A.  Yes.

20  Q.  Now, do you know what the distance is from the telephone

21  booths to the front of the diner?

22  A.  I did not measure that.

23  Q.  So let's, for example, install a permanent ramp in front of

24  the diner, would people be able to pass through on the

25  sidewalk?  Would that be allowed by the city?

1    A.  Again, there is a minimum passageway requirement of eight

2    feet between the ramp and any street furniture.

3    Q.  And, would there be eight feet of clearance for people to

4    pass by on the sidewalk?

5    A.  I can not measure that.  I cannot tell.

6    Q.  Now, for clarification for the Court as well, I believe

7    this is the document you were referring to.  If you would have

8    a look at that for a moment?

9            THE COURT:  Do you have a number on it?

10           MR. STAMATELATOS:  No, your Honor.  It is not in

11   evidence.

12           THE COURT:  Let's put a number on it.

13           MR. STAMATELATOS:  I just have one copy unfortunately,

14   your Honor.

15           THE COURT:  Well, put it on.

16           MR. STAMATELATOS:  Defendant's Exhibit 37 might be.

17           THE COURT:  Whatever you think, 37?

18           MR. STAMATELATOS:  37 is fine.

19           THE WITNESS:  Rules related to.

20           THE COURT:  Wait.  Let's mark it.

21           Rules related to revocable consents?

22           THE WITNESS:  Revocable consents.

23           MR. SHORE:  Is that the complete title of the

24   document, rules related to -- or maybe if I can see it?

25           MR. STAMATELATOS:  You can have a look at it.  That is

1    the only copy I have, unfortunately.

2            MR. SHORE:  Your Honor, may I ask a question for a

3    moment?

4            THE COURT:  You'll get a chance to redirect --

5    recross, so let's -- if you have an objection you can make an

6    objection.

7            MR. SHORE:  I was going to ask regarding the

8    introduction of exhibits.

9            THE COURT:  It hasn't been introduced.

10           MR. SHORE:  I will wait to rebut.  Basically I want to

11   know if the Court would take judicial notice of laws that I

12   mentioned, the ADAG standards.

13           THE COURT:  I think I can take judicial notice of

14   various statutes and regulations.

15           MR. SHORE:  Okay.

16           THE COURT:  I'm not sure whether this is one of them.

17           MR. STAMATELATOS:  I believe that is one of them.

18           THE COURT:  Let's explore this.

19           What is the question you're asking?

20   BY MR. STAMATELATOS:

21   Q.  Is this the revocable consent document you were referring

22   to before?

23   A.  Yes, it is.

24   Q.  Do you find the section in there which says how many feet

25   from a corner one cannot put up a permanent structure on the

1    sidewalk?

2    A.   This is what I'm looking for.

3              MR. STAMATELATOS:  I believe it might be page 17 if I

4    may direct him, your Honor?

5              THE COURT:  What are you asking him?  What is on page

6    17?

7              MR. STAMATELATOS:  The regulation that he was

8    referring to.

9              THE COURT:  If you know where it is you can show it to

10   him.

11   BY MR. STAMATELATOS:

12   Q.   Have you found the regulation that you were testifying to

13   earlier?

14   A.   Yes, I do.

15   Q.   And can you read the regulation?

16   A.   Clearance for a --

17             THE COURT:  Wait.  What section are you reading from?

18             THE WITNESS:  Section 7-06.

19             THE COURT:  7-?

20             THE WITNESS:  06.

21             THE COURT:  Okay.

22             Are you --

23             THE WITNESS:  Do you want me to read it, your Honor?

24             THE COURT:  Let's ask this question.  Is this the

25   regulation or the document from the Department of

1    Transportation website you were referring to before?

2              THE WITNESS:  Yes, it is.

3              THE COURT:  And the part that you believe barred the

4    construction of a permanent ramp is Section 6-06 -- Section

5    7-06?

6              THE WITNESS:  06.

7    BY MR. STAMATELATOS:

8    Q.  How many feet from the corner does that section say one

9    cannot put up a permanent structure, Mr. Georgopoulos?

