17P7KREC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   TODD KREISLER,

 4                  Plaintiff,

 5            v.                            10 Civ. 7592 (RJS)

 6   SECOND AVENUE DINER CORP
     and J.J.N.K. CORP.,
 7
                  Defendants.
 8
     ------------------------------x
 9
                                           July 25, 2011
10                                         2:15 p.m.

11   Before:

12                    HON. RICHARD J. SULLIVAN

13                                         District Judge

14                          APPEARANCES

15   ADAM SHORE
         Attorney for Plaintiff
16
     PAUL STAMATELATOS
17       Attorney for Defendants

18

19

20

21

22

23

24

25
```

17P7KREC

```
 1              (Case called)

 2              (In open court)

 3              MR. SHORE:  Adam Shore for the plaintiff.

 4              THE COURT:  And for the defendant?

 5              MR. STAMATELATOS:  Paul Stamatelatos.

 6              THE COURT:  All right.  We're here because of the

 7    premotion letter from Mr. Stamatelatos concerning really a

 8    standing challenge with respect to the plaintiff here.

 9              I've got the response of Mr. Shore, and I have looked

10    at the cases.  Mr. Stamatelatos, you rely quite a bit on a

11    Tenth Circuit case, but I think the Second Circuit is clear

12    that they're either critical of or certainly distinguishing

13    toward that case.  The Second Circuit standard I think is quite

14    different.  Do you agree with that?

15              MR. STAMATELATOS:  Yes, I have been researching that,

16    your Honor.

