UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 7592 (RJS)

TODD KREISLER,

Plaintiff,

VERSUS

SECOND AVENUE DINER CORP., *et al.*,

Defendants.

OPINION AFTER BENCH TRIAL
September 10, 2012

RICHARD J. SULLIVAN, District Judge:

Plaintiff Todd Kreisler brings this action against Defendants Second Avenue Diner Corp. and J.J.N.K. Corp. pursuant to Title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a), and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296(2)(a).

Having held a bench trial in this action, the Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court finds that Plaintiff has met his burden of establishing that Defendants must construct a permanent ramp outside of the Plaza Diner, post clearer signage, and install a rear grab bar in the men's restroom, but that Plaintiff has failed to carry his burden with respect to the rest of the alleged violations. The Court also finds that Defendants must pay $1,000 in damages and are liable for attorneys' fees in an amount to be determined upon further submissions by Plaintiff.

I. PROCEDURAL HISTORY

Plaintiff commenced this action on October 4, 2010. The Complaint alleges that Defendants have violated the ADA, the NYCHRL, and the NYSHRL by operating a place of public accommodation -- namely, a diner -- that is inaccessible to individuals who use wheelchairs due to a step at the entrance, a vestibule that is difficult to maneuver, and an interior that is

inaccessible in numerous respects. Plaintiff seeks injunctive relief to remove alleged architectural barriers at Defendants' facility, as well as attorneys' fees and compensatory damages.

On October 5, 2011, the Court denied Defendants' motion for summary judgment (Doc. No. 39), and on October 11, 2011, the case proceeded to a non-jury trial. At trial, Plaintiff called four witnesses -- Todd Kreisler, Konstantinos ("Mike") Aronis, John Kalas, and Leon Geoxavier -- all of whom were cross-examined by Defendants. At the conclusion of Plaintiff's case, Defendants called two witnesses -- David Gentile and Panagis Georgopoulos -- each of whom Plaintiff cross-examined. On November 1, 2011, the parties submitted post-trial memoranda ("Post-Trial Mem.") in lieu of closing arguments.

II. FINDINGS OF FACT[1]

A. The Parties

1. Plaintiff

Plaintiff Todd Kreisler resides at 250 East 60th Street, New York, New York, which is about four blocks from the Plaza Diner (the "Diner"). (Tr. 20:18-19, 24:7-8.) He has cerebral palsy, as well as rheumatoid arthritis and asthma. He can stand, but he cannot walk. (*Id.* at 21:1-6.) Accordingly, he uses a motorized wheelchair to travel in and around his neighborhood. (*Id.* at 35:5-11).

Plaintiff first passed by the Diner in September of 2008. (*Id.* at 22:15-16.) At that time, he observed a step that was approximately seven or eight inches high and concluded that he would be unable to enter the premises. Accordingly, he made no attempt to enter the Diner. (*Id.* at 23:11-12.) In fact, Plaintiff has never entered the Diner (*id.* at 26:22-24, 27:15-16), although he passes by it three to four times a week (*id.* at 24:4-6). Since the start of this litigation, Plaintiff has noticed the addition of a buzzer outside the Diner, which presumably is designed to enable wheelchair-bound patrons to ring for assistance in entering the Diner. Nevertheless, Plaintiff has made no attempt to enter the Diner (*id.* at 28:14-24), though he indicated that he might attempt to enter were there some indication that Plaintiff might be able to access the facilities, such as a sign explicitly stating that a ramp was available (*id.* at 32:9-22).

Plaintiff frequents diners and other restaurants in his neighborhood, is interested in eating at the Diner, and likely would do so, provided it were accessible. (*Id.* at 24:9-12.) Although the Diner provides delivery service, the Court finds credible Plaintiff's assertion that he has not ordered from the Diner because he does not order from places he cannot access, and not because he is uninterested in eating at the Diner. (*Id.* at 29:25–30:4.) Plaintiff has filed other lawsuits in the past against restaurants and other places of public accommodation in his neighborhood, and has accessed or eaten at several of the restaurants that he has sued subsequent to the resolution of those lawsuits. (*Id.* at 56:12-59:3.)

2. Second Avenue Diner Corp.

Second Avenue Diner Corp., known as the Plaza Diner, is located at 1066 Second Avenue, New York, New York, at the northeast corner of Second Avenue and 56th Street.

---

[1] The following facts are taken from the evidence presented at trial, the trial transcript ("Tr."), and the stipulations of the parties. To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

Second Avenue Diner Corp. is owned by Konstantinos Aronis, and leases the premises from J.J.N.K. Corp. pursuant to a rental agreement that increases the rent each year. (*See* Pl.'s Ex. 2.) From October 2010 until September 2011, the Diner paid $15,462 per month in rent; after October 2011, the rent increased to $16,000 per month. (Tr. 164:17-24.) The Diner earns roughly $12,000 in gross sales each week. (*Id.* at 132:22-25.) In 2010, the Diner's gross sales totaled $615,799, and its net profit was $23,383. (Pl.'s Ex. 6; Tr. 134:5.)[2] Because the Diner has struggled to cover its rent, J.J.N.K. Corp. has not charged it for real estate tax increases. (Tr. 170:7-9, 171:11-18.)

### 3. J.J.N.K. Corp.

J.J.N.K. Corp. is the owner and landlord of the premises located at 1066 Second Avenue. (Tr. 148:24-25.) John and Nick Kalas, brothers, each own 50% of the stock of J.J.N.K. (*Id.* at 148:9-12.) It is organized as a holding company such that J.J.N.K. as an organization receives exactly $36,000 in income each year. (*Id.* at 177:20-21.) The rest of the corporation's income is distributed to John and Nick Kalas as managers of the property, and each earns about $100,000 to $125,000 per year. (*Id.* at 177:20-25, 185:22-23.) Neither individual is named as a party in this litigation.