10   A.  I need one minute, please.

11   Q.  Sure.

12   A.  I have to read another section before I -- ramps, intended

13   to provide access for people with disabilities, this is --

14             THE COURT:  Section 7-06?

15             THE WITNESS:  I go back to 7-03.  Sorry.

16             THE COURT:  Was there a question about 7-06 first?

17             THE WITNESS:  It is --

18             THE COURT:  I am asking Mr. Stamatelatos.

19   BY MR. STAMATELATOS:

20   Q.  What is the clearance that Section 7-06 provides for?

21             THE COURT:  7-06 C?

22             MR. STAMATELATOS:  Just 7-06.

23             THE COURT:  7-06, I pulled it up online, I think it is

24   the same thing you have got there.  Aren't there subsections?

25             MR. STAMATELATOS:  You're right, your Honor.  I

1  apologize.

2            THE WITNESS:  C, yes.

3  BY MR. STAMATELATOS:

4  Q.  C-1.  What does that provide firstly, Mr. Georgopoulos?

5  A.  No revocable consent will be granted for above ground

6  structures located within the corner quadrant.

7            THE COURT:  Parentheses, the area ten feet from either

8  side of the area created by extending the building line to the

9  curb.  Is that correct?  That's what it says?

10           THE WITNESS:  Yes.

11           THE COURT:  What does that mean to you?  What did you

12  interpret that to mean?  Why don't we look at the exhibit, the

13  photograph, 15-1.

14           Basically you extend the line on the pavement at the

15  bottom there moving from the corner of the building --

16           THE WITNESS:  From the corner of the building created

17  by extending the building line to the curb 10 feet.

18           THE COURT:  So, what is your understanding?  This

19  regulation requires you to do what or forbids you to do what?

20  BY MR. STAMATELATOS:

21  Q.  Can you answer what the judge is asking you

22  Mr. Georgopoulos, please?

23  A.  I am trying understand.  Forgive me, I am confused because

24  this is not what the sections --

25           THE COURT:  This is not what?

 1              THE WITNESS:  This is not the correct section.

 2              THE COURT:  It is not the correct section?

 3              THE WITNESS:  I beg your pardon.

 4              THE COURT:  What is the section you referred to that

 5    you believe barred the construction of a permanent ramp at the

 6    Plaza Diner?

 7              THE WITNESS:  I have to look through it because it is

 8    15 feet.

 9              THE COURT:  Try 27-308.

10              THE WITNESS:  I don't have my glasses.

11              THE COURT:  Try section 3, clear path.

12              MR. STAMATELATOS:  Just listen to the Judge and

13    concentrate on what he is asking you.

14              THE COURT:  7-06 C-3.  Is that what you're referring

15    to?  The reference is 15 feet for a clear path.

16              MR. STAMATELATOS:  What section was that, your Honor?

17              THE COURT:  7-06 C-3, second to last sentence.  I

18    don't know that this has anything to do with anything but it

19    says 15 feet.

20              THE WITNESS:  Yes, this is the one.  I'm sorry, your

21    Honor.

22              THE COURT:  So, what is the relevant portion of this?

23              THE WITNESS:  The minimum width of a clear path shall

24    be -- the clear path shall be maintained for 15 feet to either

25    side of the improvement.  15 feet clear path from the corner,

1AC5kreT                       Georgopoulos - redirect

1   from the building to the sidewalk -- from the building to the

2   sidewalk construction.

3              MR. STAMATELATOS:  I have no further questions.

4              THE COURT:  Nothing further.

5              THE WITNESS:  Thank you.

6              THE COURT:  Mr. Shore, anything you want to cover on

7   recross?

8              THE WITNESS:  I'm sorry, I cannot answer the question.

9   I'm looking at it.

10             THE COURT:  I don't think there is any question

11  pending.

12             So, Mr. Shore, do you want do any recross?

13             MR. SHORE:  No, your Honor.  I don't think any is

14  necessary.

15             THE COURT:  Okay.  You can step down,

16  Mr. Georgopoulos.  Thank you.

17             THE WITNESS:  Thank you.

18             MR. STAMATELATOS:  The defendants rest, your Honor.

19             THE COURT:  Do you have any other witness you plan to

20  call on a rebuttal case?

21             MR. SHORE:  No, your Honor.

22             THE COURT:  No.  Well then let's talk about where we

23  are with this.

24             You can step down, Mr. Georgopoulos.

25             THE WITNESS:  Thank you.

1AC5kreT

1          THE COURT:  It seems to me that this case is really

2    about whether or not -- whether the barriers or violations that

3    have been alleged here can be removed in a readily achievable

4    way.  That seems to be what the focus was and should be

5    according to both the statute and the law as interpreted by

6    courts.  Readily achievable means easily accomplishable and

7    able to be carried out without much difficulty or expense.