17              THE COURT:  Yes.  I mean, look, there is a certain

18    intuitive appeal to the argument you are making here, and it

19    might be a closer case in the case that Mr. Hirsch, who has

20    about 80 of these things kicking around, but even in that case

21    I'm just not sure that Congress didn't frankly intend for

22    people to be acting as their own little private Attorneys

23    General and figuring out what establishments are in compliance

24    and what ones are not in compliance with the Americans with

25    Disabilities Act.  So, I think it's not likely to be a winner
```

1   here.

2          I don't think the plaintiff has to establish that he

3   desperately wants to eat at a particular place and has tried to

4   get over the step to do it in order to have standing.  I think

5   some of the internal problems I think are a closer question,

6   because if he has never been inside the restaurant before, the

7   additional burdens are ones that it seems like those are just

8   kind of tag-along causes of action or tag-along arguments.

9          But it seems to me this is not likely a winner, and as

10  you know I haven't decided, and I don't ever tell anyone they

11  can't make a motion, but I do think it's worth discussing with

12  the parties what my sense of the merits of a motion are before

13  they spend a lot of time, and energy and money making the

14  motion.

15         So, it does seem to me that it's not likely to be a

16  winner.  I think that, you know, injure in fact doesn't require

17  that much, certainly doesn't require what the Tenth Circuit has

18  said it requires.  But I am happy to hear you,

19  Mr. Stamatelatos.

20         MR. STAMATELATOS:  The issue here, your Honor, is out

21  of the plaintiff's deposition came testimony that he never saw

22  the complaint.  The first time he saw the complaint was during

23  the deposition.  He never entered the store.  He was not aware

24  of any of the architectural barriers.  So, I think firstly

25  that's going to be a problem for the plaintiff with standing.

17P7KREC

1           THE COURT:  But I mean never mind the interior

2      barriers.  There is a barrier to getting in, right?

3           MR. STAMATELATOS:  But the defendants had a portable

4      ramp, your Honor.  He never approached the diner at any time

5      saying, yes, I want to come into the store but I cannot.  That

6      was in his testimony.  He never spoke to anybody at the diner

7      trying to get access into the diner.  So, it's not a given

8      that, yes, because there is a step he cannot gain access.

9           My clients have had people in the diner with

10     wheelchairs, so it is possible for somebody to enter the store

11     with a wheelchair.  You put the portable ramp.  They cannot

12     install a permanent ramp there.  I think the distance between

13     the step and not the sidewalk but the curb, I think there are

14     some phone booths, there is maybe four feet, so it's not

15     possible for them to install a permanent ramp.  But they do

16     have a portable ramp that is used when handicapped people need

17     access to the diner.

18          So, it's not that he couldn't get into the store.  He

19     never tried to get into the store.  He never spoke to anybody

20     at the diner to gain access into the store.

21          THE COURT:  But I don't think you have to have tried

22     to get into the store to have standing.  The cases don't seem

23     to say that.  I think they are saying there is authority for

24     the proposition that you have to have knowledge of the

25     barriers, and I think a person who is standing outside or

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17P7KREC

1   sitting outside of the establishment can look at the step that

2   is a barrier to entrance and can conclude from that that there

3   is a barrier that's not in compliance with the ADA.  So, I

4   don't think standing is ultimately going to be the winner here.

5        Now, you may be able to establish that what they've

6   got, the temporary ramp, is sufficient or that the changes

7   being proposed of a permanent nature are not feasible.  And

8   then I think that you have some pretty good arguments about

9   whether or not there was any actual knowledge of the barriers

10  that were inside the restaurant, which is the height of the

11  cashier area, the table there, the signage, the restroom

12  facilities and the emergency exit.  I think it seems to me that

13  the record is -- at least it's been represented to me that the

14  record is clear that the plaintiff didn't know any of those

15  things at the time the suit was brought.  But it does seem

16  certainly that he was aware of the step that would have

17  prohibited him from getting into the restaurant absent a ramp,

18  right?  Do you agree with that?

19       MR. STAMATELATOS:  There is a step, yes, there is.