### B. The Diner

#### 1. The Entrance

The Diner has one entrance that is accessible to the general public on the Second Avenue side and is approximately one to two feet from the corner of the building. (Tr. 352:1-5.) The entrance has one step, which is approximately eight inches high. (*Id.* at 308:13-14.)

Prior to the start of this litigation, the Diner possessed a small portable ramp made of wood. (*Id.* at 87:1-6.) Patrons in wheelchairs were usually pulled up the ramp in reverse; on one occasion, Aronis observed a person on a motorized wheelchair entering forward without assistance. (*Id.* at 87:12-24.) Approximately three or four individuals in wheelchairs eat at the Diner each week. (*Id.* at 83:7-13.)

Subsequent to the commencement of this litigation, J.J.N.K. Corp. bought a new ramp as a gift for the Diner. (*Id.* at 112:12-113:1.) The ramp is made of aluminum, worth roughly $300 to $500, contains anti-skid material, and does not have hand rails. (*Id.* at 113:2-9.) Defendants also installed a buzzer at the entrance of the Diner with a sign, which is printed on what appears to be a white sheet of paper, that says "Please Ring Bell for Assistance." (*Id.* at 114:10-19; Pl.'s Ex. 14, App. C at 2.) Since the initiation of this lawsuit, the buzzer has been utilized only once, but Diner employees are trained to look out for individuals who may need assistance entering the Diner. (Tr. 114:5-12.) The sign is removed for twice-weekly window cleaning, though Aronis conceded that the sign is sometimes down for longer periods of time. (*Id.* at 114:23-115:10.) The buzzer is affixed to a metal strip between the panes of glass. (*Id.* at 115:17-20.)

---

[2] At trial, Aronis testified that in 2010, the Diner made roughly $72,072 in sales. (Tr. 92:25.) However, this appears to be based on a misreading of the tax returns: Second Avenue Diner Corp's 2010 tax return reflects $615,799 in sales and $72,072 in "Total Liabilities and shareholders' equity." (Pl.'s Ex. 6.) The parties did not offer any evidence regarding the calculation of the "Total Liabilities and shareholder's equity" total; moreover, Plaintiff did not challenge Defendants' tax returns as an accurate reflection of their revenues and profits.

The sidewalk outside of the Diner along Second Avenue could accommodate a permanent ramp that complies with ADA standards. (*Id.* at 211:14-16, 215:18-23.) The cost of the ramp would vary depending on design, but would cost between $3,000 and $10,000. (*Id*. at 222:8-12.)[3]

Separate from the cost of building a ramp, Defendants' expert, Georgopoulos, testified for the first time at trial that he had learned of a directive from the New York City Department of Transportation that prohibited the construction of a permanent ramp on the corner of Second Avenue and 56th Street. (*Id.* at 310:8-21.) He stated that he found this directive three weeks prior to the trial, and acknowledged that he had not previously done *any* research as to whether a permanent ramp could be constructed. (*Id.* at 311:7-23.) Defendants concede that they have never sought a permit or other regulatory clearance for building a ramp. (*Id.*)

A ramp could also be built inside of the building, but not within the existing vestibule. (*Id.* at 214:14-19.) Neither party submitted evidence regarding the potential cost of such a project. (*Id.* at 216:5-10.)

2. The Vestibule

Upon entering the front door of the Diner, there is a vestibule in which a person must make a left turn before proceeding through another door. Both doors swing outward, and individuals who use wheelchairs generally need assistance opening the doors. (Tr. 88:10–89:4.)

The vestibule is currently five feet by four feet; however, in order to comply with the ADA, it would need to be five feet by seven feet. (*Id.* at 315:7-18.) To enlarge the vestibule, the Diner would need to remove one booth, resulting in the loss of four seats and annual sales of at least $24,000. (*Id.* at 123:10-124:9; Pl.'s ex. 15-15 to 15-18.) Rebuilding the vestibule to comply fully with the ADA also would entail a one-time construction cost of between $5,000 and $10,000. (Tr. 316:6-15.)

3. The Interior

The Diner has a seating capacity of approximately fifty, with counter seating for approximately ten on stools and the balance made up of booth tables arranged in two rows. (Tr. 124:24-25:11.) Because of the height of the counter, individuals in wheelchairs cannot use the counter seating (*id.* at 99:11-20), but can sit at the ends of booths (*id.* at 96:25-97:1-2). There are three to four tables in the Diner that individuals in wheelchairs may not use because doing so would create risks in the event of fire by blocking access to exits. (*Id.* at 97:5-7.)

The aisle between the two rows of booths is roughly thirty-two-inches wide. (*Id.* at 125:18-21.) Because the booths are fixed and cannot be narrowed due to "cap wrapping" around them, the only way to widen the aisle would be to remove a row of smaller booths that seat two people, resulting in a loss of six seats. (*Id.* at 323:19-24, 126:1-9.) In order to make the counter accessible to wheelchairs, it would have to be altered in such a way that the counter would lose three to four seats. (*Id.* at 124:10-15.)

---

[3] Defendants' expert, Panagis Georgopoulos, testified that the cost of a permanent ramp would be roughly $12,000. (*Id.* at 314:11-13.) The Court found Georgopoulos to be less credible than Plaintiff's expert, Leon Geoxavier, particularly in light of the former's rapidly changing account of his research into City regulations. However, in any event, for the reasons set forth below, the Court finds that installation of the permanent ramp would be readily achievable even if it costs $12,000.

4

The last major changes to the premises were made in 1990. (*Id.* at 192:9-11.) In recent years, the Diner has made other improvements, including replacing ceiling tiles (*id.* at 91:15-17), installing a drop ceiling in 2003 (*id.* at 93:23-24), replacing parts in fluorescent lights (*id.* at 91:19-21), and adding neon trim to the Diner's interior (*id.* at 121:24-25). Additionally, the Diner has purchased an air conditioning unit, re-upholstered seats, changed the external sign from neon to LED, and purchased kitchen equipment. (*Id.* 95:6-22.) The floor, entrance, and counter have all remained largely the same since at least 2003, and the general layout, seating, and restrooms have not changed since 1990. (*Id.* at 91:22-24, 121:4-11, 151:8-10.)