8    Factors to be considered include the nature and costs of needed

9    changes, the financial resources of the facility, number of

10   employees, effect on expenses and resources and other impact on

11   the facility, the financial resources and size of the covered

12   entity and the type of operations at the entity in relationship

13   between the facility and the covered entity which here we have

14   a landlord and we have the business that is operating in the

15   location.

16         Plaintiff has to articulate a plausible proposal for

17   barrier removal, the costs of which facially do not clearly

18   exceed its benefits, and so one issue is whether the plaintiffs

19   have done that and then I guess the other issue is whether the

20   defendants have articulated a basis to conclude that the

21   changes proposed here would be not readily achievable.

22         Now, there is a variety of different alleged

23   deficiencies here from the lack of a permanent ramp to lack of

24   proper signage about a ramp, lack of adequate buzzer or other

25   things that would allow one to alert people inside that they

1    are planning to come in.  There are alleged violations with the

2    restrooms both as to the size of the restroom so that's a

3    little unclear, frankly, to me, and the placement of grab bars,

4    insulation for pipes, mirrors, that sort of thing, and then

5    there is also the issue of the aisle clearance and the counter

6    configuration.

7              So, I'm happy to take argument from you now or maybe

8    you want to come back tomorrow after you've had a chance to

9    think about your summations and make an argument then.  Or

10   maybe you want to make written submissions after having

11   reviewed the transcripts of the testimony.  I have to say, I

12   think that there is holes in both sides' presentation of the

13   evidence.

14             So, what did you folks intend on doing?  Summations?

15   Oral summations?

16             MR. SHORE:  I'm prepared to do a closing.  If

17   Mr. Stamatelatos would like to put it off a day I'm agreeable

18   to that also.  I'm also agreeable to written submissions.

19   Whatever the Court thinks is advisable.

20             THE COURT:  There has been a lot of testimony today,

21   both direct and cross, about regulations which it is not clear

22   to me exactly which of the regulations this apply.  Mr. Shore,

23   you suggested that the Court can take judicial notice of the

24   relevant regulations; federal, city, state, local, I don't know

25   which regulations you consider to be relevant, but is that

1AC5kreT

```
 1    something that I've got at my finger tips right now?  I have

 2    Title 42.

 3              MR. SHORE:  I think perhaps submitting written

 4    submissions would be the best thing.

 5              THE COURT:  How long do you think you would need to

 6    make those kinds of submissions?

 7              MR. SHORE:  I could have it done tomorrow.  I would

 8    prefer an extra week or two.

 9              THE COURT:  I would give you a week or two, I would

10    think, to do written submissions.

11              MR. SHORE:  I would appreciate if I could have two

12    weeks.

13              MR. STAMATELATOS:  I think the transcript we can

14    probably get in a few days and a few weeks would be fine, your

15    Honor.

16              THE COURT:  I think written submissions will be

17    helpful.  I think it will help the parties focus their

18    arguments and help me to focus what factual disputes are that

19    are relevant.  I think I have identified the most important one

20    which is readily achievable, but if it in fact turned out to be

21    the case that New York City regulations barred the construction

22    of a permanent ramp that close to the corner, that would I

23    think be dispositive with respect to the ramp.  I'm not

24    prepared to find that today but it seems to me that that would

25    make it not readily achievable.
```

1AC5kreT

1          Do you agree with that, Mr. Shore, as a hypothetical?

2     If there is a regulation that says you can't build

3          MR. SHORE: As a hypothetical, yes. I'm not aware of

4     any such regulation.

5          THE COURT: Well, you saw what the witness was shown

6     which -- I just went to the website under the assumption that I

7     can consider things that are regulations that are available to

8     the Court.

9          MR. SHORE: My expert didn't testify or put in an

10    expert affidavit so that is something I will have to inquire

11    with him and also read the regulation that was cited and it is

12    going to take some time to see if that's actually accurate.

13    I'm doubtful that it is. That is something that I would like

14    some time to look into.

15         THE COURT: You can look into it but everybody has

16    rested at this point so it is not as though --

17         MR. SHORE: Based on the written submission.

18         THE COURT: I'm not planning to open the record again

19    for expert testimony. If there is something that the Court can

20    consider, regulations and statutes, then I think I clearly can;

21    I think parties can make arguments from those.

22         MR. STAMATELATOS: I think that's the way to go.

23         THE COURT: But I don't anticipate reopening the

24    evidence in a case so that an expert can now take a crack at

25    interpreting or providing me with how it really works in the

1AC5kreT

1    real world based on statutes or regulations that are now part

2    of the record, right?  You are not suggesting that?