20  There is access for him.  If he requires access, there is a

21  portable ramp that the diner can place for handicapped people

22  to gain access.

23       THE COURT:  So, you are suggesting that in order to

24  have standing he's basically got to try to get in and see if

25  they have a ramp or see if they make accommodations to get him

17P7KREC

1    in?

2            MR. STAMATELATOS:  Sure.

3            THE COURT:  And if he doesn't do that, he doesn't have

4    standing?

5            MR. STAMATELATOS:  That's what I feel.

6            THE COURT:  Well, I mean you can feel it, but I don't

7    see any authority that supports that.  So, I mean is there any

8    authority that you are citing besides this Tenth Circuit case?

9            MR. STAMATELATOS:  I haven't found anything in the

10   Second Circuit yet, your Honor.

11           THE COURT:  OK.  So, I think it's not likely to be a

12   winner on standing.  That's my sense.

13           All right.  Mr. Shore, what is one to make of this?  I

14   mean general matter I mean there are a number of plaintiffs who

15   are bringing dozens of cases including Mr. Hirsch, and there is

16   a law firm that represents Mr. Hirsch in all of these cases,

17   including some restaurants where Mr. Hirsch would have

18   difficulty based on dietary restrictions from eating a meal

19   there, and so the whole thing looks to a cynical observer as

20   just sort of a game.  Is that's what's going on?

21           MR. SHORE:  Your Honor, I'm not involved in Mr.

22   Hirsch's cases, I have never been involved in Mr. Hirsch's

23   cases.  I don't know who he is.

24           THE COURT:  He's represented by the Weitz law firm.

25   So, what's the relationship between your firm or you and the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17P7KREC

1   Weitz law firm in this case?

2            MR. SHORE:  I am lead case.  The Weitz law firm just

3   happens to be cocounsel.  The plaintiff mainly always basically

4   deals with me.  Mr. Todd Kreisler deals with me.  The Weitz Law

5   Firm, P.A. handles the Hirsch cases.  I have no involvement in

6   these Hirsch cases, and I don't have any knowledge, and I don't

7   have any comment on those cases because, one, they haven't been

8   decided yet, and, two, it's just a New York Post article.

9            I really don't know what to say other than those cases

10  remain to be resolved, and it's for a court to decide, and I

11  have no other comment with regard to the Hirsch matters because

12  I'm not involved with them.

13           With regards to this case the plaintiff lives within

14  three blocks from the Plaza Diner.  He wants to eat in the

15  diner.  He testified that he has wanted to eat there on

16  numerous occasions and would have gone in if it was accessible.

17           Prior to the commencement of this action there was

18  never a buzzer at the entrance of the diner.  Subsequent to the

19  filing of this action, defendant admitted that they installed a

20  buzzer for the plaintiff and others who are similarly situated

21  to press the buzzer to alert staff to place the portable ramp

22  at the entrance of the facility.  Plaintiff is not

23  acknowledging whether the portable ramp is or is not in

24  compliance with the ADA.

25           THE COURT:  Well, that seems to be one of the issues,

17P7KREC

1    whether the portable ramp or the temporary ramp is compliant,

2    whether that's enough to solve the problem.  Another issue is

3    if it's not, what is the plausible proposal for a permanent

4    removal of the barrier.  And Mr. Stamatelatos seems to be

5    suggesting that it's not even possible to put in a ramp because

6    it's too close to the sidewalk or the street, whatever it is.

7    So, that's another issue.  And then the costs and other factors

8    associated with whether it's readily achievable will have to be

9    things that are resolved either from a jury or before me or as

10   part of a summary judgment motion.  But, Mr. Stamatelatos, you

11   are not really talking about summary judgment on anything other

12   than standing, right?

13        MR. STAMATELATOS:  Readily achievable as well, your

14   Honor.

15        THE COURT:  OK.

16        MR. STAMATELATOS:  Basically the plaintiff's expert

17   report, your Honor, doesn't have any specifics, doesn't have

18   the costs involved which would rectify any of the barriers.

19   So, I feel that the defendant does have a chance even on the

20   readily achievable standard on a summary judgment motion.

21        THE COURT:  You are basically saying that the

22   plaintiffs have not met their burden of establishing readily

23   achievable corrections of the barrier, right, because their

24   expert report doesn't explain what could be done, what it would

25   cost, what it would entail.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17P7KREC