4. Restrooms

Although the Diner has both a men's and women's restroom, Plaintiff's expert, Leon Geoxavier, acknowledged that he only entered the men's room. (*Id.* at 225:17-21.) The men's restroom at the Diner is small, and people who use wheelchairs have sometimes been unable to access it (*Id.* at 102:5-10) because there is insufficient floor space for some individuals to maneuver with their wheelchairs. (*Id.* at 227:11-16.)

The men's room has one grab bar alongside the toilet, but does not have one behind the toilet. (Pl.'s Ex. 15-2; Tr. 106:4-5; 228:21-23.) At the time of the trial, there was no guard or insulation under the sink in the men's restroom to protect people who use wheelchairs from being burned by hot pipes. (Pl.'s Ex. 15-8; Tr. 229:1-4.)[4]

The women's room is larger than the men's room. (Tr. 101:9.) As a result, individuals who use wheelchairs are directed to use the women's room, even though it is not marked as a restroom for the disabled. (*Id.* at 102:5-20.) The women's restroom has both a rear and side grab bar around the toilet. The grab bars were installed in 1998. (Pl.'s Ex. 15-8; Tr. 102:25–103:3, 110:8-22, 319:21-24.) The side grab bar is roughly eight inches above the toilet paper dispenser. (Tr. 109:16-23.) Like the men's room, however, at the time of the trial the women's room lacked any guard or insulation under the sink. (Pl.'s Ex. 15-10.)

Because there is little unused space in the Diner, expanding one or both of the restrooms while otherwise maintaining the basic layout of the restaurant would result in the loss of one to two booths, or four to eight seats. (*Id.* at 124:16-22, 277:11-279:14.) No cost estimate was provided either for expanding the restrooms or for combining them to be a larger unisex restroom. (Tr. 234:16-18.) In any event, the latter option is precluded by the Diner's beer and wine license, which requires it to have two restrooms. (*Id.* at 127:14-18.)

Less intrusive changes to the existing restrooms could be accomplished more cheaply. Insulating sink pipes would cost approximately $500 (Tr. 320:14-18), and new grab bars would cost $500 to $1,000 (Tr. 321:1-2).

---

[4] Defendants objected at trial to Plaintiff's Exhibit 15, which contains a series of photographs, on the grounds that the individual who took the photographs was not identified, as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure. Defendants renewed their objection in their post-trial Memorandum. However, Aronis, who was called by Plaintiff but is an officer of Second Avenue Diner Corp., authenticated the photographs and stated that, although the photos are incomplete, they are largely representative of the inside of the Diner. (Tr. 105:15–109:5.) The Court considered Aronis's testimony that the photos were not fully representative. Accordingly, the Court finds that any failure by Plaintiff to provide for the provenance of the photographs is harmless.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Venue in the Southern District is proper under 28 U.S.C. § 1391(b)-(c).

### B. Title III of the ADA

#### 1. Standing

Although the Court has already determined that Plaintiff has standing to sue with respect to the front step and vestibule (*see* Doc. No. 39), Defendants persist in asserting that Plaintiff lacks standing to bring this action because he never entered or attempted to enter the Diner prior to trial. Nothing presented at trial undermines the conclusions set forth in the Court's Order dated October 5, 2011.

Specifically, as noted above, the Court credits Plaintiff's testimony that he would visit the Diner if he were able to access it but has not attempted to do so because of the high step and lack of any indication that he would be able to enter. This is sufficient to establish standing to sue under the ADA. *See Access 4 All, Inc. v. G & T Consulting Co., LLC*, No. 06 Civ. 13736 (DF), 2008 WL 851918, at *4 (S.D.N.Y. Mar. 8, 2008) (holding that ADA plaintiffs "must at least prove actual knowledge of the barriers and show that they would visit the building in the imminent future but for those barriers"); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) (holding that "awareness of discriminatory conditions, and the avoidance of a public accommodation because of that awareness, is injury in fact," regardless of whether a wheelchair user actually entered the defendant's premises); *Small v. Gen. Nutrition Cos.*, 388 F. Supp. 2d 83, 88-89 (S.D.N.Y. 2005) (holding that allegations of awareness of a barrier and resulting deterrence are sufficient to establish standing without a plaintiff undertaking a "futile gesture" of attempting to enter) (citing 42 U.S.C. § 12188(a)(1)). Accordingly, the Court reaffirms its October 5, 2011 ruling that Plaintiff has established standing to sue with respect to the entry barriers at the Diner.

With respect to the interior violations -- including the height of the counter, width of the aisles, and size and features of the restrooms -- Defendants argue that Plaintiff lacks standing to challenge the conditions inside the Diner because he has never entered or attempted to enter the premises. However, as the Court stated in its October 5, 2011 Order, it finds persuasive the rulings in the Eighth and Ninth Circuits that, once a plaintiff has established that he has standing to sue with respect to one barrier, he can sue with respect to all barriers on the premises affecting his disabilities. *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008) ("An ADA plaintiff who has Article III standing as a result of at least one barrier at a place of public accommodation may, in one suit, permissibly challenge all barriers in that public accommodation that are related to his or her specific disability."); *Steger v. Franco*, 228 F.3d 889, 894 (8th Cir. 2000) (holding that a blind plaintiff who encountered one barrier had standing to sue regarding all barriers to blind patrons -- even those not encountered by him personally -- since requiring that a plaintiff encountered all barriers would result in "piecemeal compliance [with the ADA]"); *see also Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d at 174 (agreeing with *Steger* that "it would be absurd to require 70 different plaintiffs to bring 70 different lawsuits" for each noncompliant room in an arena even

6

where the plaintiff only actually encountered one room).