3              MR. SHORE:  Suggesting what?

4              THE COURT:  That we reopen the evidence.

5              MR. SHORE:  No.  Suggesting written submissions, your

6    Honor, to assist the Court.

7              THE COURT:  So, I think that would be helpful.  So,

8    what do you think, two weeks?  Today is Wednesday?  Two weeks

9    from Friday.

10             MR. STAMATELATOS:  Should be fine, your.

11             THE COURT:  October 28th the parties can make written

12   submissions related to propose -- you have already made

13   proposed findings of fact and conclusions of law.  Now, I think

14   this is reference to the actual transcript and exhibits that

15   were admitted and regulations that are part of the record or

16   that are deemed available to the Court for judicial notice and

17   then we will see.  Once I have your submissions maybe I will

18   bring you in for some oral argument so that I can ask questions

19   or maybe I will just rely on written submissions.  Once I have

20   them then I will be in a position to decide.  Okay?

21             MR. STAMATELATOS:  That's fine, your Honor.

22             THE COURT:  Is there anything else we should do today?

23             MR. STAMATELATOS:  I believe nothing else, your Honor.

24             THE COURT:  Mr. Shore?

25             MR. SHORE:  No, your Honor.

1AC5kreT

```
 1          THE COURT:  Mr. Kreisler?
 2          PLAINTIFF:  No.  I'm fine, thank you.  Thank you,
 3   Judge.
 4          THE COURT:  I will wait until I get the parties'
 5   submissions, file them on ECF by October 28th.  If after
 6   getting the other side's submission you think you would like to
 7   make a response, ask me.  I'm not going to set a schedule for
 8   that now because I think it might be unnecessary, but if you
 9   see something that's completely off the wall that you hadn't,
10   didn't think you could fairly anticipate, you can ask.  But
11   once I have your submissions then I will give you guidance as
12   to whether I'm going to bring you back or I will rule, okay?
13          MR. SHORE:  Are the written submissions basically --
14   they're going to be submitted on ECF as just a written
15   submission or memorandum of law?
16          THE COURT:  Yes, just a memorandum.  Exactly.
17          MR. SHORE:  Based on the evidence that was introduced.
18          THE COURT:  Nobody should be relying on things that
19   aren't in evidence.  I don't think there should be any dispute
20   as to what is in.  Look at the transcript.  If there are
21   exhibits that for whatever reason didn't get moved in and the
22   parties stipulate to being in, then you can just -- in fact, I
23   will ask you to do this.  By Friday send me just an exhibit
24   list.  If we had a jury I would ask the parties to send me an
25   exhibit list of all the exhibits that are in evidence.  And if
```

1AC5kreT

1    there is dispute, just indicate where there is dispute but I

2    don't think there should be disputes.  There are not many

3    pieces of evidence admitted in this trial.

4              So, just send me an exhibit list by Friday so that

5    we're all on the same page as to what the universe of exhibits

6    is, and then post-trial submissions by the 28th, okay?  All

7    right.  Thanks.

8              Let me thank the court reporter, as always.  She never

9    gets a break.  We get to rest once a while but she doesn't.

10             Have a good day.  Appreciate it.

11                                o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

372

```
 1                     INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    LEON GEOXAVIER

 4    Direct By Mr. Shore  . . . . . . . . . . . . . 208

 5    Cross By Mr. Stamatelatos  . . . . . . . . . 245

 6    Redirect By Mr. Shore  . . . . . . . . . . . 285

 7    DAVID GENTILE

 8    Direct By Mr. Stamatelatos . . . . . . . . . 288

 9    Cross By Mr. Shore . . . . . . . . . . . . . 301

10    PANAGIS GEORGOPOULOS

11    Direct By Mr. Stamatelatos . . . . . . . . . 306

12    Cross By Mr. Shore . . . . . . . . . . . . . 326

13    Redirect By Mr. Stamatelatos . . . . . . . . 356

14                     PLAINTIFF EXHIBITS

15    Exhibit No.                             Received

16     13    . . . . . . . . . . . . . . . . . . 209

17     14    . . . . . . . . . . . . . . . . . . 219

18

19

20

21

22

23

24

25
```