```
 1          MR. STAMATELATOS:  That's correct, your Honor.

 2          THE COURT:  All right.  And standing you cite a Judge

 3   Duffy case in decent in the Ninth Circuit, but that doesn't get

 4   us too far.  And then you have a Tenth Circuit case that you

 5   also referenced, which I think has been clearly distinguished,

 6   and frankly it's criticized by the Second Circuit.

 7          So, I think the standing issue is a long shot.  I

 8   think the issue as to readily achievable is something that's

 9   generally going to be left to a fact finder, and the only way

10   it would be appropriate for summary judgment is if there is no

11   way that a reasonable fact finder, a reasonable jury, could

12   conclude in the plaintiff's favor.  I don't know enough about

13   the state of the record at this point, but that would be

14   unusual certainly.

15          All right.  When do you want to make your motion?  Or

16   is there any point?  I mean, look, I think there is going to be

17   a trial here; I think this is where this is headed.  It might

18   be a lot easier to just get there and make your arguments which

19   might be very good defenses frankly.  I mean I thought this

20   case was very close to settling and then for whatever reason it

21   got pulled back primarily because of the public nature of a

22   settlement, right?

23          MR. STAMATELATOS:  That's correct, your Honor.

24          THE COURT:  So, I never quite understood that one.

25   But in any event it seems to me that I certainly don't tell you
```

17P7KREC

1    you can't make a motion, but I'm not sure that we should

2    schedule the motion and then only after that do I set a trial

3    date.  I think we ought to just put this down for a trial, and

4    I will resolve the motion before trial, but I think it's not

5    likely to resolve the whole case.

6              So, Mr. Shore, anything you want to say?

7              MR. SHORE:  No, your Honor.

8              THE COURT:  I mean are you prepared to try this case?

9              MR. SHORE:  Yes.

10             THE COURT:  And I mean what is your response to what

11   Mr. Stamatelatos has to say about the fact that your expert

12   hasn't really provided too much in the way of details?

13             MR. SHORE:  Well, your Honor, plaintiff's expert has

14   provided --

15             THE COURT:  But he hasn't even visited the location,

16   right?

17             MR. SHORE:  The plaintiff's expert visited the

18   location on June 15, conducted an inspection and then provided

19   an expert report approximately two weeks later.  The expert

20   report does contain certain procedures or things that the

21   defendants can do to make the facility accessible in accordance

22   with the ADA.  There is a remediation plan.

23             THE COURT:  So, what does he propose?  I haven't seen

24   the report.  What is he saying?

25             MR. SHORE:  The plaintiff's expert report states that

17P7KREC

1    there should be a permanent ramp as well as accessible

2    restroom.  Currently there is no accessible restroom.  Although

3    plaintiff's expert report doesn't include costs or specific

4    estimates in its expert report, I don't think that's necessary

5    given the case law.

6             And, in addition, the defendant's expert report does

7    contain cost estimates for modifying the restroom to make it

8    accessible.  The defendant's expert stated it would cost

9    approximately $13,000 to make the restroom accessible, which

10   certainly given the defendant's tax returns they have the money

11   to do it, and it should be done.

12            In addition, plaintiff's expert --

13            THE COURT:  How is a jury to determine whether

14   something is readily achievable if they don't have any idea how

15   much it's going to cost?  Cost isn't a relevant factor?

16            MR. SHORE:  The defendant's expert report states that

17   to make the bathroom fully accessible would cost 13,000.

18            THE COURT:  No, I am talking about the ramp.  Your

19   expert doesn't articulate or explain how much it's going to

20   cost.

21            MR. SHORE:  Correct.

22            THE COURT:  You concede that, right?

23            MR. SHORE:  Yes.

24            THE COURT:  So, I mean how is a jury going to conclude

25   that it's readily achievable, that this remediation that you

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    propose is readily achievable, when they are not going to know

2    how much it costs?

3            MR. SHORE:  Well, the ramp would only have to be a

4    small ram.  The cost obviously would not be a lot of money.

5            THE COURT:  Well, how do I know that it wouldn't be a

6    lot of money?  I mean how is a jury going to know it wouldn't

7    be a lot of money?  How are they going to be able to assess

8    what you think is not a lot of money is in fact a lot of money?

9            MR. SHORE:  Through the expert testimony when the

10   experts testify.

11           THE COURT:  But it's not going to be in the expert

12   report.  So, if it's not in the expert report, I'm nevertheless

13   going to let your expert get on the stand and start opining

14   about things that he didn't include in his expert report?

15           MR. SHORE:  Well, if during the bench trial the court

16   were to conclude that the permanent ramp couldn't be placed in

17   because there is no cost estimate, under the readily achievable

18   standard there is a portable ramp.  The plaintiff can get

19   into -- may possibly be able to enter the facility through the

20   portable ramp and the buzzer that has been installed.  And

21   since there is cost estimates in the defendant's expert report