Plaintiff's testimony at trial does not alter this conclusion. At trial, Plaintiff stated that he had input into the Complaint, but that he was "not familiar" with the interior violations because he could not get into the Diner to see them. (Tr. 44:2-5, 16-23.) Plaintiff's testimony that he personally encountered the barrier to entry and was made aware of the interior barriers is sufficient, even though Plaintiff would not have been able to testify as to the specifics of the interior barriers. Thus, none of the evidence at trial undermines the Court's conclusion that Plaintiff has standing to sue for all violations alleged in the Complaint.

2. Violation of the ADA

To claim a violation of Title III of the ADA, a plaintiff must establish: "(1) [that] he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008) (citation omitted). The parties do not dispute that, under the ADA, Plaintiff is disabled. (Tr. 5:8-10.) Nor do they dispute that the Diner is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(B). The sole issue, therefore, is whether Defendants discriminated against Plaintiff within the meaning of the ADA.

Under the ADA, disability discrimination includes "failure to remove architectural barriers . . . where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). The Department of Justice promulgates the ADA Standards for Accessible Design, hereinafter cited to as the ADAAG. 28 C.F.R. § 36 App. D.[5] Although only new construction and altered portions of existing facilities must comply with the standards, *see id.* § 36.406(a), the ADAAG nonetheless "provide[s] valuable guidance for determining whether an existing facility contains architectural barriers." *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999); *see also Brown v. Cnty. of Nassau*, 736 F. Supp. 2d 602, 616-17 (E.D.N.Y. 2010) ("In other words, a plaintiff certainly cannot claim that an existing facility's non-compliance with the ADAAG standards, by itself, constitutes a prima facie violation of the ADA. . . . However . . . [the ADAAG standards] can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities.").

Here, there is no question that Plaintiff encountered architectural barriers that rendered the facility inaccessible. The only question is whether removal of those barriers is "readily achievable." Under the ADA, "'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). Factors to be considered when determining if a modification is readily achievable include: (1) the nature and costs of needed changes; (2) the financial resources of the facility, number of employees, effect on expenses and resources, and other impact on the facility; (3) the financial resources and size of the defendant; and (4) the type of operations at the facility and relationship between the facility and the defendant. *Id.*

---

[5] In 2010, the Department of Justice promulgated new guidelines, which became effective on March 15, 2012. 28 C.F.R. § 36; AG Order No. 3181-2010. However, since all of the events in this litigation took place prior to the effective date of the 2010 guidelines, the Court will apply the 1991 guidelines.

7

In order to make a prima facie showing that removal is readily achievable, a plaintiff must "articulate a plausible proposal for barrier removal, 'the costs of which, facially, do not clearly exceed its benefits.'" *Roberts*, 542 F.3d at 373 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed the benefits." *Roberts*, 542 F.3d at 373. Requiring great detail "asks too much of the typical plaintiff, particularly where defendants can so quickly dispose of non-meritorious claims by reference to their knowledge and information regarding their own facilities." *Id.* at n.6. Once the plaintiff meets its burden, the burden shifts to the defendant to "establish[] that the costs of a plaintiff's proposal would in fact exceed the benefits." *Id.* at 373. Either party may include "both monetary and non-monetary considerations." *Id.*

Nevertheless, even the minimal burden of *Roberts* requires that a plaintiff must provide at least *some* estimate of costs. *See id.* at 377-78 (finding plaintiffs' burden was met when they "proffer[ed] plans -- proposed themselves or with the aid of the independent architect -- that would permit facially cost-effective wheelchair access"); *see also Young v. Kali Hospitality, LTD*, No. 2:07-CV-395, 2010 WL 3037017, at *8 (S.D. Ohio Aug. 2, 2010) ("Under even the test from the Second Circuit, however, a Title III plaintiff needs to provide some cost estimate and a proposal for barrier removal.").

Where all changes needed for full compliance are not readily achievable, "a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specified requirements," such as building a ramp with a steeper slope than the ADAAG would ordinarily permit. 28 C.F.R. § 36.304(d)(3). Additionally, the ADA's implementing regulations set forth clear priorities for making facilities accessible: first, the entrance should be made accessible; second, the areas where goods and services are made available to the public should be made accessible; third, restrooms should be made accessible; fourth, any other measures necessary should be taken. *Id.* § 36.304(c). The Court will consider, in turn, whether the modifications Plaintiff has proposed to each of these areas are readily achievable.

a. Step at the Entrance

Defendants do not seriously dispute that the eight-inch step into the entrance of the Diner constitutes an "architectural barrier" under the ADA. Although Defendants have a portable ramp available, a portable ramp is permitted only "when installation of a permanent ramp is not readily achievable." 28 C.F.R. § 36.304(e). Accordingly, even if individuals who use wheelchairs are currently able to enter the Diner, the Court still must assess whether installation of a permanent ramp is readily achievable. The determination has two parts: first, whether Defendants can afford to build a ramp, and secondly, whether New York City regulations permit a permanent ramp's construction.

(i) Readily Achievable Based on Cost

The Court finds that Plaintiff has established that building a ramp along the front of the Diner is readily achievable; however, the Court finds that constructing a ramp inside the vestibule is not readily achievable.

Defendants' expert testified that a ramp along the front of the Diner would cost $12,000, while Plaintiff's expert testified that it would cost between $5,000 and $10,000. Neither expert included a specific cost estimate in his report. Even accepting Defendants' higher estimate, however, the Court finds that construction of a permanent ramp outside the Diner would be readily affordable based on the Diner's annual profits of roughly $23,383. (Tr. 134:5). This is particularly true in light of federal tax benefits available to small businesses that undertake modifications designed to make their premises more accessible to persons with disabilities. Businesses with less than $1,000,000 in total annual revenue or with thirty or fewer full-time employees can receive a tax credit for 50% of eligible access expenditures in a year over $250 and up to $10,250, with a maximum credit of $5,000. 26 U.S.C. § 44. Alternatively, or above the first $10,250, a business may deduct expenses of barrier removal up to $15,000. *Id.* § 190; *see id.* § 44(d)(7). Accordingly, the tax benefits that would be available to Defendants for improvements in accessibility to the Diner would significantly defray the costs of those improvements. Thus, the Court finds that a ramp along the outside of the Diner is readily achievable based on cost.