22   regarding the restroom, then your Honor could decide that the

23   restroom could be made accessible to provide access to my

24   client.

25           THE COURT:  All right.  This is a bench trial?

17P7KREC

1           MR. SHORE:  Yes, it's a bench trial.

2           THE COURT:  But I mean how am I going to -- on the

3      cause of action relating to the ramp getting into the

4      restaurant, you are arguing that a permanent ramp is readily

5      achievable, but you haven't introduced or you are not prepared

6      to introduce evidence as to how much that is going to cost,

7      correct?

8           MR. SHORE:  Unless the plaintiff is able to amend the

9      expert report, no, there is no cost estimates regarding the

10     permanent ramp.

11          THE COURT:  Well, why not?  I mean why was that not a

12     foreseeable and obvious question for fact finder?

13          MR. SHORE:  I requested the expert to put cost

14     estimates in the report, however, on such short notice he

15     didn't respond, he didn't put the cost estimates.

16          THE COURT:  But why short notice?  I mean this seems

17     to have been a very simple case with very simple key issues,

18     and yet that has eluded everyone.

19          MR. SHORE:  Plaintiff isn't conceding that it's his

20     burden to establish that it's readily achievable or that it's

21     even necessary for plaintiff to include in its expert report

22     specific cost estimates.

23          THE COURT:  Wait.  You don't think that it's your

24     burden to articulate a plausible proposal for barrier removal?

25          MR. SHORE:  I think it is.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

17P7KREC

1          THE COURT:  The costs of which facially do not exceed

2     its benefits?

3          MR. SHORE:  I just don't know if it's necessary for

4     there to be exact cost estimates in the expert report.

5          THE COURT:  Well, the case law is clear -- and this is

6     the Second Circuit -- that neither the estimates nor the

7     proposal are required to be exact or detailed, but I mean here

8     we don't even have a cost proposal at all.  Right?

9          MR. SHORE:  There is no cost proposal in plaintiff's

10    expert report regarding the permanent ramp.

11         THE COURT:  So, I mean, look, I don't know, but it

12    seems to me that it's a pretty big oversight.

13         Well, let's first find out when Mr. Stamatelatos wants

14    to make the motion.

15         MR. STAMATELATOS:  I could make a motion probably in

16    about three weeks, your Honor.

17         THE COURT:  All right.  And then how long to respond,

18    Mr. Shore?

19         MR. SHORE:  Seven to ten days.

20         THE COURT:  OK.  Then reply, I give you a week?

21         MR. STAMATELATOS:  That's fine.

22         THE COURT:  I am just wondering if it makes sense to

23    schedule this for a trial at the same time.

24         And is there any benefit at taking another crack at

25    settlement since this thing was so close once before?

17P7KREC

1          MR. STAMATELATOS:  Defendants do not want to settle at

2     this stage, your Honor.

3          THE COURT:  They don't?  They'd rather going go to

4     trial?

5          MR. STAMATELATOS:  Yes, Judge.

6          THE COURT:  Let's schedule this for October 11 for a

7     trial.  I have another trial the week before that I think

8     should finish up.  If it doesn't, or it doesn't look like it, I

9     will let you know.  In the meantime then let's have the motion.

10    So, three weeks from today puts us at August 15.  And we will

11    just say ten days for you, Mr. Shore?

12         MR. SHORE:  Yes, your Honor.

13         THE COURT:  So, that's August 25.  What day of the

14    week is that?  Thursday?  All right, I will give you until

15    Friday the 26th just to keep it round.  And then September 2nd.

16    Are you around then, Mr. Stamatelatos, September 2?

17         MR. STAMATELATOS:  Yes.

18         THE COURT:  So, September 2 for the reply brief.  That

19    gives me time to look at it and then still be ready for our

20    trial on October 11.

21         All right.  What hung this up for settlement was the

22    insistence that it be a confidential settlement, is that

23    correct?  That's what it was?

24         MR. STAMATELATOS:  That's what Mr. Shore wanted.  The

25    defendant's feel was that he doesn't want to settle and then

17P7KREC

1    have a whole bunch of lawsuits by other plaintiffs seeing that

2    he admitted that there were some violations.

3              THE COURT:  I don't think he would have to admit there

4    was violations.  That wouldn't be a part of the settlement.

5    But, you know the fact of a settlement is something that will

6    be known presumably, and that would be something that might

7    have an impact on others.  Who knows.  I don't know.

8              It seems to me that there is only so many things in a

9    restaurant that could be the basis for a suit under the ADA,

10   and, you know, if those are repaired, then I think that

11   resolves the problem, but I don't know.  But your client sounds

12   like they have moved past that, that they don't want to settle

13   now at all.  Right?

14             MR. STAMATELATOS:  That's what it seems, your Honor.

15             THE COURT:  I am not sure what accounts for that, or

16   it's just that the litigation has become --

17             MR. STAMATELATOS:  Actually I spoke to my client

18   actually after the depositions when I think me and Mr. Shore

19   briefly spoke about a possible settlement again.  My client

20   said they are were not prepared to settle.  I haven't spoken to