However, with respect to Plaintiff's alternative proposal of building a ramp *inside* of the Diner, Plaintiff failed to provide even a general cost estimate and design proposal, resting instead on rank speculation. Accordingly, the Court finds that Plaintiff failed to set forth "a plausible proposal" for building a ramp *inside* of the Diner.

(ii) Local Laws

Defendants contend that City ordinances will not permit the construction of a permanent ramp outside of the Diner. First, Defendants argue that due to the ongoing Second Avenue subway project, no new permanent structures are being permitted. (Defs.' Post-Trial Mem. 10.). However, Defendants were unable to substantiate that assertion in any way at trial. Second, Defendants argue that City rules relating to corner clearance make building a permanent ramp impossible. (*Id.*).

Permanent structures on sidewalks are subject to approval by the New York City Department of Buildings ("NYCDOB") and Department of Transportation ("NYCDOT"). 34 Rules of the City of N.Y. § 7-04(a). As a general matter, the Building Code permits ramps in buildings built before December 6, 1969 that extend up to 44 inches from the street line, N.Y.C. Admin. Code § 27-308; moreover, the NYCDOT will grant revocable consents for wider ramps at a cost of $25 per year, 34 Rules of the City of N.Y. § 7-04(a)(23). Generally speaking, permanent structures are not permitted within ten feet of the "corner quadrant," which is the area created by extending the corner of each building to the sidewalk. *Id.* § 7-06(c)(1). However, "[w]here strict compliance with these rules shall create undue hardship," a petitioner may make a written request for a waiver, which should be granted "if in [the Commissioner's] opinion, the public health, safety and general welfare will not be endangered thereby." *Id.* § 7-06(d)(1). Such a waiver must first undergo review by the Department of City Planning. *Id.* § 7-06(d)(2).

Defendants concede that they have never attempted to obtain approval for a permanent ramp, and have provided only generalized eleventh-hour objections concerning the above-mentioned regulations. (*See, e.g.*, Defs.' Post-Trial Mem. 10 ("The New York City Department

9

of Transportation would not grant its consent for a permit on a permanent ramp. A permanent ramp on either side of the building would violate the DOT's corner clearance policy.").) While Defendants have established that it is *possible* that City authorities will not permit them to build a ramp, they have provided no explanation as to why they should be excused from trying. Indeed, a casual visual inspection of New York City's sidewalks suggests that exceptions to the City's sidewalk structure rules are granted with some frequency. Defendants thus have fallen far short of their burden to establish that a ramp is not readily achievable.

Accordingly, Defendants shall initiate the formal process for seeking permission to install a permanent ramp no later than October 10, 2012. Upon receiving such permission, Defendants shall build the permanent ramp within 90 days.

b. Vestibule

Defendants appear to agree that individuals who use wheelchairs have difficulty navigating the vestibule without assistance. (*See* Tr. 88:10–89:4.) However, Plaintiff provided no plausible proposal for reconfiguring the vestibule other than generally asserting that it *could* be reconfigured in a number of ways. (*E.g.*, *id.* at 261:20-24.)

The evidence presented at trial suggests only that reconfiguration of the vestibule to allow easier access by disabled individuals would be costly, and would result in the loss of at least four seats in the Diner. Such a loss would reduce Defendants' sales by $24,000 annually, not to mention the costs of reconfiguring the vestibule and the possible need to close the Diner for some period of time during renovations. Since these costs would almost certainly exceed the Diner's annual net profits, the Court concludes that modification of the vestibule is not "readily achievable." If alternatives to making the vestibule more accessible exist, Plaintiff has not met his burden of presenting them.

c. Interior

The parties dispute whether the changes to the interior of the Diner since 1992 -- namely, re-upholstering seats, changing lights, adding a drop ceiling, and installing an air conditioner and kitchen equipment -- qualify as "alterations" sufficient to trigger more onerous obligations to make the premises fully compliant with current ADA standards.

The ADA distinguishes between two types of changes to facilities: alterations, which trigger sweeping compliance obligations, and modifications, which in general do not. "Alterations" to facilities constructed prior to 1992 "shall provide the maximum physical accessibility feasible" even if full compliance is "virtually impossible." 28 C.F.R. § 36.402(c). An alteration is "'a change . . . that affects or could affect the usability of the building or facility or any part thereof.'" *Roberts*, 542 F.3d at 369 (quoting 28 C.F.R. § 36.402(b)). Renovation and other structural changes are likely to constitute alterations, in contrast to "[n]ormal maintenance, reroofing, painting . . . or changes to mechanical and electrical systems" that do not affect usability. *Id.* at 369-70. But "[e]ven a relatively inexpensive or localized modification" may constitute an alteration if it "fundamentally change[s] the use of a facility." *Id.* at 370. Where an alteration has been made, the path of travel to the altered area must also be accessible. *Id.* at 369 (citing 42 U.S.C. § 12182(b)(2)(A)(iv)).

10

If a plaintiff "identif[ies] a modification to a facility and . . . mak[es] a facially plausible demonstration that the modification is an alteration under the ADA," the burden shifts to the defendant "to establish that the modification is in fact not an alteration." *Id.* at 371. If the Court concludes that there has been an alteration, the plaintiff must only "identify[] some manner in which the alteration could be, or could have been, made 'readily accessible.'" *Id.* at 372 (quoting 42 U.S.C. § 12183 and 28 C.F.R. § 36.402). The burden then shifts to the defendant to "persuad[e] the factfinder that the plaintiff's proposal would be 'virtually impossible' in light of the 'nature of the facility.'" *Id.*

However, the ADA guidelines clarify that minor changes do not trigger sweeping obligations. For example, if a door handle is replaced, the new handle must be compliant, but the entire door need not be replaced. ADAAG § 4.1.6(1)(a). Thus, absent the finding of an alteration, Plaintiff bears the burden of establishing that the removal of the barriers in question are "readily achievable."