21   them since, your Honor.

22             THE COURT:  Well, I just don't know if it's worth

23   taking a crack at this before you spend a lot of time writing

24   motions and preparing for trial, and I spend a lot of time

25   resolving motions and preparing for trial.  So, that's the

17P7KREC

1    thought.  I don't know if you want to do that or if you want to

2    --

3            MR. STAMATELATOS:  If your Honor thinks that it might

4    serve a purpose, I have no problem setting it down for a

5    settlement.

6            THE COURT:  Well, it's just an odd reason for a case

7    not to settle, it seems to me.  But, Mr. Shore, it was your

8    client who was insisting on the confidential treatment of this?

9            MR. SHORE:  Your Honor, it wasn't so much the

10   confidentiality; it was the defendant's insistence that the

11   on-the-record admission by plaintiff that it's not really

12   achievable to make certain modifications that the defendant did

13   not want to make, and at that stage of litigation there wasn't

14   enough evidence or discovery  -- there was actually no

15   discovery for plaintiff to state that it wasn't readily

16   achievable for certain modifications to be made to the

17   facility.

18           THE COURT:  All right.  Well, now we have had some

19   discovery, so how does that play into a potential resolution?

20           MR. SHORE:  The plaintiff is willing to engage in

21   settlement negotiations and is certainly willing to do so.  It

22   is willing to discuss settlement with defense counsel and his

23   clients.

24           THE COURT:  Have you told that to Mr. Stamatelatos?

25           MR. SHORE:  Yes, I have.

17P7KREC

1          THE COURT:  Mr. Stamatelatos, have you discussed that
2    with your client?
3          MR. STAMATELATOS:  The last time we discussed it, your
4    Honor, was after the deposition, which I believe was June 30.
5          THE COURT:  It sounds like, you know, feelings have
6    been running high since then, but, you know, the alternative is
7    more money and more time and a trial that's going to last how
8    long?  What do you think?  Not a week.  Do you think we will go
9    more than a week?
10         MR. STAMATELATOS:  No, Judge, not more than a few
11   days, I don't believe.
12         THE COURT:  But still it's time not running a
13   restaurant.  I mean I don't know.  It seems to me if the
14   parties disagree because one thinks there is a valid cause of
15   action and the other thinks not, that there is a valid defense,
16   then you go to trial.  But if it's just that you were close to
17   settling but couldn't because for whatever reason, other
18   factors that have nothing to do with liability, it seems to me
19   silly to get hung up on that.  But what do I know.
20         So, I think it's worth obviously conveying that to
21   your client and seeing if there is any reason why it might make
22   sense to get together.
23         The magistrate judge, who was it in this case?  Judge
24   Peck.  You met with Judge Peck?
25         MR. STAMATELATOS:  Yes, Magistrate Judge Peck, your

17P7KREC

 1  Honor.

 2           THE COURT:  So, is it worth spending another couple

 3  hours with Judge Peck?

 4           MR. STAMATELATOS:  I don't mind.  We can give it one

 5  last shot, your Honor.  No problem with that.

 6           MR. SHORE:  I am willing also.

 7           THE COURT:  All right.  Well, I'm not sure what his

 8  schedule is like, but it probably makes sense doing that before

 9  you spend a ton of time on briefs, which would be relatively

10  soon, unless you want me to delay the briefing schedule by a

11  week, but that just gets you closer to the trial.

12           What do you think, Mr. Stamatelatos?  You have the

13  opening brief, so I will defer to you.

14           MR. STAMATELATOS:  We can schedule it for one last

15  try, your Honor.

16           THE COURT:  OK.  But keep the schedule that I've just

17  set?

18           MR. STAMATELATOS:  Maybe if we can push it back a

19  week.

20           THE COURT:  All right.

21           MR. STAMATELATOS:  That will be fine.

22           THE COURT:  All right.  So, we will do that.  Why

23  don't you let me know before then if you've resolved this.  If

24  not, let me know if you haven't and you will move forward with

25  the motions.  So, if you can let me know by August 15 whether

17P7KREC

1    you have wrapped up a settlement.  If you have, then let me

2    know.  If you haven't, just then let me know by the way we are

3    going to keep this schedule and we are going to submit the

4    briefs.  OK?

5            August 22, September 2, and then September 9, with

6    trial to start on the 11th of October.  And I will issue an

7    order that gives you more information and more detail about

8    pretrial submissions.  OK.  But I will do that after I have

9    gotten your letter on August 15.  OK?

10           MR. STAMATELATOS:  Yes, your Honor.

11           THE COURT:  All right.  We will give it a shot.

12   Anything else we should cover today?

13           MR. STAMATELATOS:  No.

14           MR. SHORE:  No, your Honor.

15           THE COURT:  All right.  So, let's see where we are in

16   a few weeks time, and then if it doesn't work out then we will

17   go to trial.  Good.  OK, thank you, gentlemen.

18           MR. STAMATELATOS:  So, we will be in touch with

19   Magistrate Judge Peck.

20           THE COURT:  Yes, reach out to him right away.  I will

21   refer to him again just for a follow-up.  Good.  Thank you.

22   Have a good day.  If you need a copy of the transcript, you can

23   take that up with the court reporter.

24                              - - -

25