Plaintiff has not established that the changes to the interior of the Diner since 1992 constitute "alterations" within the meaning of the ADA. Indeed, the changes made within the Diner constitute precisely the kinds of minor and superficial changes that courts have repeatedly held, and that regulations indicate, do not trigger the sweeping obligations that accompany "alterations." Accordingly, the Court analyzes each of the alleged violations inside of the Diner under the "readily achievable" standard.

(i) Aisle

Plaintiff's wheelchair is approximately thirty inches wide, and the aisle in the Diner is only thirty-two inches wide. Plaintiff did not put forth specifics as to whether a thirty-two inch aisle poses an architectural barrier to him, but it may be inferred that it does.

The ADAAG provides that fixed tables must be accessible by means of an aisle at least 36-inches wide between parallel edges of tables. ADAAG § 5.3. If the Diner were built today, the aisle would clearly be non-compliant. However, because the Diner's construction predates the ADAAG, Plaintiff must establish that widening the aisle is readily achievable. This Plaintiff has failed to do. First, Plaintiff did not provide *any* estimate of the cost of widening the aisle. Additionally, Plaintiff failed to set forth any proposal for widening the aisle. As a result, the only evidence presented on this issue was Defendants' assertion that the only way to widen the aisle would be to remove three "two-top" booths, resulting in a loss of six seats in a facility that has a seating capacity of barely fifty. Such a change would constitute a dramatic architectural alteration and would result in a net annual loss of more than $22,500 in sales, eliminating the Diner's profits entirely, or even causing it to operate at a loss. On top of these losses would be the cost of construction as well as the potential need to close the Diner while the renovations are completed. Such a change is far from "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9); 28 C.F.R. § 36.304. Although J.J.N.K. earns $36,000 per year, it is a separate corporate entity from Second Avenue Diner Corp., and although J.J.N.K. is responsible for the accessibility of its premises, Plaintiff has offered no reason why it would be responsible for compensating its tenant for its lost profits.

Accordingly, Plaintiff has failed to meet his burden of establishing that widening the aisle in the Diner is readily achievable.

(ii) Counter

In addition to booths, the Diner provides counter seating, which is not accessible by individuals who use wheelchairs. The ADAAG provides:

> [w]here food or drink is served at counters exceeding 34 in (865 mm) in height for consumption by customers seated on stools or standing at the counter, a portion of the main counter which is 60 in (1525 mm) in length minimum shall be provided [at an accessible height] . . . or service shall be available at accessible tables within the same area.

ADAAG § 5.2.

The fact that the Diner has *some* counters that are inaccessible to disabled individuals does not in itself violate the ADA. Plaintiff did not establish that services provided at the counter are unavailable at other tables, which are accessible. Instead, the evidence indicated that the counter merely provides an alternative to booth seating and is in the same general area as the booth seating. Accordingly, Plaintiff has failed to establish that the existence of the counter, without more, violates the ADA.

(iii) Seating

Likewise, Plaintiff has not established that there is insufficient accessible seating in the Diner. The ADAAG states that "[w]here fixed tables . . . are provided, at least 5 percent, but not less than one, of the fixed tables (or a portion of the dining counter) shall be accessible." ADAAG § 5.1. The evidence at trial established that there are three to four tables where patrons who use wheelchairs can sit without blocking the fire exit. (Tr. 97:3-7.) Plaintiff presented no evidence suggesting that the available seating at booths is unacceptable and, moreover, has presented no plausible proposal for providing alternative seating. Accordingly, Plaintiff has not carried his burden of establishing that Defendants are obligated to modify the seating in the Diner.

(iv) Signage

The Diner does not have any signs containing the universal symbol of accessibility for handicapped people as suggested by the ADAAG. However, the Court finds that such signage would be inappropriate in any event, since the facilities within the Diner are not, and will not be, fully compliant with the ADAAG. Nonetheless, the Court finds that the current signage at the entrance of the Diner does not provide sufficient information to disabled patrons, particularly since the evidence at trial established that the sign is frequently removed for long periods of time. Clearly, posting clearer instructions to disabled patrons is readily achievable. Accordingly, while the portable ramp is in use Defendants shall post an updated sign informing potential patrons that the ramp is available for those requiring wheelchair access and instructing them to use the buzzer for assistance. When a permanent ramp is installed, the sign shall inform patrons that assistance with the doors is available. Defendants shall post the sign permanently and prominently in the window.

d. Restrooms

The parties do not appear to dispute that the size of the restrooms presents difficulty for Diner patrons who use wheelchairs. Although Plaintiff provided no cost estimate of his own for needed changes to the restroom, he seemingly adopts Defendants' expert report, which states that making the

restroom fully accessible in compliance with the ADAAG would cost $13,000. (Pl.'s Mem. 10.) However, even Defendants' estimate fails to account for the loss of four to eight seats that would be necessary to bring the restrooms into compliance, which would result in at least $20,000 of lost revenue per year. (*See* Tr. 294:23-297:21.) Accordingly, the Court finds that Plaintiff has not articulated a plausible proposal for enlarging the restrooms. Moreover, any proposals hinted at are not readily achievable.

At the same time, the fact that wholesale alterations to the restrooms are not readily achievable does not excuse Defendants from taking smaller steps to make the restrooms more usable for disabled patrons. For example, the ADAAG requires both back and side grab bars around toilets. *See* ADAAG § 4.16.4, Fig. 29. While the women's restroom has both grab bars, the men's room lacks a rear grab bar. Indeed, although the Court finds that the 1998 installation of grab bars did not constitute an "alteration" triggering sweeping obligations to make the Diner fully accessible, once Defendants opted to install grab bars, they were obligated to do so in a manner consistent with the ADAAG. *See Greer v. Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 756-57 (N.D. Tex. 2010). Clearly, based upon their net annual profit of over $23,000, Defendants are able to pay the estimated cost of $500 to $1,000 to install the grab bars. Accordingly, Defendants shall install a rear grab bar in the men's restroom.

For the same reasons, the Court also finds that insulating the pipes below the sink, which would cost roughly $500, is readily achievable.[6]

With respect to other alleged deficiencies, Plaintiff has once again failed to meet his burden of proof. For example, although Plaintiff's expert witness testified that the soap dispenser is "too high," he did not introduce any evidence to establish how high it is, or how its placement affects individuals who use wheelchairs. (Tr. 241:1-7.) Moreover, merely establishing that the dispenser does not comply with the ADAAG does not, absent a showing that the facility has been altered, prove a violation under the lowered standard applicable to existing facilities. Similarly, Plaintiff's expert's general assertion that the mirror is "not at the proper minimum and maximum height" (*id.* 228:24-25) is insufficient to establish a violation. Accordingly, the Court finds that Plaintiff has failed to establish that the placement of the soap dispenser and mirror constitute architectural barriers under the ADA.

Plaintiff suggests in his post-trial memorandum, for the first time, that the women's room door could be made to swing outward. (Pl.'s Mem. 10-11.) However, because Plaintiff failed to introduce evidence of this at trial, and Defendants had no opportunity at trial to address whether this proposal would be readily achievable, the Court will not consider it here.

In sum, then, Plaintiff has established that Defendants are obligated to install a rear grab bar in the men's restroom and insulation for the pipes below the sink in both restrooms. However, Plaintiff has

---

[6] Defendants represented in their post-trial briefing that, subsequent to the initiation of this action, they covered the lavatory pipes and replaced fixed soap dispensers with bottled soap. (Defs.' Mem. 20.) The Court makes no finding of fact as to whether such improvements were in fact made or whether they were done in a manner consistent with the ADAAG. The Court simply finds that Defendants are obligated to insulate the pipes in the restroom so that persons in wheelchairs will not be scalded or otherwise injured by coming in contact with exposed pipes.

failed to establish that Defendants must remedy any of the other alleged violations in the restrooms.

### C. State Law Claims

#### 1. New York State Human Rights Law

The NYSHRL makes it unlawful for the owner or operator of a place of public accommodation, "directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof" on the grounds of disability. N.Y. Exec. Law § 296(2)(a) (McKinney 2010). Specifically, discrimination in violation of § 296(2)(a) includes:

> (iii) a refusal to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable; and
>
> (iv) where such person can demonstrate that the removal of a barrier under subparagraph (iii) of this paragraph is not readily achievable, a failure to make such facilities, privileges, advantages or accommodations available through alternative methods if such methods are readily achievable.

*Id.* § 296(2)(c). In order to conclude that a modification is "readily achievable" under the NYSHRL, the Court must analyze (1) the nature and cost of the needed action, (2) the overall financial and other resources and size of the facility, and (3) the type of operation. *Id.* § 296(2)(d)(i).

The relevant portions of the NYSHRL are interpreted to be similar to those of the ADA. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008); *Stephens v. Shuttle Assocs., LLC*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008).[7] Accordingly, for the reasons set forth above, the Court finds that Plaintiff established violations of the NYSHRL with respect to the ramp, signage, grab bars in the men's room, and pipe insulation in both restrooms, but not with respect to Plaintiff's remaining claims.

#### 2. New York City Human Rights Law

Under the NYCHRL, an owner, lessee, or operator of any place of public accommodation may not, "because of the actual or perceived . . . disability . . . of any person, directly or indirectly, . . . refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." N.Y.C. Admin. Code § 8-107(4)(a).

Section 107(15) adds that "any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Id.* § 107(15)(a). In the definitional portion of the NYCHRL, the statute explains that "'reasonable accommodation' means such accommodation that can be made that shall not cause undue hardship in the conduct of the covered entity's business. *The covered entity shall have the burden of proving undue hardship.*" *Id.* § 8-102(18) (emphasis added). Factors to be considered in establishing an undue burden include the cost of the accommodation, the facility's

---

[7] The court in *Stephens* noted that the NYSHRL and NYCHRL apply a broader definition of "disability" than does the ADA. *Stephens*, 547 F. Supp. 2d at 278 n.3. However, the parties do not dispute that Plaintiff is disabled within the meaning of the ADA, so this distinction between the federal law and its state and local analogs is of no moment here.

14

size and resources, and the type of operations at the facility. *Id.*

Although the ADA and the NYCHRL contain similar language about disability discrimination, the Second Circuit recently cautioned that the two are not coextensive. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278-79 (2d Cir. 2009). Pursuant to the Local Civil Rights Restoration Act of 2005, the NYCHRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Local L. No. 85 § 7 (2005). Accordingly, courts should view "similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall." *Id.* § 1. As the Appellate Division, First Department, noted:

> As a result of [the Restoration Act], the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart State or federal civil rights laws.

*Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009). Recognizing that many questions remain as to how the NYCHRL should be construed, the Second Circuit "[left] it to the district court to interpret any specific, applicable provisions in the first instance." *Loeffler*, 582 F.3d at 278-79.

The parties have provided no briefing as to why the standard under the NYCHRL should be different from that applied under the ADA for purposes of this action, and the Court is aware of no facts that would justify any different result under the NYCHRL. Accordingly, for the reasons set forth above, the Court finds that Plaintiff has established violations of the NYCHRL with respect to the front step, signage, men's room grab bars, and restroom pipe insulation, but not with respect to Plaintiff's remaining claims.

3. Damages

Both the NYSHRL and the NYCHRL provide for compensatory damages for anyone aggrieved by discriminatory conduct. The New York Court of Appeals has held that, in determining damages under the state human rights law, "[b]eyond the fact of mental anguish caused by discriminatory conduct, there must be some evidence of the magnitude of the injury, to assure that the Commissioner's damage award is neither punitive nor arbitrary." *In re N.Y.C. Transit Auth. v. State Div. of Human Rights*, 577 N.E.2d 40, 45 (N.Y. 1991).

The New York City Human Rights Commission has deemed awards of $1,000 to be sufficient in cases where complainants did not establish any particular damage "other than what a decent and reasonable individual would suffer when faced with such ignorant behavior." *Okoumou v. Cnty. Recovery Corp.*, 2009 WL 6910263, at *2 (N.Y.C.Com.Hum.Rts. June 1, 2009); *see also Gardner v. I.J.K. Serv. Inc.*, 2009 WL 6929883 (N.Y.C.Com.Hum.Rts. Feb. 19, 2009) (similar). Likewise, the Commission has awarded damages of under $5,000 where the complainant was expressly told

that the business did not wish to serve individuals with disabilities. *Peters v. Cunningham's Florist*, 1993 WL 856502 (N.Y.C.Com.Hum.Rts. Aug. 31, 1993) (awarding $5,000 where florist told complainant that wheelchairs were not allowed in the store); *Zgardowski v. Caprice*, 1990 WL 712650 (N.Y.C.Com.Hum.Rts. Oct. 1, 1990) (awarding $2,500 where store owner told complainant, who used a wheelchair, to "[g]et those things out of here"); *Figueroa v. New Yu Lung Corp.*, 1980 WL 140988 (N.Y.C.Com.Hum.Rts. Dec. 5, 1980) (awarding $1,200 where restaurant manager refused to serve complainant because he used a wheelchair and said disabilities made patrons uncomfortable). Although Plaintiff has undoubtedly been harmed by Defendants' failure to provide a reasonably accessible facility, his harm falls far short of the type of humiliating conduct alleged in those cases.

More substantial damages have typically only been warranted in extreme circumstances or where the defendant refused to remove architectural barriers from the complainant's home. *See, e.g.*, *Romo v. ISS Action Sec.*, 2011 WL 7809919 (N.Y.C.Com.Hum.Rts. June 26, 2011) (awarding $360 in compensatory damages and $20,000 for mental anguish where security guard demanded that complainant describe his disability and then insulted and refused to help him because he was HIV-positive); *De La Rosa v. Manhattan & Bronx Surface Transit Operating Auth.*, 2005 WL 5632050 (N.Y.C.Com.Hum.Rts. Mar. 2005) (awarding damages of $10,000 to one plaintiff and $12,000 to another where bus driver demeaned disabled couple and refused to assist them in getting off of the bus, resulting in the couple being trapped on the bus for three hours and dropped off miles from their intended location); *Comm'n on Human Rights ex rel. Raymond v. 325 Coop., Inc.*, 1999 WL 156021 (N.Y.C.Com.Hum.Rts. Jan. 12, 1999) (awarding $10,000 damages where cooperative housing refused for several years to build ramp for occupant); *Torres v. Prince Mgmt. Corp.*, 1997 WL 1129224 (N.Y.C.Com.Hum.Rts. Aug. 14, 1997) (similar).

Plaintiff has requested $1,000 in damages. (Compl. ¶ 24.) Although Plaintiff has not established any particular damages other than that he feels discriminated against because he is unable to access the Diner, the Court finds that such harm warrants compensation. Still, Defendants' conduct here, which might be best characterized as merely negligent rather than malicious, falls far short of the typical case for which state authorities have awarded substantial damages. Accordingly, the Court awards $1,000 in damages to Plaintiff, for which Defendants shall be jointly and severally liable.

IV. ATTORNEYS' FEES

Both the ADA and the NYCHRL allow a prevailing party in an action to recover reasonable attorneys' fees, including litigation expenses and costs. 42 U.S.C. § 12205; N.Y.C. Admin. Code § 8-502(f). Accordingly, Plaintiff shall submit documentation of attorneys' fees and costs incurred, and Defendants shall be jointly and severally liable for paying those costs and fees. However, because Plaintiff failed to carry his burden on a number of claims, the Court is likely to reduce any award of attorneys' fees in light of this mixed verdict.

V. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has met his burden with respect to the step outside of the Diner, the lack of proper signage, the absence of a rear

grab bar in the men's restroom, and the lack of insulation over the restroom pipes. Judgment is thus entered in favor of Plaintiff against Defendants, who shall be jointly and severally liable, as follows:

IT IS HEREBY ORDERED THAT Defendants shall initiate the process for obtaining a permit to build a permanent ramp along Second Avenue no later than October 10, 2012, and shall build a permanent ramp that complies with ADA standards within 90 days of the date it receives the appropriate permits.[8]

IT IS FURTHER ORDERED THAT Defendants shall install a rear grab bar in the men's restroom of the Diner no later than October 10, 2012.

IT IS FURTHER ORDERED THAT Defendants shall install insulation over the pipes under the sinks in both restrooms no later than October 10, 2012.

IT IS FURTHER ORDERED THAT Defendants shall post an updated permanent sign outside of the Diner no later than October 10, 2012.

IT IS FURTHER ORDERED THAT Defendants shall pay Plaintiff $1,000 in damages no later than October 10, 2012.

IT IS FURTHER ORDERED THAT Plaintiff shall make a submission detailing the costs and attorney's fees incurred in connection with this case no later than October 10, 2012. Defendants' opposition, if any, is due by November 10, 2012.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 10, 2012
New York, New York

\*\*\*

Plaintiff Todd Kreisler is represented by Adam T. Shore, Esq., Law Offices of Adam Shore, 100 Park Avenue, Suite 1600, New York, NY 10017, and Ben-Zion Bradley Weitz, The Weitz Law Firm, P.A., 18305 Biscayne Boulevard, Aventura, FL 33160.

Defendants Second Avenue Diner Corp. and J.J.N.K. Corp. are represented by Paul Stamatelatos, Esq., 36-19 Broadway, 2nd Floor, Astoria, NY 11106.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/11/2012

---

[8] Should City authorities refuse to grant the necessary permits and waivers to build a ramp, Defendants are free to move to amend or obtain relief from the final judgment in this case pursuant to Rules 59 or 60 of the Federal Rules of Civil Procedure.